**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SUNSHINE EASTGATE PLAZA, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-02986-O |
| | § | |
| LEXINGTON INSURANCE COMPANY, | § | |
| AXIS SURPLUS INSURANCE COMPANY, | § | |
| AND STARSTONE SPECIALTY | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| *Defendants.* | § | |

**APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF SUNSHINE EASTGATE PLAZA, LLC'S BREACH OF CONTRACT CLAIM**

Defendants AXIS Surplus Insurance Company ("AXIS") and StarStone Specialty Insurance Company ("StarStone") file this Appendix to its Motion for Summary Judgment on Plaintiff Sunshine Eastgate Plaza, LLC's breach of contract claim and respectfully shows the Court as follows:

| Exhibit | Description | Appendix Pages |
|---|---|---|
| A | AXIS Surplus Insurance Company Policy No. EAF657479-23, effective November 1, 2023 through November 1, 2024. | 1–73 |
| B | StarStone Specialty Insurance Company Policy No. U87778230CSP, effective November 1, 2023 through November 1, 2024. | 74–93 |
| C | Lexington Insurance Company Policy No. 062502712, effective November 1, 2023 through November 1, 2024. | 94–130 |
| D | J.S. Held, LLC Engineering Assessment Report, dated January 24, 2025. | 131–210 |
| E | AXIS and StarStone's Requests for Production and Interrogatories to Plaintiff, served on April 28, 2026. | 211–238 |
| F | AXIS's latest Company Overview per the National Associations of Insurance Commissioners. | 239–240 |

| | | |
|---|---|---|
| G | Examination Report of StarStone Specialty Insurance Company. | 241–266 |
| H | Examination Report of Lexington Insurance Company. | 267–279 |

Respectfully submitted,

SHACKELFORD, MCKINLEY & NORTON, LLP

By: */s/ Bruce R. Wilkin*

**Bruce R. Wilkin**
Texas Bar No. 24053549
bwilkin@shackelford.law
**Gisela A. Aguilar**
Texas Bar No. 24132153
gaguilar@shackelford.law
717 Texas Avenue, 27th Floor
Houston, Texas 77002
Phone: (832) 415-1801
Fax: (832) 565-9030

**Timothy E. Drake**
State Bar No. 00789789
tdrake@shackelford.law
9201 N. Central Expressway, Fourth Floor
Dallas, Texas 75231
Phone: (214) 780-1383
Fax: (214) 780-1401

**ATTORNEYS FOR DEFENDANTS STARSTONE SPECIALTY INSURANCE COMPANY AND AXIS SURPLUS INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system on September 8, 2026.

*/s/ Bruce R. Wilkin*
Bruce R. Wilkin

# EXHIBIT A

# Commercial Property – Claim Reporting and Claim Questions

## Options for Reporting a New Claim

- ***Telephone :*** ***AIG CallOne[sm]:*** 800-931-9546 24/7, 365 days/year
- ***Fax :*** 855-805-4125
- ***Email :*** ***Please send your email to:*** NewLoss-USproperty&energy@aig.com
- ***Mail :*** P.O. Box 25967, Shawnee Mission, KS 66225

Such notice shall include the Named Insured as shown on the Declarations, the policy number, the date of loss and a brief description of the potential claim.

## Options for Questions Regarding Existing/Previously Reported Claims

For questions regarding existing claims, contact should be made directly via phone or email with the assigned AIG Examiner. ***However, in the instance where an AIG Examiner is unknown, please use the following methods to obtain the information:***

- **Claim Service Center: 877-873-9972**
- **AIG CallOne: 800-931-9546**

# LEXINGTON INSURANCE COMPANY

**ADMINISTRATIVE OFFICES: 99 HIGH STREET, BOSTON, MA 02110**
**(hereinafter called the "Company")**

## COMMERCIAL PROPERTY POLICY
## DECLARATIONS

**Policy Number:** 062502712 **Renewal of:** 062502712

*Item 1.* **Named Insured and Address:**

CUMBERLAND PROPERTY MANAGEMENT, LLC
4686 MCDERMOTT ROAD, SUITE 201
PLANO, TX 75024

The Named Insured shall mean the First Named Insured and its affiliated and subsidiary companies and/or corporations as now exist or may hereafter be incorporated, constituted or acquired including their interests as may appear in partnerships or joint ventures which the Insured is legally obligated to insure.

*Item 2.* **Mortgageholders, Loss Payees and Additional Insureds:** Per Certificates on file with the Company or any endorsement attached to and forming a part of this **Policy.**

*Item 3.* **Policy Period:**

From: 11/01/2023 To: 11/01/2024

(At 12:01 A.M. Standard Time at the **Insured Location.**)

*Item 4.* **Coverage Territory:**

The United States, its territories and possessions and Puerto Rico, including their respective coastal waters.

*Item 5.* **Premium:**

**A. Total Premium**: $1,120,855

**B. Terrorism Premium:** $DECLINED

**C. Minimum Earned Premium**: 35.00% of Total Premium

*Item 6.* **Policy Limit:** $5,000,000 is the maximum liability in any one **Occurrence** as a result of all covered loss or damage regardless of the number of **Insured Locations**, coverages or **Covered Causes of Loss** under this **Policy.**

**Lexington's Participation** - The following applies to the **Policy Limit** and the specific Sublimits of Liability set forth in Item **6.A.** below, unless specifically changed by endorsement:

50.00% being $2,500,000 part of $5,000,000 per **Occurrence** and in the primary and the maximum amount payable by the Company. This 50.00% shall also be applicable to any Sublimit of Liability set forth in this **Policy** and the maximum amount payable by the Company with respect to any Sublimit of Liability.

The Company's participation as set forth herein under this **Policy** shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **Participating Insurer**; (2) the denial or reservation of rights with respect to any claim by any other **Participating Insurer**; (3) the cancellation, non-renewal, or other termination of any policy issued by any other **Participating Insurer**; or (4) the inability, refusal, or failure, for any reason, of any other **Participating Insurer** to fulfill its duties or obligations under any policy or program. The Company's liability is several, but not joint, under this **Policy**.

**Participating Insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this **Policy**.

**A. Sublimits of Liability:**

The Sublimits of Liability stated in this **Policy** are part of, and not in addition to the **Policy Limit** and any Sublimits of Liability shown in Item **6.A.** below. The Sublimits of Liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for a specific coverage, regardless of the number of **Insured Locations**, coverages or **Covered Causes of Loss** under this **Policy**.

The Sublimits of Liability stated in this **Policy** are per **Occurrence** unless otherwise indicated. Regardless of the number of **Occurrences**, any Annual Aggregate in this **Policy** is the maximum amount payable for all covered loss or damage for the applicable coverage or **Covered Cause of Loss**.

*If the words, NOT COVERED are shown instead of a limit, Sublimit amount, or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or **Covered Cause of Loss**, then no coverage is provided for that coverage or **Covered Cause of Loss**.*

1. **Sublimits Applicable to Specified Covered Causes of Loss** – Each of these Sublimits is part of, and not in addition to the **Policy Limit.**

   a. **Earth Movement**:

      i. $NOT COVERED: Annual Aggregate for all covered loss or damage arising out of **Earth Movement**

      ii. Subject to **A.1.a.i.** above, the Annual Aggregate for all covered loss or damage arising out of **Earth Movement** in California, Alaska, Hawaii and Puerto Rico combined: $ NOT COVERED

iii. Subject to **A.1.a.i.** above, the Annual Aggregate for all covered loss or damage arising out of **Earth Movement** in the **Pacific Northwest Earthquake Zone:** $ NOT COVERED

iv. Subject to **A.1.a.i.** above, the Annual Aggregate for all covered loss or damage arising out of **Earth Movement** in the **New Madrid Earthquake Zone:** $ NOT COVERED

v. Other Sublimit(s) Applicable to **Earth Movement**:

NOT APPLICABLE

b. **Flood**:

i. $NOT COVERED**:** Annual Aggregate for all covered loss or damage arising out of **Flood**

ii. Subject to **A.1.b.i.** above, the Annual Aggregate for all covered loss or damage arising out of **Flood** in a Special Flood Hazard Area (SFHA) as defined by the Federal Emergency Management Agency (FEMA) at the time of the loss: $NOT COVERED

If the property that sustains physical loss or damage due to **Flood** is partially in such Special Flood Hazard Area (SFHA), then the entire property shall be deemed to be in that Special Flood Hazard Area (SFHA) and the loss or damage will be subject to the Sublimit stated **A.1.b.ii.** above.

iii. Other Sublimit(s) Applicable to **Flood**:

NOT APPLICABLE

c. **Named Storm**:

i. $5,000,000 for all covered loss or damage arising out of **Named Storm**

ii. Subject to **A.1.c.i.** above, for all covered loss or damage arising out of **Named Storm** in a **Tier 1 High Hazard Wind Zone (Consisting of Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands)**: $5,000,000

iii. Subject to **A.1.c.i.** above, for all covered loss or damage arising out of **Named Storm** in a **Tier 1 High Hazard Wind Zone (Consisting of Virginia to Maine)**: $5,000,000

iv. Subject to **A.1.c.i.** above, for all covered loss or damage arising out of **Named Storm** in a **Tier 1 High Hazard Wind Zone (Florida)**: $5,000,000

v. Subject to **A.1.c.i.** above, for all covered loss or damage arising out of **Named Storm** in a **Tier 2 High Hazard Wind Zone**: $5,000,000

vi. Other Sublimit(s) Applicable to **Named Storm:**

NOT APPLICABLE

For the purpose of the above Sublimits of Liability, **Named Storm** includes, but is not limited to, loss or damage from wind, **Hail**, lightning, tornado, rain or water (whether driven by wind or not), **Flood**, or any wind driven objects or debris.

In the event covered loss or damage by **Flood** occurs concurrently or in any sequence with a **Named Storm**, the maximum amount the Company will pay per **Occurrence** for all such loss or damage by **Flood** shall be the applicable Sublimits of Liability for **Flood** as shown in Item **6.A.1.b**. above, but in no event shall the Company pay more than the maximum applicable **Named Storm** Sublimit. However, if **Flood** is not covered, the maximum amount the Company will pay per **Occurrence** for all such loss or damage arising out of **Named Storm** shall exclude loss or damage by **Flood.**

d. **Equipment Breakdown:** $ NOT COVERED for all covered loss or damage from **Equipment Breakdown**

- Other Sublimit(s) Applicable to **Equipment Breakdown**:

  NOT APPLICABLE

2. **Sublimits Applicable to Additional Time Element Coverages** - Each of these Sublimits is part of, and not in addition to the **Policy Limit** and any Sublimits applicable to Specified Covered Causes of Loss shown in Item **6.A.1** above.

| | | |
|---|---|---|
| a. | **Contingent Time Element:** | $1,000,000, except as respects **Earth Movement, Flood,** and **Named Storm,** where the Sublimit is $NOT COVERED |
| b. | **Extended Period of Indemnity:** | 180 days |
| c. | **Extra Expense:** | $2,500,000 |
| d. | **Ingress & Egress:** | 30 days, subject to a maximum Sublimit of $1,000,000 and a distance limitation of 1 mile |
| e. | **Interruption by Civil or Military Authority:** | 30 days, subject to a maximum Sublimit of $1,000,000 and a distance limitation of 1 mile |
| f. | **Rental Value:** | $500,000 |
| g. | **Royalties:** | $5,000,000 |
| h. | **Additional Sublimits:** | NOT APPLICABLE |

3. **Sublimits Applicable to Additional Coverages** - Each of these Sublimits is part of, and not in addition to the **Policy Limit** and any Sublimits applicable to Specified Covered Causes of Loss shown in Item **6.A.1.** above.

| | | |
|---|---|---|
| a. | **Accounts Receivable:** | $1,000,000 |


©American International Group, Inc.
All Rights Reserved.

| | | |
|---|---|---|
| b. | **Debris Removal**: | 25.00% of covered direct physical loss or damage payable for all Insured Property, subject to a maximum Sublimit of $1,000,000 |
| c. | **Demolition And Increased Cost of Construction**: | |
| | **Demolition Coverage A:** | $INCLUDED |
| | **Demolition Coverage B:** | $2,500,000 |
| | **Demolition Coverage C:** | $2,500,000 |
| d. | **Electronic Data and Media**: | $500,000 |
| e. | **Errors or Omissions**: | $500,000, except as respects **Earth Movement, Flood,** and **Named Storm,** where the Sublimit is $NOT COVERED |
| f. | **Expediting Expenses**: | $1,000,000 |
| g. | **Fine Arts**: | $100,000 per item subject to a maximum Sublimit of $100,000 per **Occurrence** |
| h. | **Fire Brigade Charges And Extinguishing Expenses**: | $500,000 |
| i. | **Leasehold Interest (including Leasehold Improvements & Betterments)**: | $100,000 |
| j. | **Limited Pollution Coverage**: | $250,000 Annual Aggregate |
| k. | **Miscellaneous Unnamed Locations**: | $500,000, except as respects **Earth Movement, Flood,** and **Named Storm,** where the Sublimit is $NOT COVERED |
| l. | **New Construction and Additions:** | $250,000, except as respects **Earth Movement, Flood,** and **Named Storm,** where the Sublimit is $250,000. In no event will the Company pay more than $NOT COVERED for **Soft Costs.** |
| m. | **Newly Acquired Property**: | $1,000,000, except as respects **Earth Movement, Flood,** and **Named Storm,** where the Sublimit is $1,000,000 |
| n. | **Outdoor Property**: | $500,000 |

| | | |
|---|---|---|
| o. | **Pairs or Sets:** | $1,000,000 |
| p. | **Professional Fees**: | $100,000 |
| q. | **Property Removed from Insured Locations:** | $250,000 |
| r. | **Service Interruption**: | $1,000,000 |
| s. | **Spoilage**: | $250,000 |
| t. | **Transit**: | $50,000 per conveyance subject to a maximum Sublimit of $100,000 per **Occurrence** |
| u. | **Valuable Papers and Records**: | $100,000 |
| v. | **Additional Sublimits**: | NOT APPLICABLE |

4. **Other Sublimits:** Each of these Sublimits is part of, and not in addition to the **Policy Limit** and any Sublimits applicable to Specified Covered Causes of Loss shown in Item **6.A.1** above.

| | | |
|---|---|---|
| a. | **Contractor's Equipment:** | **$**25,000 for physical loss or damage to contractor's equipment per item subject to a maximum Sublimit of **$**10,000 per **Occurrence** |
| b. | **Ordinary Payroll** | 30 days |

B. **Maximum Amount Payable**: In the event of covered loss or damage hereunder, the liability of the Company shall be limited to the least of the following:

1. The actual adjusted amount of covered loss or damage, less applicable Deductible(s);
2. As respects each **Insured Location**, 115.00% of the total combined stated values for all categories of Insured Property and Time Element coverages shown for that **Insured Location** on the latest Statement of Values or other documentation, on file with the Company prior to the time of the loss or damage; or
3. The **Policy Limit** or applicable Sublimit(s) of Liability shown in Item **6.A.** or elsewhere in this **Policy.**

***Item 7.*** **Qualifying Periods:** In accordance with the **Policy**, the following Qualifying Periods apply to these Additional Coverages:

| | | |
|---|---|---|
| A. | **Ingress & Egress**: | 48 hours |
| B. | **Interruption by Civil or Military Authority**: | 48 hours |
| C. | **Service Interruption**: | 48 hours |

***Item 8***. **Deductibles**: The Deductibles shown below apply per **Occurrence** unless otherwise stated.

**A. Policy Deductible**: $ 25,000 applicable to all covered loss or damage unless otherwise stated below or in this **Policy.**

**B. Earth Movement**:

1. $NOT COVERED for all covered loss or damage arising out of **Earth Movement** (other than as set forth in this Earth Movement Deductible section).

2. NOT COVERED% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $NOT COVERED any one **Occurrence** for all covered loss or damage arising out of **Earth Movement** in California, Hawaii, Alaska and Puerto Rico.

3. NOT COVERED% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $NOT COVERED any one **Occurrence** for all covered loss or damage arising out of **Earth Movement** in the **Pacific Northwest Earthquake Zone.**

4. NOT COVERED% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $NOT COVERED any one **Occurrence** for all covered loss or damage arising out of **Earth Movement** in the **New Madrid Earthquake Zone.**

5. Other Deductibles applicable to **Earth Movement**:

   NOT APPLICABLE

**C. Flood**:

1. $NOT COVERED for all covered loss or damage arising out of **Flood** (other than as set forth in this Flood Deductible section).

2. NOT COVERED% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $NOT COVERED any one **Occurrence** for all covered loss or damage arising out of **Flood** at any property wholly or partially within a Special Flood Hazard Area (SFHA) at the time of the loss as defined by the Federal Emergency Management Agency (FEMA).

3. Other Deductibles applicable to **Flood**:

   NOT APPLICABLE

**D. Named Storm**

1. 5.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $50,000 any one **Occurrence** for all covered loss or damage arising out of **Named Storm** (other than as set forth in this Named Storm Deductible section).

2. 5.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $50,000 any one **Occurrence** for all covered loss or damage arising out of **Named Storm** in a **Tier 1**

**High Hazard Wind Zone (Consisting of Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands).**

3. 5.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $50,000 any one **Occurrence** for all covered loss or damage arising out of **Named Storm** in a **Tier 1 High Hazard Wind Zone (Consisting of Virginia to Maine).**

4. 5.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $50,000 any one **Occurrence** for all covered loss or damage arising out of **Named Storm** in a **Tier 1 High Hazard Wind Zone (Florida).**

5. 5.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $50,000 any one **Occurrence** for all covered loss or damage arising out of **Named Storm** in a **Tier 2 High Hazard Wind Zone.**

6. Other Deductibles applicable to **Named Storm:**

   NOT APPLICABLE

**E. High Hazard Hail:**

1. 3.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $25,000 any one **Occurrence** for all covered loss or damage arising out of **Hail** in **Hail Zone 1.**

2. 3.00% of Total Insurable Values at the time of the loss at each **Insured Location** involved in the loss or damage, subject to a minimum of $25,000 any one **Occurrence** for all covered loss or damage arising out of **Hail** in **Hail Zone 2.**

3. Other Deductibles applicable to **Hail**:

   NOT APPLICABLE

**F. Equipment Breakdown:**

1. **Property Damage and Time Element Combined Deductible:**

   $NOT COVERED for all covered loss or damage from **Equipment Breakdown;** or

2. **Property Damage and Time Element Separate Deductibles:**

   a. **Property Damage:** $NOT COVERED for all covered loss or damage other than Time Element loss to **Covered Equipment** from **Equipment Breakdown** and in addition, the following Time Element Deductible:

   b. **Time Element:**

      i. $NOT COVERED for all covered Time Element loss from **Equipment Breakdown**;

      ii. NOT COVERED times the **Average Daily Value** for all covered Time Element loss from **Equipment Breakdown**; or

iii. NOT COVERED hours following the **Occurrence** for all covered Time Element loss from **Equipment Breakdown**.

3. Other Deductibles applicable to **Equipment Breakdown**:

NOT APPLICABLE

G. **Additional Deductible(s)**:

1. **All Other Windstorm or Hail**: 3% of Total Insurable Values at the time of the loss at each Insured Location involved in the loss or damage, subject to a minimum of $25,000 anyone Occurrence for all covered loss or damage arising out of Windstorm or Hail.

In each case of loss or damage covered by this **Policy**, the Company shall not be liable unless the Insured sustains covered loss or damage in a single **Occurrence** greater than any applicable Deductible described in this **Policy** and then only for the amount in excess of such Deductible.

If an amount is not shown for any Deductible, then that Deductible shall not apply. Also, if an amount is not shown with respect to a part of a Deductible, then such part shall not apply, but the rest of the Deductible shall apply. When this **Policy** covers more than one **Insured Location**, the Deductible shall apply against the total loss or damage covered by this **Policy** in any one **Occurrence**, unless otherwise stated herein.

If two or more Deductible amounts provided in this **Policy** apply to a single **Occurrence**, the total to be deducted shall not exceed the largest applicable Deductible unless otherwise stated in this **Policy**. However, if a separate Property Damage Deductible and a separate Time Element Deductible apply to loss or damage in a single **Occurrence**, the Company shall apply both Deductibles. For any coverage for which there is a waiting period or a time period before coverage commences, such period shall apply in addition to any applicable Deductible(s) set forth in this **Policy**.

For avoidance of doubt, with respect to the largest applicable Deductible, if covered loss or damage by **Flood** occurs concurrently or in any sequence with a **Named Storm**, then the Company shall apply the **Flood** Deductible set forth in Item **8.C.** or the **Named Storm** Deductible set forth in Item **8.D.**, whichever is greater.

***Item 9.*** **Assigned Adjuster:**

Adjuster Name: RYAN VESTA

Adjusting Firm: CRAWFORD

***Item 10.*** **Forms Attached:** See attached Forms Schedule

**IN WITNESS WHEREOF**, we have caused this Policy to be signed on the Declarations by our President, Secretary and our duly authorized representative.

President

Secretary

This Policy shall not be valid unless signed at the time of issuance by our authorized representative.

Authorized Representative

Countersignature (if applicable)

Date

Countersigned At

# FORMS SCHEDULE

Named Insured: CUMBERLAND PROPERTY MANAGEMENT, LLC

Policy No: 062502712 Effective Date: 11/01/2023

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| PR8370 | 09/22 | | **COMMERCIAL PROPERTY POLICY DECLARATIONS** |
| PR8371 | 01/18 | | **COMMERCIAL PROPERTY POLICY** |
| NMA2918 | 08/01 | 001 | **WAR AND TERRORISM EXCLUSION ENDORSEMENT** |
| NMA2914 | 01/01 | 002 | **ELECTRONIC DATA ENDORSEMENT A** |
| PR4259 | 07/14 | 003 | **ANTI-STACKING ENDORSEMENT** |
| PR8300 | 12/07 | 004 | **CANCELLATION - ADDITIONAL PROVISIONS** |
| LX138014 | 06/20 | 005 | **HIGH HAZARD EARTHQUAKE ZONES AMENDATORY ENDORSEMENT (NEW MADRID AND PACIFIC NORTHWEST)** |
| LX138089 | 01/23 | 006 | **HIGH HAZARD HAIL ZONES DEFINITION AMENDATORY ENDORSEMENT** |
| LX138119 | 09/22 | 007 | **EXTORTION AND RANSOMWARE EVENT EXCLUSION** |
| LX138115 | 06/22 | 008 | **(1) DIGITAL ASSETS AND (2) OPERATIONS WITH RESPECT TO DIGITAL ASSETS EXCLUSIONARY ENDORSEMENT** |
| LX138111 | 03/23 | 009 | **NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION WITH RADIOACTIVE CONTAMINATION COVERAGE ENDORSEMENT** |
| LX138138 | 03/23 | 010 | **CONFISCATION, EXPROPRIATION AND NATIONALIZATION EXCLUSION ENDORSEMENT** |
| LX138123 | 09/22 | 011 | **CANCELLATION NOTICE PERIOD AMENDATORY ENDORSEMENT (90 DAYS)** |

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

# FLOOD NOTICE

*This is a Notice only. It does not change the terms and conditions of this Policy, including the applicability of a flood exclusion to jurisdictions not referred to in this Notice.*

The following notice is required by North Carolina:

## FLOOD INSURANCE NOTICE

The North Carolina Department of Insurance has requested the North Carolina Insurance Underwriting Association, the North Carolina Joint Underwriting Association, and all property and casualty companies to advise their policyholders that this commercial property policy does not provide coverage for floods. You will not have coverage for property damage from floods unless you take steps to purchase a separate policy of flood insurance.

This Notice does not expand or increase coverage in any commercial property policy or endorsement. That policy and accompanying endorsements remain subject to all exclusions, limitations and conditions.

If you would like more information about obtaining flood insurance, please contact your insurance producer. Such insurance may be available through the Federal Emergency Management Agency (FEMA) National Flood Insurance Program.

The following notice is required by Rhode Island:

## NOTICE TO POLICYHOLDERS CONCERNING FLOOD INSURANCE

This policy does not cover damages resulting from flood. Flood insurance may be available through the Federal Emergency Management Agency (FEMA) National Flood Insurance Program. Contact your insurance producer for assistance.

The following notice is required by West Virginia:

THIS POLICY DOES NOT COVER DAMAGE FROM FLOOD. FOR INFORMATION ABOUT FLOOD INSURANCE, CONTACT THE NATIONAL FLOOD INSURANCE PROGRAM OR YOUR INSURANCE AGENT.

# Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**Lexington Insurance Company**
To get information or file a complaint with your insurance company or HMO:

**Call: AIG at 212-770-7000**
**Toll-free: 866-397-1933**
**Email: GCMS@aig.com**
**Mail: Attn: Complaints, 1271 Ave of the Americas, Floor 37**
**New York, NY 10020-1304**

**The Texas Department of Insurance**
To get help with an insurance question or file a complaint with the state:

Call with a question: 1-800-252-3439
File a complaint: www.tdi.texas.gov
Email: ConsumerProtection@tdi.texas.gov
Mail: Consumer Protection, MC: CO-CP, Texas Department of Insurance, P.O. Box 12030, Austin, TX 78711-2030

# ¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

**Lexington Insurance Company**
Para obtener información o para presentar una queja ante su compañía de seguros o HMO:

**Llame a: AIG al 212-770-7000**
**Teléfono gratuito: 866-397-1933**
**Correo electrónico: GCMS@aig.com**
**Dirección postal: Attn: Complaints, 1271 Ave of the Americas, Floor 37**
**New York, NY 10020-1304**

**El Departamento de Seguros de Texas**
Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:

Llame con sus preguntas al: 1-800-252-3439
Presente una queja en: www.tdi.texas.gov
Correo electrónico: ConsumerProtection@tdi.texas.gov
Dirección postal: Consumer Protection, MC: CO-CP, Texas Department of Insurance, P.O. Box 12030, Austin, TX 78711-2030

Lexington INSURANCE Member of AIG

# LEXINGTON INSURANCE COMPANY
# COMMERCIAL PROPERTY POLICY

## TABLE OF CONTENTS

**This Table of Contents is being provided for convenience only and shall not in any way affect the provisions to which they relate.**


SECTION I – COVERED CAUSES OF LOSS ........ 1
A. INSURING AGREEMENT ........ 1
B. PERILS EXCLUDED ........ 1
1. Concurrent Causation Exclusions ........ 1
2. Exclusions (Without Concurrent Causation Wording) ........ 3
3. Concurrent Causation if Earth Movement, Flood or Named Storm is not covered ... 4
SECTION II - INSURED PROPERTY ........ 4
A. INSURED PROPERTY ........ 4
1. Real and Personal Property ........ 4
2. Improvements and betterments ........ 4
3. Personal property of officers and employees ........ 4
4. Personal property of others in the care, custody and control of the Insured ........ 4
5. Contractor's and vendor's interest ........ 4
B. PROPERTY EXCLUDED ........ 4
1. New buildings, structures and additions ........ 4
2. Materials, equipment and supplies for new buildings ........ 4
3. Currency, money, notes, securities, stamps, furs, jewelry, etc. ........ 5
4. Land, land values, etc. ........ 5
5. Water ........ 5
6. Outdoor Property ........ 5
7. Standing timber, growing crops, or animals ........ 5
8. Vehicles licensed for highway use, watercraft, aircraft, etc. ........ 5
9. Property of Insured sold under conditional sale, etc.. ........ 5
10. Property in transit ........ 5
11. Underground mines, etc. ........ 5
12. Offshore property, etc. ........ 5
13. Satellites and spacecraft ........ 5
14. Bridges, tunnels, reservoirs and canals ........ 5
15. Bulkheads, pilings, docks, piers and wharves ........ 5
16. Transmission and distributions lines ........ 5
17. Personal property in the care, custody, and control of Insured (Insured acting as a warehouse operator, etc.) ........ 5
18. Electronic Data and Media ........ 5
19. Fine Arts ........ 5
SECTION III – VALUATION ........ 5
A. All property other than property described in B – N below ........ 5
B. Stock in process ........ 6

C. Finished Goods ..... 6
D. Raw Materials ..... 6
E. Valuable Papers and Records ..... 6
F. Electronic Data and Media ..... 6
G. Jigs and fixtures, dies, small tools, etc. ..... 6
H. Leasehold improvements and betterments ..... 6
I. Fine Arts ..... 7
J. Accounts Receivable ..... 7
K. Property for Sale ..... 7
L. Property in Transit ..... 7
M. Contractor's equipment ..... 8
N. Trees, shrubs, plants and lawns ..... 8
SECTION IV – TIME ELEMENT COVERAGE GROSS EARNINGS ..... 8
A. ACTUAL LOSS OF INCOME SUSTAINED ..... 8
B. EXPENSE TO REDUCE LOSS ..... 10
C. ADDITIONAL TIME ELEMENT COVERAGES ..... 10
1. CONTINGENT TIME ELEMENT ..... 10
2. EXTENDED PERIOD OF INDEMNITY ..... 10
3. EXTRA EXPENSE ..... 11
4. INGRESS & EGRESS ..... 11
5. INTERRUPTION BY CIVIL OR MILITARY AUTHORITY ..... 11
6. RENTAL VALUE ..... 12
7. ROYALTIES ..... 12
D. ADDITIONAL (TIME ELEMENT) EXCLUSIONS ----- 12
1. IDLE PERIODS ..... 12
2. REMOTE LOSS ..... 12
3. FINISHED GOODS ..... 12
4. TRANSIT ..... 12
5. CONTRACTOR'S OR VENDOR'S INTERESTS ..... 13
SECTION V – ADDITIONAL COVERAGES ..... 13
A. ACCOUNTS RECEIVABLE ..... 13
B. DEBRIS REMOVAL ..... 13
C. DEMOLITION AND INCREASED COST OF CONSTRUCTION ..... 13
D. ELECTRONIC DATA AND MEDIA ..... 14
E. ERRORS OR OMISSIONS ..... 14
F. EXPEDITING EXPENSES ..... 15
G. FINE ARTS ..... 15
H. FIRE BRIGADE CHARGES AND EXTINGUISING EXPENSES ..... 15
I. LEASEHOLD IMPROVEMENTS & BETTERMENTS ..... 15
J. LEASEHOLD INTEREST ..... 15
K. LIMITED POLLUTION COVERAGE ..... 16
L. MISCELLANEOUS UNNAMED LOCATIONS ..... 16
M. NEW CONSTRUCTION AND ADDITIONS ..... 16
N. NEWLY ACQUIRED PROPERTY ..... 16
O. OUTDOOR PROPERTY ..... 17
P. PAIRS OR SETS ..... 17

Q. PROFESSIONAL FEES ........ 17
R. PROPERTY REMOVED FROM INSURED LOCATIONS ........ 17
S. SERVICE INTERRUPTION ........ 17
T. SPOILAGE ........ 18
U. TRANSIT ........ 18
V. VALUABLE PAPERS AND RECORDS ........ 19

SECTION VI – CONDITIONS ........ 19
A. ABANDONMENT ........ 19
B. ADJUSTMENT OF LOSSES and FIRST NAMED INSURED ........ 19
C. APPRAISAL ........ 19
D. ASSIGNED ADJUSTER ........ 20
E. ASSIGNMENT ........ 20
F. BRANDS AND LABELS ........ 20
G. CANCELLATION ........ 20
H. CONTROL OF DAMAGED MERCHANDISE ........ 20
I. CURRENCY ........ 21
J. DIVISIBLE CONTRACT ........ 21
K. ECONOMIC AND TRADE SANCTIONS ........ 21
L. INCREASE IN HAZARD ........ 21
M. INSPECTION AND AUDIT ........ 21
N. MISREPRESENTATION AND FRAUD ........ 21
O. OTHER INSURANCE/EXCESS INSURANCE/UNDERLYING INSURANCE ........ 21
P. PROTECTION AND PRESERVATION OF PROPERTY ........ 22
Q. REINSTATEMENT OF LIMITS ........ 22
R. REQUIREMENTS IN CASE OF LOSS ........ 22
S. SALVAGE AND RECOVERIES ........ 23
T. SERVICE OF SUIT ........ 23
U. SETTLEMENT OF CLAIMS ........ 23
V. SUBMISSION OF VALUES ........ 23
W. SUBROGATION ........ 24
X. SUIT AGAINST COMPANY ........ 24
Y. SUSPENSION ........ 24
Z. TITLES OF PARAGRAPHS ........ 24
AA. VACANCY ........ 24

SECTION VII – POLICY DEFINITIONS ........ 25
A. Accident ........ 25
B. Aircraft or Vehicle Impact ........ 25
C. Average Daily Value (ADV) ........ 25
D. Cloud Computing Service ........ 25
E. Collapse ........ 25
F. Corruption, Erasure or Alteration ........ 26
G. Coverage Territory ........ 26
H. Covered Cause of Loss ........ 26
I. Covered Equipment ........ 26
J. Defined Peril ........ 26
K. Denial of Service Attack ........ 26

L. Earth Movement ........ 26
M. Earthquake Zones ........ 27
N. Electronic Data and Media ........ 27
O. Equipment Breakdown ........ 27
P. Fine Arts ........ 28
Q. Finished Goods ........ 28
R. Flood ........ 28
S. Fungus, Mold or Spore ........ 28
T. Hail ........ 28
U. High Hazard Hail Zones ........ 28
V. Insured Location(s) ........ 30
W. Leakage From Fire Protection Equipment ........ 30
X. Magnetic Damage to Electronic Data and Media ........ 31
Y. Malicious Code ........ 31
Z. Miscellaneous Unnamed Location(s) ........ 31
AA. Named Storm ........ 31
BB. Occurrence ........ 31
CC. Outdoor Property ........ 31
DD. Perishable Goods ........ 31
EE. Policy ........ 31
FF. Policy Limit ........ 31
GG. Pollutants or Contaminants ........ 32
HH. Raw Materials ........ 32
II. Riot, Strike or Civil Commotion ........ 32
JJ. Smoke ........ 32
KK. Soft Costs ........ 32
LL. Terrorism ........ 32
MM. Tier 1 High Hazard Wind Zone (Consisting of Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands) ........ 33
NN. Tier 1 High Hazard Wind Zone (Consisting of Virginia to Maine) ........ 33
OO. Tier 1 High Hazard Wind Zone (Florida) ........ 34
PP. Tier 2 High Hazard Wind Zone ........ 34
QQ. Unauthorized Access ........ 34
RR. Unauthorized Use ........ 34
SS. Valuable Papers and Records ........ 34
TT. Vandalism and Malicious Mischief ........ 35
UU. Windstorm or Hail ........ 35

# LEXINGTON INSURANCE COMPANY
## ADMINISTRATIVE OFFICES: 99 HIGH STREET, BOSTON, MA 02110
**(hereinafter called the "Company")**

## COMMERCIAL PROPERTY POLICY

Various provisions in this **Policy** restrict coverage. Read the entire **Policy** carefully to determine rights, duties and what is and is not covered.

The word "Insured" means the Named Insured shown in Item **1.** of the Policy Declarations and any person or entity qualifying as a Named Insured. The word "Company" means the Insurer providing coverage under this **Policy**. Words or phrases which appear in boldface type have special meanings as defined in the POLICY DEFINITIONS Section and elsewhere in this **Policy**.

### SECTION I – COVERED CAUSES OF LOSS

A. INSURING AGREEMENT: Subject to all of the terms and conditions of this **Policy**, the Company insures against all risks of direct physical loss or damage to Insured Property from a **Covered Cause of Loss.**

B. PERILS EXCLUDED:

1. Except as otherwise provided under the Additional Coverages and Additional Time Element Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following perils. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

   a. Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or is contributed to or aggravated by a **Covered Cause of Loss**. However:

      i. If fire and sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire and sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation or radioactive contamination; and

      ii. This exclusion shall not apply to direct physical loss or damage, not otherwise excluded, caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the **Insured Location**, provided that, at the time of such loss or damage, there is neither a nuclear reactor nor any new or used nuclear fuel on the **Insured Locations.**

   b. i. War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

      (1) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces; or

(2) By military, naval or air forces; or

(3) By an agent of any such government, power, authority or force;

ii. Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

iii. Insurrection, rebellion, revolution, civil war, usurped power, seizure, destruction or any action taken by governmental authority in hindering, combating or defending against any action described in this Subparagraph b;

Including any consequence of Subparagraphs b.i., b.ii. or b.iii. above of this exclusion.

c. Loss or damage caused directly or indirectly by **Terrorism**, whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **Terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **Terrorism.**

d. Any fraudulent or dishonest act or acts committed alone or in collusion with others: by any proprietor, partner, director, trustee, officer or employee of the Insured, or by any party to whom the property may have been entrusted (other than a carrier for hire).

However, a willful act of destruction by an employee of the Insured, or others listed above, without the knowledge of any of the Insured's proprietors, partners, directors, trustees or officers is covered.

e. Removal of asbestos material, except this exclusion does not apply to asbestos material when such material is part of Insured Property which sustains direct physical loss or damage caused by a **Defined Peril** at the **Insured Location.**

f. The actual, alleged or threatened release, discharge, escape or dispersal of **Pollutants or Contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any **Covered Cause of Loss** under this **Policy.**

However, this exclusion shall not apply to direct physical loss or damage to Insured Property from **Pollutants or Contaminants** caused by a **Defined Peril** at the **Insured Location**, including the cost to clean-up **Pollutants or Contaminants** from Insured Property at the **Insured Location**, resulting from such loss or damage. No coverage is provided for testing or monitoring for **Pollutants or Contaminants.** For the purpose of the exception to this exclusion only, **Pollutants or Contaminants** do not include radioactive contaminants.

g. Lack of:

**i.** Incoming electricity, gas, fuel, steam, water or refrigeration;

ii. **Cloud Computing Service** or data, voice or video service; or

iii. Outgoing sewerage.

h. Costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

i. Any functioning or malfunctioning or lack of:

i. The internet or similar facility; or

ii. Any intranet or private network, computer system, computer or computing device or similar facility;

However, if direct physical loss or damage to Insured Property at an **Insured Location** from a **Defined Peril** ensues, this **Policy** shall cover such ensuing loss or damage.

j. Error or omission in machine programming or instructions of **Electronic Data and Media**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this **Policy** ensues, in which event, the Company shall cover only such ensuing loss or damage.

k. Loss or damage due to any **Unauthorized Access, Unauthorized Use, Malicious Code**, **Magnetic Damage to Electronic Data and Media**, **Denial of Service Attack** or other similar peril affecting **Electronic Data and Media** or the access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this **Policy** ensues, in which event, the Company shall cover only such ensuing loss or damage.

l. **Fungus, Mold or Spore;** or any spores or toxins created or produced by or emanating from such **Fungus, Mold or Spore**.

m. **Equipment Breakdown** of: (1) vehicles, draglines or excavation or construction equipment; or (2) any equipment on the foregoing.

n. Loss or damage arising out of any **Covered Cause of Loss**, Additional Coverages or Additional Time Element Coverages for which the words NOT COVERED or for which a specified amount or number of days is not shown in the Policy Declarations.

2. The Company does not insure for loss or damage caused by any of the following:

a. Delay, loss of market or loss of use.

b. Indirect, remote or consequential loss or damage.

c. Mysterious disappearance or loss or shortage disclosed on taking inventory or any unexplained loss.

d. Voluntary parting with title or possession of any property, including voluntary parting which is the result of larceny, false pretenses or any other similar act.

e. Faulty workmanship, material, construction, installation or design from any cause. However, if direct physical loss or damage not otherwise excluded by this **Policy** ensues, this **Policy** will cover only such ensuing loss or damage.

f. Processing, fabricating, testing, packaging or other similar operations as part of manufacturing or processing of stock, materials or **Finished Goods**, including any voluntary or involuntary recall of any product for any reason; all unless direct physical loss or damage not otherwise excluded by this **Policy** ensues, in which event this **Policy** will cover only such ensuing loss or damage.

g. Deterioration; depletion; rust; corrosion; erosion; wet or dry rot; decay; evaporation; leakage; wear and tear; animal, insect or vermin damage; inherent vice or latent defect; shrinkage or change in color, flavor, texture or finish; damages from extremes or changes of temperature; damage from changes in relative humidity; all whether atmospheric or not. However, if direct physical loss or damage not otherwise excluded by this **Policy** ensues, this **Policy** will cover only such ensuing loss or damage.

h. Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors or ceilings. However, if direct physical loss or damage not otherwise excluded by this **Policy** ensues, this **Policy** will cover only such ensuing loss or damage.

i. Hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test to any type of electrical equipment. However, if direct physical loss or damage not otherwise excluded by this **Policy** ensues, this **Policy** will cover only such ensuing loss or damage.

3. If **Earth Movement**, **Flood** or **Named Storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to Insured Property caused by fire, sprinkler leakage or explosion following **Earth Movement**, **Flood** or **Named Storm**, whichever is applicable.

   Direct physical loss or damage to Insured Property caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **Earth Movement**, **Flood** or **Named Storm**, whichever is applicable, within the terms and conditions of this **Policy**.

## SECTION II – INSURED PROPERTY

A. INSURED PROPERTY: Unless otherwise excluded, this **Policy** covers the following property while on the **Insured Locations** and within 1,000 feet thereof:

1. Real property and personal property in which the Insured has an insurable interest;

2. Improvements and betterments to buildings or structures in which the Insured has an insurable interest. Such improvements and betterments shall be considered real property;

3. Personal property, other than motor vehicles, of officers and employees of the Insured;

4. Except as set forth in Subparagraph **II.B.17.**, personal property of others in the care, custody and control of the Insured, when the Insured is under obligation to insure such property for physical loss or damage of the type insured against under this **Policy**;

5. Contractor’s and vendor’s interests in property of the type covered by this **Policy** to the extent of the Insured's liability imposed by law or assumed by written contract prior to the date of direct physical loss or damage. However, such interests do not extend to any Time Element coverage provided by this **Policy**.

B. PROPERTY EXCLUDED: Except as otherwise provided under the Additional Coverages and Additional Time Element Coverages (and in such event, only to the extent provided therein), this **Policy** does not insure against loss or damage to:

1. New buildings, structures and additions under construction, including any site preparation;

2. Materials, equipment and supplies for new buildings, structures and additions;

3. Currency, money, notes, securities, stamps, furs, jewelry, precious metals, precious stones and semi-precious stones. This exclusion does not apply to precious metals and precious or semi-precious stones used by the Insured for industrial purposes;

4. Land, land values, any substance in or on land or any alteration to the land; however, this **Policy** does insure the following:

   a. Any manmade: dams, dikes, levees, aqueducts and other surface containments, if values for such structures are reported to the Company; and

   b. Fill beneath any buildings or structures;

5. Water, except water which is normally contained within any type of insured tank, piping system or other process equipment;

6. **Outdoor Property**;

7. Standing timber, growing crops or animals;

8. Vehicles licensed for highway use, watercraft, aircraft, drones, locomotives and railroad rolling stock;

9. Property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers;

10. Property in transit;

11. Underground mines, caverns or mining shafts, and any property contained therein;

12. Offshore property, including offshore rigs, platforms or similar structures, and property contained therein or thereon;

13. Satellites and spacecraft while on the launch pad, and after the time of launch;

14. Bridges, tunnels, reservoirs and canals;

15. Bulkheads, pilings, docks, piers and wharves;

16. Transmission and distribution lines of every type and description, except when located on an **Insured Location** or within one-thousand (1,000) feet thereof;

17. Personal property in the care, custody, and control of the Insured when the Insured is acting as a warehouse operator, bailee for hire or a carrier for hire;

18. **Electronic Data and Media**; and

19. **Fine Arts.**

**SECTION III – VALUATION**

Unless otherwise endorsed hereon, the property, as described below, will be valued as follows:

A. For all property other than property specifically described in Subparagraphs **B.** through **N.**, inclusive, below: Such property will be valued at the cost to repair or replace (whichever is less) at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence. The Insured may elect to rebuild on another site, however the

liability of the Company is limited to the amount of loss or damage that would otherwise be payable to rebuild at the same site. Property that is not repaired or replaced within two (2) years after the date of loss, unless such requirement is waived by Company in writing, will be valued at actual cash value at the time and place of the loss.

B. Stock in process will be valued at the cost of **Raw Materials** and labor expended plus the proper proportion of overhead charges.

C. **Finished Goods** manufactured by the Insured will be valued at the regular cash selling price at the location where the loss occurs, less all discounts and charges to which the merchandise would have been subject had no loss occurred.

D. **Raw Materials**, supplies and merchandise not manufactured by the Insured will be valued at the cost to replace such property.

E. **Valuable Papers and Records** will be valued at the cost to replace or restore the property with like kind and quality including the cost to research, gather and assemble information. If not replaced, the Company will only pay the blank value of the papers or records.

F. **Electronic Data and Media: Electronic Data** will be valued at the cost to restore such data from duplicates to the condition that existed prior to the time of the loss. If duplicate electronic data is not available, then the **Electronic Data** will be valued at the cost to research, gather and assemble the **Electronic Data** to the condition that existed prior to the time of the loss.

**Media** will be valued at the lesser of the cost to repair the **Media** or replace it with blank media of like kind and quality without deduction for depreciation and/or obsolescence.

G. Jigs and fixtures, dies, small tools and patterns will be valued at replacement cost, if replacement cost values have been reported to the Company and if actually replaced; otherwise, such items will be valued at the replacement cost minus the proper deduction for depreciation and/or obsolescence, but not to exceed the cost to repair or replace the property with materials of like kind and quality.

H. Leasehold improvements and betterments will be valued as follows:

1. If repaired or replaced at the expense of the Insured within two (2) years after the date of the loss, the cost to repair or replace the damaged improvements and betterments with materials of like kind and quality;

2. If not repaired or replaced within two (2) years after the date of the loss, a proportion of the Insured's original cost determined as follows:

    a. Multiplying the original cost by the number of days from the date of loss or damage to the expiration of the lease; and

    b. Dividing the amount determined in Subparagraph a. above by the number of days from the installation of improvements to the expiration of the lease.

    If the Insured's lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure; or

3. If others pay for repairs or replacement, then no amount shall be payable.

I. **Fine Arts** will be valued at the least of: (1) the cost to repair or replace the **Fine Arts;** (2) the appraised value had no loss or damage occurred which will be determined at the time of the loss; or (3) the agreed value on file with the Company.

J. Accounts Receivable will be valued at the amount owed the Insured which the Insured is unable to collect from customers due to the loss of the Accounts Receivable, and shall include:

1. Any collection expenses over and above the normal collection costs;

2. Interest charges on any loan to offset impaired collections pending repayment of such sums that cannot be collected; and

3. The reasonable and necessary expenses incurred by the Insured to recreate Accounts Receivable records.

Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

All amounts recovered by the Insured on Accounts Receivable for which the Insured has been paid by the Company will belong and be paid to the Company by the Insured up to the total amount of loss paid by the Company. All recoveries in excess of such amounts will belong to the Insured.

In the event it is possible to reconstruct the Insured's Accounts Receivable records after they have been physically lost or damaged, so that no shortage in collection of Accounts Receivable is sustained, the Company shall only be liable for the costs of the material and the time required to reconstruct such records, with the exercise of due diligence and dispatch, but only to the extent that such amounts are not covered by any other insurance.

K. Property for Sale: As respects any real property that was being offered for sale at the time of loss, the loss or damage to such property will be valued at the lesser of:

1. The cost to repair or replace the damaged property; or

2. The price at which the property is offered for sale less the market value of the land.

L. Property in Transit: In case of loss, the basis of adjustment shall be:

1. Property shipped to or for the account of the Insured shall be valued at the actual invoice to the Insured, together with such costs and charges as may have accrued and become legally due on such property;

2. Property which has been sold by the Insured and has been shipped to or for the account of the purchaser is valued at the amount of the Insured's selling invoice, including prepaid or advanced freight;

3. Property of others not under invoice shall be valued at the least of the Insured's legal liability for such property, the replacement cost or the actual market value at the point of destination on the date of the **Occurrence**, less any charges saved which would have become due and payable upon delivery at destination; or

4. Property of the Insured not under invoice shall be valued in accordance with the valuation provisions of this **Policy** applying at the location from which such property is being transported, less any charges saved which would have become due and payable upon delivery at such destination.

M. Contractor's equipment shall be valued at actual cash value, unless an agreed value on file with the Company applies.

N. Trees, shrubs, plants and lawns will be valued at the cost to replace the property with local nursery stock.

Unless otherwise specifically stated, the Company will compute the valuations at the time and place of the loss. All of the above shall be subject to the applicable Sublimit of Liability set forth in this **Policy**.

## SECTION IV – TIME ELEMENT COVERAGE

## GROSS EARNINGS

This **Policy** covers actual loss of income sustained by the Insured during the necessary partial or total interruption of the Insured's business operations, services or production during the Period of Interruption directly resulting from a **Covered Cause of Loss** to Insured Property at an **Insured Location.**

A. ACTUAL LOSS OF INCOME SUSTAINED: In the event the Insured is prevented from producing goods or from continuing its business operations or services and is unable:

   1. To make up lost production within a reasonable period of time (not to be limited to the period during which production is interrupted); or

   2. To continue business operations or services;

   through the use of any property or service owned or controlled by the Insured, or obtainable from other sources, whether the property or service is at an **Insured Location** or through working extra time or overtime at any other substitute location(s), including any other location(s) acquired for the purpose, then the Company shall be liable, subject to all other conditions of this **Policy** not inconsistent herewith, for the actual loss of income sustained during the Period of Interruption.

   The actual loss of income sustained shall be determined by calculating the **Gross Earnings** and subtracting all charges and expenses which do not necessarily continue during the interruption of production or suspension of business operations or services.

   For the purpose of this coverage, **Gross Earnings** means:

   1. For manufacturing operations: The net sales value of production less the cost of all raw stock, materials and supplies utilized in such production; or

   2. For mercantile or non-manufacturing operations: The total net sales (excluding any revenue derived from property held for rent), less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured;

   3. Plus all other earnings except **Rental Value** derived from the operation of the business.

   In determining net sales, in the event of loss hereunder, for mercantile or non-manufacturing operations, any amount recovered under this **Policy** for direct physical loss or damage to merchandise shall be included as though the merchandise had been sold to the Insured's regular customers and will be credited against such net sales.

   In determining the amount payable under this coverage, the Period of Interruption shall be:

The period from the time of direct physical loss or damage from a **Covered Cause of Loss** to Insured Property to the time when, with the exercise of due diligence and dispatch, either:

1. Normal operations resume; or

2. Physically damaged buildings and equipment could be repaired or replaced and made ready for operations under the same or equivalent physical and operating conditions that existed prior to such loss or damage;

whichever is less. Such period of time shall not be cut short by the expiration or earlier termination date of this **Policy**.

Such Period of Interruption includes the time necessary, with the exercise of due diligence and dispatch:

a. To restore stock in process to the same state of manufacture in which it stood at the time of the initial interruption of production or suspension of business operations or services;

b. To replace physically damaged or destroyed mercantile stock necessary to resume operations; and

c. To replace **Raw Materials** and supplies in order to continue operations.

However, the inability to procure destroyed mercantile stock or suitable **Raw Materials** and supplies to replace similar stock or materials and supplies physically damaged or destroyed shall not increase the Period of Interruption.

For property in the Course of Construction: The period of time between the anticipated date of completion and the actual date on which occupancy or commercial service can commence with respect to new buildings, structures or additions under construction with the exercise of due diligence and dispatch, but only with respect to any delay related to covered loss to such property under this **Policy**.

The Period of Interruption does not include any additional time:

1. Required for restaffing or retraining employees;

2. Due to the Insured's inability to resume operations for reasons other than those enumerated in Subparagraphs a. through c., inclusive, above; or

3. Required for making change(s) to the buildings, structures or equipment for any reason except as provided in the Demolition and Increased Cost of Construction coverage, if such coverage is provided by this **Policy**.

In determining the amount of loss payable under this coverage, due consideration shall be given to the experience of the business before the Period of Interruption and the probable experience thereafter had no loss occurred, and to the continuation of only those normal charges and expenses that would have existed had no interruption of production or suspension of business operations or services occurred. Due consideration shall also be given to any sales which are made up within a reasonable period of time, not limited to the period during which business is interrupted.

There is no coverage for any portion of the Insured's Ordinary Payroll expense unless a specified number of days for Ordinary Payroll is shown in the Policy Declarations. In such case, the Company will pay Ordinary Payroll for that number of days only. Ordinary Payroll means the

entire payroll expense for all employees of the Insured except officers, executives, department managers, employees under contract, and other essential employees.

B. EXPENSE TO REDUCE LOSS: Coverage is provided for expenses necessarily incurred by the Insured in reducing its **Gross Earnings** loss otherwise payable hereunder, but in no event shall this Company be liable for an amount greater than the **Gross Earnings** loss that otherwise would have been payable.

C. ADDITIONAL TIME ELEMENT COVERAGES

All Additional Time Element Coverages are subject to the terms and conditions of this **Policy**, including but not limited to, any conditions set forth in this TIME ELEMENT COVERAGE Section, the Sublimits of Liability corresponding to each such Additional Time Element Coverage, any other applicable Sublimits or Deductibles shown elsewhere in this **Policy**. The Sublimits corresponding to each such Additional Time Element Coverage are the maximum amount the Company will pay for all loss or damage arising out of such specified Additional Coverages. Such Sublimits are part of, and not in addition to the **Policy Limit** and the Specified Covered Causes of Loss Sublimits shown in Item **6.A.1.** of the Policy Declarations or elsewhere in this **Policy**.

1. CONTINGENT TIME ELEMENT: If direct physical loss or damage to property of the type insured under this **Policy** of a direct supplier or direct customer of the Insured is damaged by a **Covered Cause of Loss**, and such loss or damage:

   a. Wholly or partially prevents any direct supplier from supplying their goods and/or services to the Insured; or

   b. Wholly or partially prevents any direct customer from accepting the Insured's goods and/or services;

   then this **Policy** is extended to cover the actual loss of income and **Extra Expense** sustained by the Insured during the Period of Interruption with respect to such property of the supplier or customer that sustains such loss or damage. This coverage does not apply to new buildings, additions or alterations in the course of construction of any direct supplier or direct customer.

   This coverage applies to the Insured's direct suppliers or direct customers located in the **Coverage Territory**.

   Notwithstanding the foregoing, this Additional Coverage does not apply to:

   a. Any supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, **Cloud Computing Service** or data, voice or video service; or

   b. The Insured's customers, if the Insured is a supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, **Cloud Computing Service** or data, voice or video service.

2. EXTENDED PERIOD OF INDEMNITY: Coverage is provided for such additional length of time as is required to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

   a. The date on which the liability of the Company for loss or damage would otherwise terminate; or

b. The earliest date on which either normal operations resume, or repair, replacement or rebuilding of the property that has been damaged is actually completed;

but in no event for a period of time exceeding the number of days specified in the Policy Declarations starting with the later of Subparagraph a. or b. above. This Extended Period of Indemnity does not apply to any Additional Time Element Coverages.

3. EXTRA EXPENSE: This **Policy** is extended to cover the loss sustained by the Insured for **Extra Expense** during the Period of Interruption resulting from direct physical loss or damage by a **Covered Cause of Loss** to Insured Property utilized by the Insured. **Extra Expense** means reasonable and necessary:

   a. Extra expense incurred to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

   b. Extra costs of temporarily using property or facilities of the Insured or others;

   all less any value remaining at the end of the Period of Interruption for property obtained in connection with the above.

   The Insured agrees to use any suitable property or service owned or controlled by the Insured or obtainable from other sources in reducing the loss under this TIME ELEMENT COVERAGE Section of this **Policy**.

   The maximum amount that the Company will pay for all **Extra Expense** under this **Policy** is the Extra Expense Sublimit of Liability as shown in the Policy Declarations regardless of any other applicable coverages, Additional Coverages or Additional Time Element Coverages.

4. INGRESS & EGRESS: This **Policy** is extended to cover the actual loss of income and **Extra Expense** sustained during the period of time when partial or total physical ingress to or egress from the Insured's real or personal property is prohibited as a direct result of a **Covered Cause of Loss** to property of others, provided that such property of others is within the distance from the **Insured Location** as shown on the Policy Declarations under Ingress & Egress. There shall be no loss payable under this Additional Coverage unless the prohibition of ingress to or egress from real or personal property exceeds the Qualifying Period shown in the Policy Declarations. If the prohibition does exceed the Qualifying Period, the loss shall be measured from the date that ingress to or egress from real or personal property is prohibited and ends when ingress or egress is no longer prohibited, but no longer than the number of days for Ingress & Egress shown in the Policy Declarations. In no event shall the Company pay more than the Sublimit shown in the Policy Declarations.

5. INTERRUPTION BY CIVIL OR MILITARY AUTHORITY: This **Policy** is extended to cover the actual loss of income and **Extra Expense** sustained during the period of time when an order of civil or military authority prohibits total or partial access to the Insured's real or personal property, provided such order is a direct result of a **Covered Cause of Loss** to property of others and such property of others is within the distance from the **Insured Location** as shown on the Policy Declarations under Interruption by Civil or Military Authority. There shall be no loss payable under this Additional Coverage unless the length of time the order prohibiting access to the Insured's real or personal property exceeds the Qualifying Period shown in the Policy Declarations. If the length of time of the order does exceed the Qualifying Period, the loss shall be measured from the effective date of such order and ends when the order expires, but no longer than the number of days for Interruption of Civil or Military Authority shown in the Policy Declarations. In no event shall the Company pay more than the Sublimit shown in the Policy Declarations.

6. RENTAL VALUE: As respects Insured Property held for rental to others, this **Policy** is extended to cover the loss sustained by the Insured due to direct physical loss or damage by a **Covered Cause of Loss** during the Period of Interruption but not exceeding the reduction in **Rental Value** less charges and expenses which do not necessarily continue.

   **Rental Value** means the sum of:

   a. The total anticipated gross rental income from tenant occupancy of the **Insured Location** as furnished and equipped by the Insured including taxes, rent based on percentage of sales, and other charges paid by tenants in respect of the leased premises;

   b. The amount of all charges which, by the terms of a written lease, are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured; and

   c. The fair rental value of any portion of such property which is occupied by the Insured.

   Due consideration will be given to the historic rental income and expenses prior to the loss and the probable rental income and expenses thereafter.

7. ROYALTIES: This **Policy** is extended to cover actual loss of income sustained by the Insured under a royalty, licensing fee or commission agreement between the Insured and another party during the Period of Interruption arising out of direct physical loss or damage by a **Covered Cause of Loss** during the term of this **Policy** to real or personal property of the type insured of such other party.

If a **Covered Cause of Loss** results in coverage under more than one Additional Time Element Coverage, the Company will only pay for loss under one of them, whichever is greater.

D. ADDITIONAL EXCLUSIONS: Time Element Coverage under this **Policy** does not cover:

1. IDLE PERIODS - Any loss during any period in which goods would not have been produced, or business operations or services would not have been maintained, for any reason other than direct physical loss or damage from a **Covered Cause of Loss** to which this coverage applies.

2. REMOTE LOSS –

   a. Any increase in loss due to the suspension, cancellation or lapse of any lease, contract, license, order or loss of market;

   b. Any loss due to fines or damages for breach of contract or for late or non-completion of orders or penalties of whatever nature; or

   c. Any increase in loss due to interference at the Insured's premises or the supplier’s or customer’s premises by strikers or other persons with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the re-occupancy of such premises.

   Nor shall the Company be liable for any other consequential or remote loss, other than as specifically provided in this TIME ELEMENT COVERAGE Section of this **Policy.**

3. FINISHED GOODS - Any loss resulting from loss or damage to **Finished Goods** nor for the time required for their reproduction.

4. TRANSIT - Any loss resulting from loss or damage to property in transit.

5. CONTRACTOR'S OR VENDOR'S INTERESTS – Any loss resulting from loss or damage to contractor's or vendor's interests in Insured Property.

**SECTION V – ADDITIONAL COVERAGES**

All Additional Coverages are subject to the terms and conditions of this **Policy**, including but not limited to, the Sublimits of Liability corresponding to each such Additional Coverage and any other applicable Sublimits or Deductibles shown elsewhere in this **Policy**. The Sublimits corresponding to each such Additional Coverage are the maximum amount the Company will pay for all loss or damage arising out of such specified Additional Coverages. Such Sublimits are part of, and not in addition to the **Policy Limit** and the Specified Covered Causes of Loss Sublimits shown in Item **6.A.1.** of the Policy Declarations or elsewhere in this **Policy**.

In addition, the maximum amount that the Company will pay for each **Occurrence** for all loss or damage with respect to **Miscellaneous Unnamed Locations**, Newly Acquired Property or for locations for which coverage is provided under the ERRORS OR OMISSIONS Additional Coverage is the corresponding applicable Sublimit of Liability for MISCELLANEOUS UNNAMED LOCATIONS, NEWLY ACQUIRED PROPERTY or ERRORS OR OMISSIONS Additional Coverages as shown in the Policy Declarations for each such Additional Coverage regardless of any other coverage, Additional Coverages or Additional Time Element Coverages.

A. ACCOUNTS RECEIVABLE: This **Policy** covers any shortage in the collection of Accounts Receivable resulting from direct physical loss or damage by a **Covered Cause of Loss** to Accounts Receivable records.

   This extension of coverage does not apply to loss due to:

   1. Bookkeeping, accounting or billing errors and omissions; and

   2. Alteration, corruption, erasure, falsification, manipulation, concealment, destruction, or disposal of Accounts Receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

B. DEBRIS REMOVAL: This **Policy** covers the necessary and reasonable expense to remove debris consisting of Insured Property from the **Insured Location(s)** remaining as a result of direct physical loss or damage from a **Covered Cause of Loss** when the Insured gives written notice of such direct physical loss or damage to the Company within one hundred eighty (180) days after such loss or damage. The Company shall not be liable for any debris removal cost or expense associated with removing contaminated or polluted uninsured property, nor the **Pollutants or Contaminants** therein or thereon, whether or not such contamination results from a **Covered Cause of Loss**.

C. DEMOLITION AND INCREASED COST OF CONSTRUCTION: In the event of direct physical loss or damage by a **Covered Cause of Loss** to a building at an **Insured Location** that results in the enforcement of any law, ordinance, governmental directive or standard in effect at the time of loss or damage regulating the construction, repair or use and occupancy of the property, the Company shall pay up to the applicable Sublimits set forth in the Policy Declarations as follows:

   1. Demolition Coverage A: In accordance with the VALUATION Section of this **Policy**, the cost to replace the undamaged portion of the damaged building as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged portion of the same building;

2. Demolition Coverage B: The cost to demolish and clear the site of the undamaged portion of the damaged building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged portion of the same building; and

3. Demolition Coverage C: The increased cost of repair or replacement of the damaged building and undamaged portion of the same building, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or replacement of the damaged building. However, the Company shall not be liable for any such increased cost unless the damaged building is actually repaired or replaced.

The Company shall not be liable for any cost set forth above:

a. Necessitated by the enforcement of any law or ordinance regulating any form of **Pollutants or Contaminants;** or

b. Incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the time of the direct physical loss or damage.

D. ELECTRONIC DATA AND MEDIA: This **Policy** is extended to cover direct physical loss or damage to **Electronic Data and Media** by a **Covered Cause of Loss.** However, the Company shall not be liable for any loss or damage arising out of **Unauthorized Access, Unauthorized Use, Denial of Service Attack, Malicious Code**, **Magnetic Damage to Electronic Data and Media** or **Vandalism** and **Malicious Mischief**.

E. ERRORS OR OMISSIONS: This **Policy** is extended to cover direct physical loss or damage by a **Covered Cause of Loss** at locations within the **Coverage Territory** that are owned, leased or operated by the Insured, if such loss or damage is not payable under this **Policy** solely due to:

1. Any error or unintentional omission in the description of the address of the property whether made at the inception of the Policy Period or subsequent thereto; or

2. Failure through any error or unintentional omission to:

a. Include any location of the Insured at the inception of the **Policy**; or

b. Report any newly acquired location before the period of automatic coverage expires under the NEWLY ACQUIRED PROPERTY Additional Coverage.

This **Policy** covers such direct physical loss or damage, to the extent it would have provided coverage had such error or omission not been made.

It is a condition of this Additional Coverage that any error or omission be reported by the Insured to the Company when discovered and that the Insured shall pay any additional premium due.

No coverage is provided at any location for new buildings, additions or alterations in the course of construction if the Insured has failed to report such location due to an error or omission (other than inadvertent error or unintentional omission in the description of the address of the property).

There is no coverage under this Subparagraph for loss or damage which is covered under the MISCELLANEOUS UNNAMED LOCATIONS or NEWLY ACQUIRED PROPERTY Additional Coverages.

F. EXPEDITING EXPENSES: This **Policy** is extended to cover reasonable and necessary expediting expenses to:

1. Make temporary repairs to Insured Property; or

2. Expedite the permanent repair or replacement of Insured Property;

that has sustained direct physical loss or damage by a **Covered Cause of Loss**.

G. FINE ARTS: This **Policy** is extended to cover direct physical loss or damage to **Fine Arts** by a **Covered Cause of Loss** at an **Insured Location.** However, no coverage is provided for breakage unless such breakage is caused by a **Defined Peril.** The Company shall not be liable for loss or damage resulting from restoring, repairing or retouching **Fine Arts.**

H. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES: This **Policy** covers the following expenses resulting from a **Covered Cause of Loss** at an **Insured Location**:

1. Fire brigade charges and extinguishing expenses which the Insured incurs;

2. Loss and disposal of fire extinguishing materials expended.

There is no coverage for any costs incurred as a result of a false alarm.

I. LEASEHOLD IMPROVEMENTS & BETTERMENTS: This **Policy** is extended to cover the value of undamaged tenant's improvements and betterments when the Insured's lease is cancelled by the Insured tenant or the Insured's lessor acting under a valid condition of the lease due to direct physical loss or damage to building or personal property caused by or resulting from a **Covered Cause of Loss** at an **Insured Location**. This Additional Coverage is subject to the Leasehold Interest Sublimit set forth in the Policy Declarations.

J. LEASEHOLD INTEREST: If Insured Property is: (1) rendered wholly or partially untenantable by direct physical loss or damage to Insured Property by a **Covered Cause of Loss** during the Policy Period and (2) the Insured's lease is cancelled by a party, other than the Named Insured or an entity that has a common ownership with the Named Insured, in accordance with the conditions of the lease, then this **Policy** is extended to cover **The Interest of the Insured as Lessee** or **The Interest of the Insured as Lessor**, whichever is applicable, but only for the first three months succeeding the date of the loss and the **Net Lease Interest** shall be paid for the remaining months of the unexpired lease.

Recovery under this Additional Coverage shall be the pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

1. The amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease; and

2. The amount of advance rent paid by the Insured and not recoverable under the terms of the lease.

The following terms, wherever used in this Subparagraph, shall mean:

1. **The Interest of the Insured as Lessee** is defined as:

   a. The excess of the **Rental Value** of similar premises over the actual rent payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease; and

b. The rental income earned by the Insured from sublease agreements, to the extent not covered under any other section of this **Policy**, over and above the rental expenses specified in the lease between the Insured and the lessor.

2. **The Interest of the Insured as Lessor** is defined as the difference between the rents payable to the Insured under the terms of the lease in effect at the time of loss and the actual rent collectible by the Insured during the unexpired term of the lease provided the lease is canceled by the lessee, to the extent not covered under any other section of this **Policy.**

3. **Net Lease Interest** is the discounted amount that at 6% interest would be equivalent to the Insured receiving the full amount of **The Interest of the Insured as Lessee or Lessor**, whichever is applicable, for each separate month of the unexpired term of the lease.

The Company shall not be liable for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any lease or by the Named Insured exercising any option to cancel the lease. Furthermore, the Named Insured shall use due diligence including all things reasonably practicable to diminish loss under this Additional Coverage.

K. LIMITED POLLUTION COVERAGE: This **Policy** is extended to cover the reasonable and necessary expense incurred to remove, dispose of, or clean-up the actual presence of **Pollutants or Contaminants** from land and water at an **Insured Location** when such land or water is contaminated or polluted due to a **Covered Cause of Loss** at that **Insured Location.** There will be no coverage unless such expenses are reported to the Company within one hundred eighty (180) days after the date of such **Covered Cause of Loss.**

L. MISCELLANEOUS UNNAMED LOCATIONS: This **Policy** is extended to cover direct physical loss or damage by a **Covered Cause of Loss** to property of the type insured under this **Policy** at **Miscellaneous Unnamed Locations** to the extent of the Insured's insurable interest. No coverage is provided for new buildings, additions or alterations in the course of construction under this MISCELLEANOUS UNNAMED LOCATIONS Additional Coverage.

There is no coverage under this Subparagraph for loss or damage which is covered under the ERRORS OR OMISSIONS or NEWLY ACQUIRED PROPERTY Additional Coverages.

M. NEW CONSTRUCTION AND ADDITIONS: This **Policy** is extended to cover:

1. Direct physical loss or damage by a **Covered Cause of Loss** to: (i) new buildings, structures and/or additions while in the course of construction at an **Insured Location** and (ii) materials, equipment and supplies to be permanently installed in such new buildings, structures and/or additions at an **Insured Location**; and

2. **Gross Earnings** loss and **Soft Costs** incurred by the Insured during the Period of Interruption as set forth in Subparagraph **IV.A.** if such property in Subparagraph **M.1.** above sustains direct physical loss or damage by a **Covered Cause of Loss.**

3. Additional expenses which are incurred by the Insured for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **Covered Cause of Loss** to new buildings, structures and/or additions while in the course of construction.

N. NEWLY ACQUIRED PROPERTY: This **Policy** covers direct physical loss or damage by a **Covered Cause of Loss** to real and personal property of the type insured under this **Policy** that is rented, leased, purchased or acquired by the Insured after the inception date of this **Policy** and within

the **Coverage Territory**. Coverage under this Additional Coverage ceases at the earliest of the following dates:

1. Ninety (90) days from the date of rental, lease, purchase or acquisition of such property;

2. When such newly acquired property is bound by the Company;

3. The Company notifies the Insured that it will not bind the coverage for such property; or

4. When this **Policy** is cancelled or expires.

There is no coverage under this Subparagraph for loss or damage which is covered under the ERRORS OR OMISSIONS or MISCELLANEOUS UNNAMED LOCATIONS Additional Coverages.

O. OUTDOOR PROPERTY: This **Policy** is extended to cover direct physical loss or damage to **Outdoor Property** at the **Insured Location**, but only for loss or damage caused directly by a **Defined Peril** (other than **Windstorm or Hail**), not otherwise excluded.

P. PAIRS OR SETS: If two or more insured components or parts that comprise Insured Property are necessary for a complete object, then this **Policy** covers reduction in value of insured components or parts of such complete object due to direct physical loss or damage by a **Covered Cause of Loss** to the other insured components or parts of such complete object.

Q. PROFESSIONAL FEES: This **Policy** is extended to include reasonable and necessary expenses incurred by the Insured for preparing and certifying particulars or details of the Insured's claim required by the Company for which the Company has accepted liability in order to determine the amount of a covered loss payable under this **Policy**. This **Policy** is also extended to include reasonable and necessary fees charged by any independent property manager for handling the claim.

There shall be no coverage under this **Policy** for expenses incurred by the Insured in utilizing the services of attorneys, public adjusters, insurance agents or brokers, or any of their subsidiary, related or associated entities, except that coverage is provided for expenses incurred by the Insured for its broker's forensic accounting units. This **Policy** also excludes any fees or costs for consultation on coverage or negotiation of claims.

R. PROPERTY REMOVED FROM INSURED LOCATIONS: This **Policy** is extended to cover direct physical loss or damage to covered personal property of the Insured by a **Covered Cause of Loss** at any location within the **Coverage Territory** when such property is removed from the **Insured Locations** for the purpose of being repaired or serviced, excluding:

1. Personal property insured under another insurance policy; or

2. Personal property removed from the **Insured Locations** for normal storage or processing or preparation for sale or delivery.

S. SERVICE INTERRUPTION: This **Policy** is extended to cover physical loss or damage to Insured Property and actual loss of income and **Extra Expense** sustained by the Insured arising from an interruption in: (1) incoming electricity, gas, water, steam or refrigeration; (2) the Insured's data, voice or video service; or (3) outgoing sewerage, caused by a **Covered Cause of Loss** to a service provider's property of the type insured under this **Policy** or to transmission, distribution or communication lines, situated outside the **Insured Location**.

This Additional Coverage for SERVICE INTERRUPTION shall also apply to such equipment of others situated on the **Insured Locations** but such equipment shall not be subject to the Service Interruption Sublimit set forth in the Policy Declarations.

There shall be no loss payable under this Additional Coverage unless the interruption exceeds the Qualifying Period shown in the Policy Declarations. If the loss exceeds the Qualifying Period then loss shall be measured from date and time of the interruption of service. However, such Qualifying Period does not apply if there is physical loss or damage to Insured Property caused by the interruption. The service interruption ends when: (1) incoming electricity, gas, fuel, steam, water or refrigeration; (2) the Insured's data, voice or video service; or (3) outgoing sewerage service; is restored.

This period of time shall not be cut short by the end of the Policy Period.

Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by the Insured or any service provider.

T. SPOILAGE: This **Policy** is extended to cover the spoilage of **Perishable Goods**, including while in transit, by a **Covered Cause of Loss**. Such physical loss or damage includes spoilage of the Insured's **Perishable Goods** due to contamination from the release of refrigerant including, but not limited to, ammonia.

U. TRANSIT: This **Policy** is extended to cover direct physical loss or damage to Insured Property by a **Covered Cause of Loss**, while such property is in transit, including:

1. Personal property shipped to customers on F.O.B., C & F, or similar terms. The Insured's contingent interest in such shipments is admitted;

2. The interest of the Insured in, and legal liability for personal property of others in the actual or constructive custody of the Insured; and

3. Personal property of others sold by the Insured for which the Insured has agreed prior to loss to insure during the course of delivery.

Subject to the terms and conditions of this **Policy**, this TRANSIT Additional Coverage attaches from the time the property leaves the original point of shipment for the commencement of transit and covers thereafter continuously in the due course of transit until delivered at the destination, provided that the original point of shipment and the point of destination are within the **Coverage Territory**.

Permission is granted to the Insured without prejudice to this insurance to accept ordinary bills of lading used by carriers, including released and/or undervalued bills of lading and/or shipping or messenger receipts. The Insured may waive subrogation against railroads under sidetrack agreements, but the Insured shall not enter into any special agreement with carriers releasing them from their common law or statutory liability.

The following additional exclusions apply to this Additional Coverage:

1. Samples in the custody of salespersons or selling agents;

2. Property insured under import or export ocean cargo policies. However, coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not

insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft;

3. Waterborne shipments via the Panama Canal or waterborne to and from the United States mainland, its territories and possessions, Alaska, Puerto Rico and Hawaii;

4. Shipments made by air unless via regularly scheduled passenger airlines or air freight carriers;

5. Property shipped by mail;

6. Property of others, including the Insured's legal liability therefor, hauled on vehicles owned, leased, or operated by the Insured when acting as a common or contract carrier as defined by the law or regulatory agencies in the applicable jurisdiction; or

7. Any transporting vehicle or conveyance.

This Additional Coverage does not provide any Time Element coverage.

These additional exclusions for transit also apply to the extent that any Additional Coverages provide transit coverage.

If another Additional Coverage, other than this TRANSIT Additional Coverage, provides coverage for a specific type of Insured Property while such property is in transit, then loss or damage for such property shall be subject to the Sublimit of Liability applicable to such Additional Coverage and no coverage for such property shall be provided under this TRANSIT Additional Coverage.

V. VALUABLE PAPERS AND RECORDS: This **Policy** is extended to cover direct physical loss or damage to **Valuable Papers and Records** by a **Covered Cause of Loss**.

## SECTION VI – CONDITIONS

A. ABANDONMENT: There can be no abandonment to the Company of any property.

B. ADJUSTMENT OF LOSSES and FIRST NAMED INSURED: Loss or damage shall be adjusted with and payable to the First Named Insured, subject to any certificates of insurance on file with the Company which require payment to a loss payee or mortgageholder.

If this **Policy** insures more than one entity, the First Named Insured is authorized to act on behalf of all other Insureds with respect to their rights, obligations and duties under this **Policy**. Payment of loss or return premium under this **Policy** to the First Named Insured shall satisfy the Company's obligations with respect to all Insureds.

C. APPRAISAL: If the Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of the **Policy** including the Company's right to deny the claim.

D. ASSIGNED ADJUSTER: It is hereby agreed that the Assigned Adjuster set forth in the Policy Declarations, if any, shall be designated as the Account Claim Adjuster for all claims reported under this **Policy**. If the Account Claim Adjuster fails to comply with the Company's "Claim Handling Guidelines for Independent Adjusters Protocol" or similar guidelines, the Company reserves the right to select an alternative claim adjuster. The Account Claim Adjuster may not re-assign any claim(s) without the prior approval of the Company. The Account Claim Adjuster is not a party to this contract.

The Company retains the right to terminate the Account Claim Adjuster for lack of compliance with the aforementioned Guidelines Protocol or for lack of performance at the discretion of the Company. In such event, or in the event that the Account Claim Adjuster becomes unwilling or unable to perform, a replacement Account Claim Adjuster will be selected by the mutual agreement of the Company and Named Insured.

E. ASSIGNMENT: The Insured may not assign this **Policy** without the Company's prior written consent.

F. BRANDS AND LABELS: If branded or labeled merchandise covered by this **Policy** is physically damaged and the Company elects to take all or any part of such merchandise at the value established by the terms of this **Policy**, the Insured may, at its own expense, stamp "SALVAGE" on the merchandise or its containers, or may remove or obliterate the brands or labels, if such stamp, removal or obliteration will not physically damage the merchandise, but the Insured must re-label the merchandise or containers in compliance with the requirements of law.

G. CANCELLATION:

1. This **Policy** can be canceled by the First Named Insured by providing the Company with:

   a. An advance written request for cancellation stating when the cancellation shall be effective; and

   b. The original **Policy** or a lost policyholder release signed by the First Named Insured or its legal representative.

2. This **Policy** may be canceled by the Company by giving written notice to the First Named Insured stating when, not less than sixty (60) days thereafter, or ten (10) days thereafter for non-payment of premium, such cancellation shall be effective. If notice is mailed, proof of mailing will be sufficient proof of notice. Payment or tender of any unearned premium due to the First Named Insured shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made in due course.

3. If the Company cancels, any refund due will be pro-rata. If the First Named Insured cancels, any earned premium due will be calculated in accordance with the customary short-rate table and procedure, subject to the Minimum Earned Premium shown in the Policy Declarations.

H. CONTROL OF DAMAGED MERCHANDISE: This **Policy** gives the Insured control of physically damaged **Finished Goods** that have been manufactured by or for the Insured, provided that such goods have been physically damaged as a result of direct physical loss or damage by a **Covered Cause of Loss**. Under such circumstances, the Insured shall have full rights to the possession and control of all such physically damaged **Finished Goods,** provided that the Insured performs or has proper testing performed to demonstrate what property is physically damaged. The Insured,

exercising reasonable judgment, will decide if the physically damaged **Finished Goods** can be reprocessed or sold. Physically damaged **Finished Goods** judged by the Insured to be fit for reprocessing or for selling will be sold or otherwise disposed of and the salvage proceeds shall be handled in accordance with the SALVAGE AND RECOVERIES Condition of this Section. These rights and obligations also are extended to merchandise that the Insured is contractually obligated by the manufacturer or designer to exercise control of the damaged merchandise as long as such obligation is in writing prior to the loss or damage.

I. CURRENCY: Any amount of money specified in this **Policy**, including **Policy Limit**, Deductibles and Premium, shall be considered to be in United States dollars.

J. DIVISIBLE CONTRACT: Subject to the MISREPRESENTATION AND FRAUD Condition of this Section, if any **Insured Location** includes two or more buildings or the contents of two or more buildings, the breach of any condition of this **Policy** in respect to any one or more of the buildings insured or containing the Insured Property, shall not prejudice the right to recover for direct physical loss or damage by a **Covered Cause of Loss** occurring in any building insured or containing the Insured Property where, at the time of such loss or damage, a breach of condition does not exist.

K. ECONOMIC AND TRADE SANCTIONS: The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

L. INCREASE IN HAZARD: The Company is not liable for any loss at an **Insured Location** to the extent that such loss is a result of or in connection with a material increase in hazard over which the Insured has control or knowledge. Any material increase in hazard at one or more **Insured Locations** will not affect coverage at other **Insured Locations** where, at the time of loss or damage, the increase in hazard does not exist.

M. INSPECTION AND AUDIT: The Company, at all reasonable times during this Policy Period, shall be permitted but not obligated to inspect the property insured by this **Policy**. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property is safe or healthful or that they comply with any law, rule or regulation.

The Company may also examine and audit the Insured's books and records at any reasonable time during the Policy Period and within one year after the **Policy** termination, as long as such examination and audit relate to the subject matter of this **Policy**.

N. MISREPRESENTATION AND FRAUD: This entire **Policy** shall be voidable by the Company if, whether before or after a loss, the Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud, or false swearing by the Insured relating thereto.

O. OTHER INSURANCE/EXCESS INSURANCE/UNDERLYING INSURANCE: In the event there is other insurance covering loss or damage insured under this **Policy**, then this **Policy** shall apply only as excess and in no event as contributory insurance (unless this **Policy** is specifically written to be primary or contributory insurance), and then only after all other insurance has been exhausted, whether or not such insurance is collectible. Permission is granted for the Insured to

purchase excess insurance over the limits provided by this **Policy**, and underlying insurance on all or any part of the Deductibles of this **Policy**.

P. PROTECTION AND PRESERVATION OF PROPERTY: In case of actual or imminent direct physical loss or damage by a **Covered Cause of Loss**, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of Insured Property shall be included in the physical loss or damage amount otherwise recoverable under this **Policy**, if any, but shall be subject to the applicable Deductible, Sublimit of Liability and the **Policy Limit**.

Q. REINSTATEMENT OF LIMITS: Except for any **Covered Cause of Loss** which is subject to an Annual Aggregate limit or Annual Aggregate Sublimit of Liability, payment of a claim will not reduce the amount payable under this **Policy** for any subsequent covered loss.

R. REQUIREMENTS IN CASE OF LOSS: The Insured shall:

1. Give prompt written notice of any loss or damage to the Company;

2. Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3. Protect the property from further loss or damage;

4. Separate the damaged and undamaged personal property;

5. Maintain such property in the best possible order;

6. Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7. Furnish all other documents or insurance policies that the Company may reasonably require;

8. Allow the Company to access and inspect any of the damaged or undamaged property;

9. Submit to examination under oath at such times as may be reasonably required about any matter relating to this insurance or any claim;

10. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that it requires; and

11. Within sixty (60) days after the Company's request, the Insured shall provide the Company with a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

    a. The time and origin of the loss;

    b. The interest of the Insured and of all others in the property;

    c. The value of each item thereof determined in accordance with the valuation provisions of this **Policy** and the amount of loss thereto and all encumbrances thereon;

    d. All other contracts of insurance, whether collectible or not, covering any of said property; and

e. Any changes in the title, use, occupation, location, possession or exposures of said property subsequent to the issuance of this **Policy**, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss whether or not it then stood on leased ground.

S. SALVAGE AND RECOVERIES: All salvages, recoveries and payments (other than proceeds from subrogation and underlying insurance), will accrue entirely to the benefit of the Company until the sum paid or payable by the Company is recovered or reduced as applicable.

T. SERVICE OF SUIT: In the event of the Company's failure to pay any amount claimed to be due hereunder, the Company, at the Insured's request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 99 High Street, Boston, Massachusetts 02110 or his or her representative, and that in any suit instituted against the Company upon this **Policy**, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by the Insured or on the Insured's behalf or any beneficiary hereunder arising out of this **Policy** of insurance and hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

U. SETTLEMENT OF CLAIMS: The amount of loss for which the Company may be liable shall be payable within thirty (30) days after proof of loss herein required is received and accepted by the Company and ascertainment of the amount of loss is made either by agreement between the First Named Insured and the Company or an amount is determined by binding Appraisal in accordance with the provisions of this **Policy**.

The Company shall have the option to take all or any part of the property at the agreed or appraised value. Alternatively, the Company shall have the option to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, on giving notice of its intention to do so up to thirty (30) days after receipt of the proof of loss herein required.

V. SUBMISSION OF VALUES: The Insured shall provide to the Company at **Policy** inception and each subsequent anniversary date of this **Policy**, a Statement of Values which consists of the separate amounts for real property, personal property and Time Element values for each **Insured Location** calculated on the same basis as valuation under this **Policy**.

The property values shall be shown on a replacement cost basis for property which is covered on a replacement cost basis and on an actual cash value basis for other property. The value of stock and supplies shall be determined in accordance with the VALUATION Section of this **Policy** and shall be based on the approximate average of the stock and supplies on hand during the twelve (12) months immediately preceding the annual review of values. Time Element values (if

applicable) shall be forwarded in accordance with the terms of the applicable Time Element provisions and projected twelve (12) months into the future.

Upon inception of this **Policy** and at each anniversary date, the Annual Premium shall be due and payable to the Company. Receipt of said Statement of Values by this Company shall be considered as authorization by the Insured for the Company to calculate, at its discretion, premiums due for subsequent annual renewal(s).

The premium for this **Policy** is based upon the Statement of Values on file with the Company.

W. SUBROGATION: The Company may require from the Insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by the Company, but the Company shall not acquire any rights of recovery which the Insured has expressly waived in writing prior to loss nor shall such waiver in writing affect the Insured's rights under this **Policy**.

Any recovery as a result of subrogation proceedings arising out of an **Occurrence**, after expenses incurred in such subrogation proceedings are deducted, shall accrue to the Insured in the proportion that the Deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The Insured will cooperate with the Company and, upon the Company's request and expense will:

1. Attend hearings and trials; and

2. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting suits.

X. SUIT AGAINST COMPANY: No suit, action or proceeding for the recovery of any claim under this **Policy** shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this **Policy**, nor unless the same be commenced within twenty four (24) months following the date of the loss, provided that if under the laws of the applicable jurisdiction such time limitation is invalid, then any such claims shall be void unless such action, suit or proceedings is commenced within the shortest applicable limit of time permitted by the laws of such jurisdiction.

Y. SUSPENSION: Upon the discovery of a dangerous condition with respect to **Covered Equipment**, any representative of the Company may immediately suspend the insurance against loss from an **Accident** to such **Covered Equipment** or part thereof by notifying the Insured’s representative at the **Insured Location** of such dangerous condition. Written notice of the suspension will also be mailed or delivered to the Named Insured at the address of the Named Insured shown in the Policy Declarations. The insurance so suspended may be reinstated by the Company, but only by endorsement to this **Policy**. The Insured shall be allowed a pro-rata return of the unearned portion of the premium paid for such suspended insurance.

Z. TITLES OF PARAGRAPHS: The titles in this **Policy** are solely for reference and shall not in any way affect the provisions to which they relate.

AA. VACANCY: The Insured has permission to cease business operations or to have any insured building remain vacant or unoccupied, provided that fire protection, security and alarm services are maintained and written notice is given to the Company prior to the one-hundred twentieth (120th) consecutive day of cessation of business operations, vacancy or lack of occupancy. The insured building is considered vacant or unoccupied when:

1. Such building does not contain adequate Insured Property to conduct customary business operations; or

2. Such building is no longer used by the Insured, a lessee or a sub-lessee to conduct customary business operations;

provided however, this provision shall not apply to any time period when customary business operations are suspended due to circumstances that are usual to such business operations.

## SECTION VII – POLICY DEFINITIONS

A. **Accident** means a fortuitous event that causes direct physical loss or damage to **Covered Equipment.** The event must be one of the following:

   1. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   2. Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   3. Explosion of steam boilers, steam turbines, steam engines or steam pipes owned or leased by the Insured, or operated under the control of the Insured, except explosion of accumulated gases or unconsumed fuel;

   4. Loss or damage to steam boilers, steam turbines, steam engines or steam pipes caused by or resulting from any condition or event inside such equipment; or

   5. Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

B. **Aircraft or Vehicle Impact** means physical contact of an aircraft including a drone, spacecraft, self-propelled missile or objects falling therefrom, or of a vehicle or an object thrown up by a vehicle.

C. **Average Daily Value (ADV)** means the **Gross Earnings** that would have been earned during the Period of Interruption had no loss or damage occurred, divided by the number of working days during that Period of Interruption. No reduction shall be made for the **Gross Earnings** not being earned, or in the number of working days, because of the loss or damage or any other scheduled or unscheduled shutdowns during the Period of Interruption. The **ADV** applies to the **Gross Earnings** of the entire **Insured Location**, whether or not the loss affects the entire **Insured Location.** If more than one **Insured Location** is included in the valuation of the loss, the **ADV** will be the combined value of all affected **Insured Locations.** The number of days for **ADV** indicated in the Policy Declarations will be multiplied by the **ADV** as determined above. The result shall be used as the applicable Deductible.

D. **Cloud Computing Service** means a service: (i) in the business of storing, managing and processing electronic data for which the **Insured** has a written contract and (ii) that provides access to and use of: software and/or a network of remote servers hosted away from an **Insured Location** to store, manage or process such data.

E. **Collapse** means an abrupt falling down or caving in of a building or any part of a building or structure.

F. **Corruption, Erasure or Alteration** means **Electronic Data and Media** that has been corrupted, destroyed or deleted such that the **Electronic Data and Media** can no longer be accessed or used for its intended purpose.

G. **Coverage Territory** means the coverage territory shown in Item **4.** of the Policy Declarations.

H. **Covered Cause of Loss** means a peril or other type of loss, not otherwise excluded under this **Policy**.

I. **Covered Equipment** means the following:

1. Equipment that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

2. Equipment which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

The following is not **Covered Equipment**:

1. Structure, foundation, cabinet, compartment or air supported structure or building;

2. Insulating or refractory material;

3. Sewer piping, underground vessels or piping, or piping forming a part of a sprinkler system;

4. Water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

5. Vehicle or any equipment mounted on a vehicle;

6. Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

7. Dragline, excavation or construction equipment; or

8. Equipment manufactured by the Insured for sale.

J. **Defined Peril** means fire; lightning; explosion; **Windstorm or Hail**; **Smoke**; **Aircraft or Vehicle Impact**; **Riot, Strike or Civil Commotion**; **Vandalism and Malicious Mischief**; **Collapse** or **Leakage From Fire Protection Equipment**. **Defined Peril** also includes **Equipment Breakdown**, provided that **Equipment Breakdown** is covered under this **Policy**.

K. **Denial of Service Attack** means an attack that sends an excessive volume of electronic data to computer hardware, software or any components thereof which prevents those who are authorized to do so from gaining access to or using such computer hardware, software or any components thereof.

L. **Earth Movement** means any natural or manmade:

1. Earthquake, including any earth sinking, rising or shifting related to such event;

2. Landslide, including any earth sinking, rising or shifting related to such event;

3. Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

4. Earth sinking, rising, or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of real or personal property. Soil conditions include, but are not limited to, contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface;

5. Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse or subsidence; or

6. Tsunami arising out of any of the above.

M. Earthquake Zones: Designated Earthquake Zones as reflected in this **Policy** shall be the following:

1. **Pacific Northwest Earthquake Zone** means the following counties in Washington state:

   Clallam, Jefferson, King, Kitsap, Mason, Pierce, San Juan, Skagit, Snohomish, Thurston and Whatcom.

2. **New Madrid Earthquake Zone** means the following counties (unless otherwise stated) within the following states:

| | |
|---|---|
| **Arkansas:** | Counties of Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Mississippi, Poinsett, Randolph and Sharp; |
| **Illinois:** | Counties of Alexander, Bond, Clinton, Franklin, Hardin, Jackson, Jefferson, Johnson, Madison, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Saline, St. Clair, Union, Washington and Williamson; |
| **Indiana:** | **Counties of** Gibson, Pike, Posey, Vanderburgh and Warrick; |
| **Kentucky:** | Counties of Ballard, Calloway, Carlisle, Fulton, Graves, Hickman, Livingston, Marshall and McCracken; |
| **Mississippi:** | Counties of Bolivar, Coahoma, Desoto, Marshall, Tate and Tunica; |
| **Missouri:** | Counties of Bollinger, Butler, Cape Girardeau, Dunklin, Franklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Pemiscot, Perry, Reynolds, Scott, Stoddard, St. Charles, St. Francois, St. Genevieve, St. Louis, Warren, Washington, Wayne; and the City of St. Louis; and |
| **Tennessee:** | Counties of Crockett, Dyer, Fayette, Gibson, Hardeman, Haywood, Lake, Lauderdale, Madison, Obion, Shelby and Tipton. |

N. **Electronic Data and Media** consists of:

1. **Electronic Data**, meaning data, messages, information, coding, programs, instructions or software stored in a form suitable for communications, storage or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment; and

2. **Media**, meaning the electronic storage media upon which **Electronic Data** is stored.

**Electronic Data and Media** does not include **Valuable Papers and Records.**

O. **Equipment Breakdown** means damage that is the direct result of an **Accident**.

P. **Fine Arts** means paintings, etchings, pictures, tapestries, rare or art glass, art glass windows, valuable rugs, statuary, sculptures, antique furniture, antique jewelry, bric-a-brac, porcelains and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities. **Fine Arts** does not include any item which would qualify as **Valuable Papers and Records.**

Q. **Finished Goods** means stock manufactured or processed by the Insured, which is in final packaging and ready for shipment or sale to the Insured's customers.

R. **Flood** means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a **Flood.**

S. **Fungus, Mold or Spore** means:

**Fungus** includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **Mold**(s), rusts, mildews, yeast, smuts and mushrooms.

**Mold** includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce mold(s).

**Spore** includes any dormant or reproductive body produced by or arising or emanating out of any **Fungus**, **Mold**(s), mildew, plants, organisms or microorganisms.

T. **Hail** means precipitation consisting of concentric layers of clear ice or compact snow.

U. <u>High Hazard Hail Zones</u>: Designated High Hazard Hail Zones as reflected in this **Policy** shall be the following:

1. **Hail Zone 1** means the following counties (unless otherwise stated) within the following states:

<u>Colorado:</u> Counties of Adams, Arapahoe, Baca, Bent, Cheyenne, Crowley, Elbert, Kiowa, Kit Carson, Lincoln, Logan, Morgan, Phillips, Prowers, Sedgwick, Washington, Weld and Yuma;

<u>Kansas:</u> Counties of Barber, Barton, Butler, Cheyenne, Clark, Comanche, Cowley, Decatur, Dickinson, Edwards, Ellis, Ellsworth, Finney, Ford, Gove, Graham, Grant, Gray, Greeley, Hamilton, Harper, Harvey, Haskell, Hodgeman, Jewell, Kearny, Kingman, Kiowa, Lane, Lincoln, Logan, Marion, McPherson, Meade, Mitchell, Morton, Ness, Norton, Osborne, Ottawa, Pawnee, Phillips, Pratt, Rawlins, Reno, Rice, Rooks, Rush, Russell, Saline, Scott, Sedgwick, Seward, Sheridan, Sherman, Smith, Stafford, Stanton, Stevens, Sumner, Thomas, Trego, Wallace and Wichita;

<u>Nebraska:</u> Counties of Arthur, Banner, Blaine, Box Butte, Brown, Buffalo, Chase, Cherry, Cheyenne, Custer, Dawes, Dawson, Deuel, Dundy, Franklin, Frontier, Furnas, Garden, Gosper, Grant, Harlan, Hayes, Hitchcock, Hooker, Kearney, Keith, Kimball, Lincoln, Logan, Loup, McPherson, Morrill, Perkins, Phelps, Red Willow, Rock, Scotts Bluff, Sheridan, Sherman, Sioux, Thomas and Valley;

<u>New Mexico</u>: Counties of Chaves, Curry, Eddy, Lea, Quay and Roosevelt;

Oklahoma: Counties of Alfalfa, Beaver, Beckham, Blaine, Caddo, Canadian, Carter, Cimarron, Cleveland, Comanche, Cotton, Custer, Dewey, Ellis, Garfield, Garvin, Grady, Grant, Greer, Harmon, Harper, Jackson, Jefferson, Kay, Kingfisher, Kiowa, Lincoln, Logan, Love, Major, Marshall, McClain, Murray, Noble, Oklahoma, Osage, Pawnee, Payne, Pottawatomie, Roger Mills, Stephens, Texas, Tillman, Washita, Woods and Woodward;

South Dakota: Counties of Bennett, Butte, Custer, Fall River, Haakon, Harding, Jackson, Lawrence, Meade, Oglala Lakota, Pennington, Perkins, Todd and Ziebach;

Texas: Counties of Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Bosque, Brewster, Briscoe, Brown, Callahan, Carson, Castro, Childress, Clay, Cochran, Coke, Coleman, Collin, Collingsworth, Comanche, Concho, Cooke, Cottle, Crane, Crosby, Dallam, Dallas, Dawson, Deaf Smith, Denton, Dickens, Donley, Eastland, Ector, Ellis, Erath, Fisher, Floyd, Foard, Gaines, Garza, Glasscock, Gray, Grayson, Hale, Hall, Hamilton, Hansford, Hardeman, Hartley, Haskell, Hemphill, Hill, Hockley, Hood, Howard, Hutchinson, Jack, Johnson, Jones, Kent, King, Knox, Lamb, Lampasas, Lipscomb, Loving, Lubbock, Lynn, Martin, McCulloch, Midland, Mills, Mitchell, Montague, Moore, Motley, Nolan, Ochiltree, Oldham, Palo Pinto, Parker, Parmer, Pecos, Potter, Randall, Roberts, Rockwall, Runnels, San Saba, Scurry, Shackelford, Sherman, Somervell, Stephens, Sterling, Stonewall, Swisher, Tarrant, Taylor, Terrell, Terry, Throckmorton, Tom Green, Upton, Ward, Wheeler, Wichita, Wilbarger, Winkler, Wise, Yoakum and Young; and

Wyoming: Counties of Campbell, Crook, Goshen, Laramie, Niobrara, Platte and Weston.

2. **Hail Zone 2** means the following counties (unless otherwise stated) within the following states:

Colorado: Counties of Denver, Douglas, El Paso, Las Animas, Otero and Pueblo;

Kansas: Counties of Allen, Anderson, Atchison, Bourbon, Brown, Chase, Chautauqua, Cherokee, Clay, Cloud, Coffey, Crawford, Douglas, Elk, Franklin, Geary, Greenwood, Jackson, Jefferson, Johnson, Labette, Leavenworth, Linn, Lyon, Marshall, Miami, Montgomery, Morris, Nemaha, Neosho, Osage, Pottawatomie, Republic, Riley, Shawnee, Wabaunsee, Washington, Wilson, Woodson and Wyandotte;

Missouri: Counties of Andrew, Atchison, Barry, Barton, Bates, Benton, Buchanan, Camden, Cass, Cedar, Christian, Clay, Clinton, Crawford, Dade, Dallas, Dekalb, Dent, Douglas, Franklin, Gasconade, Greene, Henry, Hickory, Holt, Howell, Jackson, Jasper, Jefferson, Johnson, Laclede, Lafayette, Lawrence, Lincoln, Maries, McDonald, Newton, Nodaway, Oregon, Osage, Ozark, Phelps, Platte, Polk, Pulaski, Ray, Shannon, St. Charles, St. Clair, St. Louis, Stone, Taney, Texas, Vernon, Warren, Washington, Webster and Wright; and the City of St. Louis;

Nebraska: Counties of Adams, Antelope, Boone, Boyd, Burt, Butler, Cass, Cedar, Clay, Colfax, Cuming, Dodge, Douglas, Fillmore, Gage, Garfield, Greeley, Hall, Hamilton, Holt, Howard, Jefferson, Johnson, Keya Paha, Knox, Lancaster, Madison, Merrick, Nance, Nemaha, Nuckolls, Otoe, Pawnee, Pierce, Platte, Polk, Richardson, Saline, Sarpy, Saunders, Seward, Stanton, Thayer, Thurston, Washington, Wayne, Webster, Wheeler and York;

New Mexico: Counties of Colfax, De Baca, Guadalupe, Harding, Lincoln, San Miguel and Union;

Oklahoma: Counties of Adair, Atoka, Bryan, Cherokee, Choctaw, Coal, Craig, Creek, Delaware, Haskell, Hughes, Johnston, Latimer, Le Flore, Mayes, McCurtain, McIntosh, Muskogee, Nowata, Okfuskee, Okmulgee, Ottawa, Pittsburg, Pontotoc, Pushmataha, Rogers, Seminole, Sequoyah, Tulsa, Wagoner and Washington;

South Dakota: Counties of Aurora, Beadle, Bon Homme, Brookings, Brown, Brule, Buffalo, Campbell, Charles Mix, Clark, Clay, Codington, Corson, Davison, Day, Deuel, Dewey, Douglas, Edmunds, Faulk, Gregory, Hamlin, Hand, Hanson, Hughes, Hutchinson, Hyde, Jerauld, Jones, Kingsbury, Lake, Lincoln, Lyman, Marshall, McCook, McPherson, Mellette, Miner, Minnehaha, Moody, Potter, Sanborn, Spink, Stanley, Sully, Tripp, Turner, Union, Walworth and Yankton;

Texas: Counties of Anderson, Bandera, Bell, Bexar, Blanco, Bowie, Burnet, Camp, Cass, Cherokee, Comal, Coryell, Crockett, Culberson, Delta, Edwards, Falls, Fannin, Franklin, Freestone, Gillespie, Gregg, Harrison, Hays, Henderson, Hopkins, Hunt, Irion, Jeff Davis, Kaufman, Kendall, Kerr, Kimble, Kinney, Lamar, Limestone, Llano, Marion, Mason, Maverick, McLennan, Medina, Menard, Morris, Navarro, Panola, Presidio, Rains, Reagan, Real, Red River, Reeves, Rusk, Schleicher, Smith, Sutton, Titus, Travis, Upshur, Uvalde, Val Verde, Van Zandt, Williamson, Wood and Zavala; and

Wyoming: Counties of Albany, Converse, Johnson and Sheridan.

V. **Insured Location(s)** means:

1. The location(s) within the **Coverage Territory** described in the most recent Statement of Values on file with the Company, **Miscellaneous Unnamed Locations** and locations as covered by the ERRORS OR OMISSIONS and NEWLY ACQUIRED PROPERTIES Additional Coverages;

2. Unless otherwise set forth in the Statement of Values, each such **Insured Location(s)** shall be comprised of any building, yard, dock, wharf, pier or bulkhead or any group of the foregoing bounded on all sides by public streets, clear land space or open waterways, each not less than fifty (50) feet wide. Any bridge or tunnel crossing such street, space or waterway shall render such separation inoperative for the purpose of this definition.

W. **Leakage From Fire Protection Equipment** means direct physical loss or damage from:

1. Water or other substances discharged from within any part of the **Fire Protection Equipment** for the **Insured Location** or for any adjoining locations; and/or

2. Collapse or fall of tanks forming a part of the **Fire Protection Equipment** or the component parts or supports of such tanks.

The term **Fire Protection Equipment** includes tanks, water mains, hydrants or valves, and any other equipment whether used solely for fire protection or jointly for fire protection and for other purposes, but does not include:

1. Branch piping from a joint system where such branches are used entirely for purposes other than fire protection;

2. Any underground water mains or appurtenances located outside of the **Insured Location** and forming a part of the public water distribution system; or

3. Any pond or reservoir in which the water is impounded by a dam.

X. **Magnetic Damage to Electronic Data and Media** means the **Corruption, Erasure or Alteration** of **Electronic Data and Media** through magnetism of any kind or description from any source.

Y. **Malicious Code** means a corrupting or a harmful piece of code which infiltrates computer hardware, software or any components thereof.

Z. **Miscellaneous Unnamed Location(s)** means a location(s) in the **Coverage Territory** that has not been included in the most recent Statement of Values on file with the Company and has not been reported to the Company as may be required in the **Policy** provisions elsewhere. Such locations shall be comprised as set forth in Subparagraph **V.2.** of the POLICY DEFINITIONS Section of this **Policy**.

AA. **Named Storm** means a storm that, at any time, has been declared by the United States National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm or Tropical Depression, including any status or designation change with respect to such storm.

BB. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this **Policy** and with respect to:

1. **Terrorism** (to the extent **Terrorism** is covered), arises out of the same or related purpose or cause; or

2. Covered perils other than **Terrorism**, arises out of a single event or originating cause.

The **Occurrence** must occur during the Policy Period.

When the term applies to loss or losses from the perils of **Windstorm or Hail**; **Named Storm**; **Riot, Strike or Civil Commotion**; **Vandalism and Malicious Mischief**; **Earth Movement**; **Flood** or **Terrorism**, to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of seventy-two (72) hours shall be deemed to be a single **Occurrence**. The Insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the Insured Property, but no two such 72 hour periods shall overlap.

If the **Occurrence** commences during the Policy Period, then the Company shall treat the entire **Occurrence** as occurring during the Policy Period.

CC. **Outdoor Property** means outdoor: (i) lawns (including fairways, greens and tees), trees, shrubs, plants; and (ii) walkways, roadways, patios or other paved surfaces, including the fill beneath such paved surfaces.

DD. **Perishable Goods** means personal property: (i) maintained under controlled conditions for its preservation; and (ii) susceptible to loss or damage if the controlled conditions are not maintained.

EE. **Policy** means the policy, the Policy Declarations and any extensions or endorsements hereto.

FF. **Policy Limit** means the limit of liability shown in Item **6.** of the Policy Declarations.

GG. **Pollutants or Contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances listed in applicable environmental state, federal or foreign law or regulation, or as designated by the U.S. Environmental Protection Agency or similar applicable state or foreign governmental authority. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants or Contaminants** does not include **Fungus, Mold or Spore**.

HH. **Raw Materials** means materials and supplies in the state in which the Insured receives them for conversion by the Insured into **Finished Goods**.

II. **Riot, Strike or Civil Commotion** means riot or civil commotion including, but not limited to:

1. Acts of striking employees while occupying an **Insured Location**; and
2. Pilferage or looting occurring at the time and place of a riot or civil commotion.

JJ. **Smoke** means loss or damage ensuing from a sudden and accidental release of smoke. The peril of **Smoke** does not include loss or damage caused by smoke from agricultural smudging or industrial operations.

KK. **Soft Costs** means the reasonable and necessary:

1. Amount of actual interim or construction financing interest, including loan fees and other one-time charges incurred to negotiate a new construction loan and/or extend the existing one;
2. Real estate taxes and ground rent, if any;
3. Advertising and promotional expenses;
4. Cost of additional commissions;
5. Fees for architects, surveyors, legal services, consulting engineers or other fees not otherwise covered under this **Policy**;
6. Project administration expense, but not including development fees; and
7. Insurance premiums.

LL. **Terrorism** means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

1. A government;
2. The civilian population of a country, state or community; or
3. Disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002, and any revisions, reauthorizations or amendments thereto is in effect (the "Act"), **Terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

MM. **Tier 1 High Hazard Wind Zone (Consisting of Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands)** means the following counties (unless otherwise stated) within the following states or territories:

| | |
|---|---|
| Alabama: | Counties of Baldwin and Mobile; |
| Georgia: | Counties of Bryan, Camden, Chatham, Glynn, Liberty and McIntosh; |
| Hawaii: | Entire State; |
| Louisiana: | Parishes of Assumption, Calcasieu, Cameron, Iberia, Jefferson, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Martin (South), St. Mary, St. Tammany, Tangipahoa, Terrebonne and Vermilion; |
| Mississippi: | Counties of Hancock, Harrison and Jackson; |
| North Carolina: | Counties of Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell and Washington; |
| Puerto Rico: | Entire Territory; |
| South Carolina: | Counties of Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Hampton, Horry and Jasper; |
| Texas: | Counties of Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris, Jackson, Jefferson, Kenedy, Kleberg, Liberty, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria and Willacy; and |
| U.S. Virgin Islands: | Entire territory, including St. Croix, St. John and St. Thomas. |

NN. **Tier 1 High Hazard Wind Zone (Consisting of Virginia to Maine)** means the following counties (unless otherwise stated) within the following states:

| | |
|---|---|
| Connecticut: | Counties of Fairfield, Middlesex, New Haven and New London; |
| Delaware: | County of Sussex; |
| Maine: | Counties of Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington and York; |
| Maryland: | Counties of Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico and Worcester; |
| Massachusetts: | Counties of Barnstable, Bristol, Dukes, Essex, Nantucket, Norfolk, Plymouth and Suffolk; |
| New Hampshire: | Counties of Rockingham and Strafford; |


©American International Group, Inc.
All Rights Reserved.

| | |
|---|---|
| New Jersey: | Counties of Atlantic, Bergen, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean and Union; |
| New York: | Counties of Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester; |
| Rhode Island: | Counties of Bristol, Kent, Newport, Providence and Washington; and |
| Virginia: | Counties of Accomack, Charles City, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, New Kent, Northampton, Northumberland, Prince George, Surry, Sussex, York and Westmoreland; and<br><br>Independent Cities of Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach and Williamsburg. |

OO. **Tier 1 High Hazard Wind Zone (Florida)** means the entire state of Florida.

PP. **Tier 2 High Hazard Wind Zone** means the following counties (unless otherwise stated) within the following states:

| | |
|---|---|
| Georgia: | Counties of Brantley, Charlton, Effingham, Long and Wayne; |
| Louisiana: | Parishes of Acadia, Ascension, East Baton Rouge, Iberville, Jefferson Davis, Lafayette, St. Martin (North), Washington and West Baton Rouge; |
| Mississippi: | Counties of George, Pearl River and Stone; |
| North Carolina: | Counties of Bladen, Duplin, Gates, Hertford, Lenoir, Martin and Pitt; |
| South Carolina: | Counties of Florence, Marion and Williamsburg; and |
| Texas: | Counties of Bee, Brooks, Fort Bend, Goliad, Hardin, Hidalgo, Jasper, Jim Wells and Wharton. |

QQ. **Unauthorized Access** means the gaining of access to computer hardware, software or any components thereof by an unauthorized person.

RR. **Unauthorized Use** means the use of computer hardware, software or any components thereof by any person in an unauthorized manner.

SS. **Valuable Papers and Records** means documents that are written, printed or otherwise inscribed. These include:

1. Books, manuscripts, abstracts, maps and drawings; film and other photographically produced records, such as slides and microfilm;
2. Legal and financial agreements such as deeds and mortgages;
3. Addressograph plates; and
4. Any data stored on printouts or punched cards.

**Valuable Papers and Records** does not include money and securities, **Fine Arts** or **Electronic Data and Media**.

TT. **Vandalism and Malicious Mischief** means willful and malicious damage to, or destruction of, Insured Property. **Vandalism and Malicious Mischief** does not include loss or damage caused by or resulting from theft, except for real property loss or damage caused by the breaking or exiting of burglars.

UU. **Windstorm or Hail** means the direct action of wind or the direct action of **Hail**, whether accompanied by wind or not. However, **Windstorm or Hail** does not mean:

1. Loss or damage caused by or resulting from frost or cold weather, ice (other than **Hail**), snow or sleet, whether driven by wind or not;

2. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand, or dust, whether driven by wind or not, unless the building or structure first sustains wind or **Hail** damage to its roof or walls through which the rain, snow, sand or dust enters; or

3. Loss or damage caused when the weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **Collapse** of a building or structure or any part thereof, whether driven by wind or not.


©American International Group, Inc. All Rights Reserved.

**ENDORSEMENT #001**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

# WAR AND TERRORISM EXCLUSION ENDORSEMENT

**(Applies to locations outside the United States of America, its territories and possessions)**

This endorsement modifies insurance provided by the Policy:

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto, it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

1. War, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. Any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act including, but not limited to, the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1. and/or 2. above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

All other terms and conditions of the Policy remain the same.

Authorized Representative

**ENDORSEMENT #002**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

# ELECTRONIC DATA ENDORSEMENT A

**1. Electronic Data Exclusion**

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:-

a) This Policy does not insure loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting therefrom, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programmes, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorised instructions or code including a set of maliciously introduced unauthorised instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

b) However, in the event that a peril listed below results from any of the matters described in paragraph a) above, this Policy, subject to all its terms, conditions and exclusions, will cover physical damage occurring during the Policy period to property insured by this Policy directly caused by such listed peril.

Listed Perils:
Fire, Explosion

**2. Electronic Data Processing Media Valuation**

Notwithstanding any provision to the contrary within the Policy or any endorsement thereto, it is understood and agreed as follows:-

Should electronic data processing media insured by this Policy suffer physical loss or damage insured by this Policy, then the basis of valuation shall be the cost to repair, replace or restore such media to the condition that existed immediately prior to such loss or damage, including the cost of reproducing any ELECTRONIC DATA contained thereon, providing such media is repaired, replaced or restored. Such cost of reproduction shall include all reasonable and necessary amounts, not to exceed $500,000 any one loss, incurred by the Assured in recreating, gathering and assembling such ELECTRONIC DATA. If the media is not repaired, replaced or restored the basis of valuation shall be the cost of the blank media. However this Policy does not insure any amount pertaining to the value of


**©American International Group, Inc.
All Rights Reserved**

such ELECTRONIC DATA to the Assured or any other party, even if such ELECTRONIC DATA cannot be recreated, gathered or assembled.

Authorized Representative


©American International Group, Inc.
All Rights Reserved

**ENDORSEMENT #003**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## ANTI-STACKING ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

The following condition is added to the Policy:

If this insurance and any other insurance issued to the Insured by the Company or any entity that the Company controls, is controlled by or is under common control with applies to the same loss, claim, suit, occurrence or accident, whichever is applicable, then:

1. The maximum limit of liability, or

2. The maximum sublimit of liability with respect to a specific coverage or specific Covered Cause of Loss or peril;

under all insurance available from the above entities in the aggregate will not exceed the highest applicable limit of liability or highest applicable sublimit of liability available under any one policy.

However, this condition does not apply to any other insurance issued to the Insured by the Company or any entity that the Company controls, is controlled by or is under common control with which is specifically written to be primary to, in excess of, or quota share with the Policy to which this endorsement is attached.

All other terms and conditions of the Policy remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #004**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## CANCELLATION - ADDITIONAL PROVISIONS

This endorsement modifies insurance provided by the Policy:

The Policy is amended as respects cancellation. The following additional provisions shall apply with respect to the cancellation provisions of this Policy:

If this Policy covers any location or locations in "Tier 1 wind zone(s)" as defined in this Policy, and the Policy is cancelled at the request of the Insured, the following provision will apply:

If the Policy was in effect at any time during the period from June 1st to November 30th, the amount of premium we will return upon the Insured's cancellation of the Policy will be a percentage of the total premium, determined as follows:

1 Year Policy

| Number of Days Policy In Force | Percentage of Premium to Be Returned |
|---|---|
| 1 to 180 | 20% |
| 181 to 210 | 15% |
| 211 to 240 | 10% |
| 241 to 270 | 7.5% |
| 271 to 300 | 5.0% |
| 301 to 330 | 2.5% |
| 331 to 365 | 0.0% |

If a coverage or location is added to or deleted from the Policy, each type of coverage or such location(s) shall be underwritten separately and the rate will be determined based upon the characteristics of the risk.

If a location within a "Tier 1 wind zone" is added to or deleted from the Policy, and coverage for that location existed at any time during the period from June 1st to November 30th, the premium to be returned for that location upon the Insured's cancellation of the Policy will be determined in accordance with the above table.

If a location is not within a "Tier 1 wind zone" and is added to or deleted from the Policy, normal pro rata or short rate factors shall apply as provided by the Policy.

All other terms and conditions of the Policy remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #005**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

# HIGH HAZARD EARTHQUAKE ZONES AMENDATORY ENDORSEMENT
## (NEW MADRID AND PACIFIC NORTHWEST)

This endorsement modifies insurance provided by the Policy:

The following counties within the following states are added to the **New Madrid Earthquake Zone** definition:

**Arkansas:** Lee, Monroe, Prairie, St. Francis; and

**Tennessee:** Carroll and Weakley.

The following counties within the following states are added to the **Pacific Northwest Earthquake Zone** definition:

**Washington state**: Clark, Cowlitz, Grays Harbor, Island, Kittitas, Lewis, Pacific, Skamania, Wahkiakum; and

**Oregon**: Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Tillamook, Polk, Washington, Yamhill.

All other terms and conditions of the Policy remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #006**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.**: 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## HIGH HAZARD HAIL ZONES DEFINITION AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the **Policy**:

The High Hazard Hail Zones Definition of the POLICY DEFINITIONS Section is deleted in its entirety and replaced with the following:

- High Hazard Hail Zones: Designated High Hazard Hail Zones as reflected in this **Policy** shall be the following:

  1. **Hail Zone 1** means the following counties within the following states:

| State | Counties |
|---|---|
| ARKANSAS | BENTON; BOONE; CARROLL; CRAWFORD; FRANKLIN; JOHNSON; LOGAN; MADISON; MONTGOMERY; NEWTON; POLK; POPE; SCOTT; SEBASTIAN; WASHINGTON. |
| COLORADO | ARAPAHOE; BACA; BENT; CHEYENNE; KIOWA; KIT CARSON; LOGAN; MORGAN; PHILLIPS; PROWERS; SEDGWICK; WASHINGTON; YUMA. |
| IOWA | ADAIR; ADAMS; AUDUBON; BOONE; BUENA VISTA; CALHOUN; CARROLL; CASS; CHEROKEE; CLAY; CRAWFORD; DALLAS; DICKINSON; EMMET; FRANKLIN; FREMONT; GREENE; GUTHRIE; HAMILTON; HARDIN; HARRISON; HUMBOLDT; IDA; LYON; MARSHALL; MILLS; MONONA; MONTGOMERY; O'BRIEN; OSCEOLA; PAGE; PALO ALTO; PLYMOUTH; POCAHONTAS; POLK; POTTAWATTAMIE; RINGGOLD; SAC; SHELBY; SIOUX; STORY; TAYLOR; UNION; WEBSTER; WOODBURY; WRIGHT. |
| KANSAS | ALLEN; ANDERSON; ATCHISON; BARBER; BARTON; BOURBON; BROWN; BUTLER; CHASE; CHAUTAUQUA; CHEROKEE; CHEYENNE; CLARK; CLAY; CLOUD; COFFEY; COMANCHE; COWLEY; CRAWFORD; DECATUR; DICKINSON; DONIPHAN; DOUGLAS; EDWARDS; ELK; ELLIS; ELLSWORTH; FINNEY; FORD; FRANKLIN; GEARY; GOVE; GRAHAM; GRANT; GRAY; GREELEY; GREENWOOD; HAMILTON; HARPER; HARVEY; HASKELL; HODGEMAN; JACKSON; JEFFERSON; JEWELL; JOHNSON; KEARNY; KINGMAN; KIOWA; LABETTE; LANE; LEAVENWORTH; LINCOLN; LINN; LOGAN; LYON; MCPHERSON; MARION; MARSHALL; MEADE; MIAMI; MITCHELL; MONTGOMERY; MORRIS; MORTON; NEMAHA; NEOSHO; NESS; NORTON; OSAGE; OSBORNE; OTTAWA; PAWNEE; PHILLIPS; POTTAWATOMIE; PRATT; RAWLINS; RENO; REPUBLIC; RICE; RILEY; ROOKS; RUSH; RUSSELL; SALINE; SCOTT; SEDGWICK; SEWARD; SHAWNEE; SHERIDAN; SHERMAN; SMITH; STAFFORD; STANTON; STEVENS; SUMNER; THOMAS; TREGO; WABAUNSEE; WALLACE; WASHINGTON; WICHITA; WILSON; WOODSON; WYANDOTTE. |


©American International Group, Inc.
All Rights Reserved.

| | |
|---|---|
| MINNESOTA | COTTONWOOD; JACKSON; LINCOLN; LYON; MURRAY; NOBLES; PIPESTONE; ROCK; YELLOW MEDICINE. |
| MISSOURI | ANDREW; ATCHISON; BARRY; BARTON; BATES; BUCHANAN; CASS; CEDAR; CHRISTIAN; CLAY; CLINTON; DADE; DALLAS; DAVIESS; DEKALB; GENTRY; GREENE; HARRISON; HOLT; JACKSON; JASPER; LACLEDE; LAWRENCE; MCDONALD; NEWTON; NODAWAY; PLATTE; POLK; PULASKI; STONE; TANEY; TEXAS; VERNON; WEBSTER; WORTH; WRIGHT. |
| NEBRASKA | ADAMS; ANTELOPE; ARTHUR; BLAINE; BOONE; BOYD; BROWN; BUFFALO; BURT; BUTLER; CASS; CEDAR; CHASE; CHERRY; CHEYENNE; CLAY; COLFAX; CUMING; CUSTER; DAKOTA; DAWSON; DEUEL; DIXON; DODGE; DOUGLAS; DUNDY; FILLMORE; FRANKLIN; FRONTIER; FURNAS; GAGE; GARDEN; GARFIELD; GOSPER; GRANT; GREELEY; HALL; HAMILTON; HARLAN; HAYES; HITCHCOCK; HOLT; HOOKER; HOWARD; JEFFERSON; JOHNSON; KEARNEY; KEITH; KEYA PAHA; KNOX; LANCASTER; LINCOLN; LOGAN; LOUP; MCPHERSON; MADISON; MERRICK; NANCE; NEMAHA; NUCKOLLS; OTOE; PAWNEE; PERKINS; PHELPS; PIERCE; PLATTE; POLK; RED WILLOW; RICHARDSON; ROCK; SALINE; SARPY; SAUNDERS; SEWARD; SHERIDAN; SHERMAN; STANTON; THAYER; THOMAS; THURSTON; VALLEY; WASHINGTON; WAYNE; WEBSTER; WHEELER; YORK. |
| NORTH DAKOTA | DICKEY; EMMONS; GRANT; HETTINGER; KIDDER; LAMOURE; LOGAN; MCINTOSH; SIOUX; WELLS. |
| OKLAHOMA | ADAIR; ALFALFA; ATOKA; BEAVER; BECKHAM; BLAINE; BRYAN; CADDO; CANADIAN; CARTER; CHEROKEE; CHOCTAW; CLEVELAND; COAL; COMANCHE; COTTON; CRAIG; CREEK; CUSTER; DELAWARE; DEWEY; ELLIS; GARFIELD; GARVIN; GRADY; GRANT; GREER; HARMON; HARPER; HASKELL; HUGHES; JACKSON; JEFFERSON; JOHNSTON; KAY; KINGFISHER; KIOWA; LATIMER; LE FLORE; LINCOLN; LOGAN; LOVE; MCCLAIN; MCCURTAIN; MCINTOSH; MAJOR; MARSHALL; MAYES; MURRAY; MUSKOGEE; NOBLE; NOWATA; OKFUSKEE; OKLAHOMA; OKMULGEE; OSAGE; OTTAWA; PAWNEE; PAYNE; PITTSBURG; PONTOTOC; POTTAWATOMIE; PUSHMATAHA; ROGER MILLS; ROGERS; SEMINOLE; SEQUOYAH; STEPHENS; TEXAS; TILLMAN; TULSA; WAGONER; WASHINGTON; WASHITA; WOODS; WOODWARD. |
| SOUTH DAKOTA | AURORA; BEADLE; BENNETT; BON HOMME; BROOKINGS; BRULE; BUFFALO; CAMPBELL; CHARLES MIX; CLARK; CLAY; CODINGTON; CORSON; CUSTER; DAVISON; DAY; DEUEL; DEWEY; DOUGLAS; EDMUNDS; FAULK; GRANT; GREGORY; HAMLIN; HAND; HANSON; HUTCHINSON; HYDE; JERAULD; JONES; KINGSBURY; LAKE; LINCOLN; LYMAN; MCCOOK; MCPHERSON; MELLETTE; MINER; MINNEHAHA; MOODY; PENNINGTON; PERKINS; POTTER; ROBERTS; SANBORN; SPINK; TODD; TRIPP; TURNER; UNION; WALWORTH; YANKTON. |


**©American International Group, Inc.**
**All Rights Reserved.**

| | |
|---|---|
| TEXAS | ARCHER; ARMSTRONG; BANDERA; BAYLOR; BLANCO; BORDEN; BOSQUE; BRISCOE; BROWN; BURNET; CALLAHAN; CHILDRESS; CLAY; COKE; COLEMAN; COLLIN; COLLINGSWORTH; COMANCHE; CONCHO; COOKE; CORYELL; COTTLE; CRANE; CROCKETT; CROSBY; DALLAS; DAWSON; DENTON; DICKENS; DONLEY; EASTLAND; ECTOR; EDWARDS; ELLIS; ERATH; FANNIN; FISHER; FLOYD; FOARD; GARZA; GILLESPIE; GLASSCOCK; GRAY; GRAYSON; HALE; HALL; HAMILTON; HANSFORD; HARDEMAN; HASKELL; HEMPHILL; HILL; HOCKLEY; HOOD; HOWARD; HUNT; HUTCHINSON; IRION; JACK; JOHNSON; JONES; KENDALL; KENT; KERR; KIMBLE; KING; KINNEY; KNOX; LAMB; LAMPASAS; LIPSCOMB; LLANO; LUBBOCK; LYNN; MCCULLOCH; MARTIN; MASON; MEDINA; MENARD; MIDLAND; MILLS; MITCHELL; MONTAGUE; MOTLEY; NAVARRO; NOLAN; OCHILTREE; PALO PINTO; PARKER; RANDALL; REAGAN; REAL; ROBERTS; ROCKWALL; RUNNELS; SAN SABA; SCHLEICHER; SCURRY; SHACKELFORD; SOMERVELL; STEPHENS; STERLING; STONEWALL; SUTTON; SWISHER; TARRANT; TAYLOR; TERRELL; THROCKMORTON; TOM GREEN; UPTON; UVALDE; VAL VERDE; WARD; WHEELER; WICHITA; WILBARGER; WINKLER; WISE; YOUNG; ZAVALA. |

2. **Hail Zone 2** means the following counties and parishes within the following states:

| State | Counties/Parishes |
|---|---|
| ARKANSAS | BAXTER; CLARK; COLUMBIA; CONWAY; FULTON; GARLAND; HEMPSTEAD; HOT SPRING; HOWARD; IZARD; LAFAYETTE; LAWRENCE; LITTLE RIVER; MARION, MILLER; NEVADA; OUACHITA; PERRY; PIKE; PULASKI; RANDOLPH; SALINE; SEARCY; SEVIER; SHARP; STONE; UNION; VAN BUREN; YELL. |
| COLORADO | ADAMS; BOULDER; CROWLEY; CUSTER; DENVER; ELBERT; LARIMER; LINCOLN; OTERO; PUEBLO; WELD. |
| ILLINOIS | BUREAU; DEKALB; HENRY; JO DAVIESS; KANE; KENDALL; KNOX; LA SALLE; LEE; MARSHALL; MERCER; PEORIA; PUTNAM; ROCK ISLAND; STARK; WARREN; WOODFORD. |
| IOWA | APPANOOSE; BENTON; BLACK HAWK; BREMER; BUCHANAN; BUTLER; CEDAR; CERRO GORDO; CHICKASAW; CLARKE; CLAYTON; CLINTON; DAVIS; DECATUR; DELAWARE; FAYETTE; FLOYD; GRUNDY; HANCOCK; HOWARD; IOWA; JACKSON; JASPER; JOHNSON; JONES; KEOKUK; KOSSUTH; LINN; LUCAS; MADISON; MAHASKA; MARION; MITCHELL; MONROE; MUSCATINE; POWESHIEK; SCOTT; TAMA; WAPELLO; WARREN; WASHINGTON; WAYNE; WINNEBAGO; WINNESHIEK; WORTH. |
| LOUISIANA | PARISHES: BIENVILLE; BOSSIER; CADDO; CLAIBORNE; DE SOTO; GRANT; RED RIVER; SABINE; VERNON; WEBSTER; WINN. |


©American International Group, Inc.
All Rights Reserved.

| | |
|---|---|
| MINNESOTA | AITKIN; ANOKA; BECKER; BELTRAMI; BENTON; BIG STONE; BLUE EARTH; BROWN; CARLTON; CARVER; CASS; CHIPPEWA; CHISAGO; CLAY; CLEARWATER; CROW WING; DAKOTA; DODGE; DOUGLAS; FARIBAULT; FILLMORE; FREEBORN; GRANT; HENNEPIN; HUBBARD; ISANTI; ITASCA; KANABEC; KANDIYOHI; KITTSON; KOOCHICHING; LAC QUI PARLE; LAKE; LAKE OF THE WOODS; LE SUEUR; MCLEOD; MAHNOMEN; MARSHALL; MARTIN; MEEKER; MILLE LACS; MORRISON; MOWER; NICOLLET; NORMAN; OLMSTEAD; OTTER TAIL; PENNINGTON; PINE; POLK; POPE; RAMSEY; RED LAKE; REDWOOD; RENVILLE; RICE; ROSEAU; SAINT LOUIS; SCOTT; SHERBURNE; SIBLEY; STEARNS; STEELE; STEVENS; SWIFT; TODD; TRAVERSE; WADENA; WASECA; WASHINGTON; WATONWAN; WILKIN; WINONA; WRIGHT. |
| MISSOURI | ADAIR; BENTON; BOLLINGER; BOONE; CALDWELL; CALLAWAY; CAMDEN; CARROLL; CHARITON; COLE; COOPER; CRAWFORD; DENT; DOUGLAS; FRANKLIN; GASCONADE; GRUNDY; HENRY; HICKORY; HOWARD; HOWELL; IRON; JOHNSON; LAFAYETTE; LINN; LIVINGSTON; MADISON; MARIES; MERCER; MILLER; MONITEAU; MORGAN; OREGON; OSAGE; OZARK; PETTIS; PHELPS; PUTNAM; RAY; REYNOLDS; SAINT CLAIR; SALINE; SCHUYLER; SHANNON; SULLIVAN; WASHINGTON. |
| MONTANA | DANIELS; RICHLAND; ROOSEVELT; SHERIDAN. |
| NEBRASKA | BANNER; BOX BUTTE; DAWES; KIMBALL; MORRILL; SCOTTS BLUFF; SIOUX. |
| NEW MEXICO | COLFAX; CURRY; DE BACA; EDDY; GUADALUPE; HARDING; LEA; LINCOLN; QUAY; ROOSEVELT; SAN MIGUEL; UNION. |
| NORTH DAKOTA | ADAMS; BARNES; BENSON; BILLINGS; BOTTINEAU; BOWMAN; BURKE; BURLEIGH; CASS; CAVALIER; DIVIDE; DUNN; EDDY; FOSTER; GOLDEN VALLEY; GRAND FORKS; GRIGGS; MCHENRY; MCKENZIE; MCLEAN; MERCER; MORTON; MOUNTRAIL; NELSON; OLIVER; PEMBINA; PIERCE; RAMSEY; RANSOM; RENVILLE; RICHLAND; ROLETTE; SARGENT; SHERIDAN; SLOPE; STARK; STEELE; STUTSMAN; TOWNER; TRAILL; WALSH; WARD; WILLIAMS. |
| OKLAHOMA | CIMARRON. |
| SOUTH DAKOTA | BROWN; BUTTE; FALL RIVER; HAAKON; HARDING; HUGHES; JACKSON; LAWRENCE; MARSHALL; MEADE; SHANNON; STANLEY; SULLY; ZIEBACH. |
| TEXAS | ANDERSON; ANDREW; ANGELINA; ATACOSA; AUSTIN; BAILEY; BASTROP; BELL; BEXAR; BOWIE; BRAZOS; BREWSTER; BURLESON; CALDWELL; CAMP; CARSON; CASS; CASTRO; CHEROKEE; COCHRAN; COLORADO; COMAL; DALLAM; DEAF SMITH; DELTA; DEWITT; DIMMIT; DUVAL; FALLS; FAYETTE; FORT BEND; FRANKLIN; FREESTONE; FRIO; GAINES; GONZALES; GREGG; GRIMES; GUADALUPE; HARDIN; HARRIS; HARRISON; HARTLEY; HAYS; HENDERSON; HOPKINS; HOUSTON; JEFF DAVIS; KAUFMAN; LAMAR; LA SALLE; LAVACA; LEE; LEON; LIMESTONE; LOVING; MCLENNAN; MCMULLEN; MADISON; MARION; MAVERICK; MILAM; MONTGOMERY; MOORE; MORRIS; NACOGDOCHES; OLDHAM; |


©American International Group, Inc.
All Rights Reserved.

| | |
|---|---|
| | PANOLA; PARMER; PECOS; POLK; POTTER; RAINS; RED RIVER; ROBERTSON; RUSK; SABINE; SAN AUGUSTINE; SAN JACINTO; SHELBY; SHERMAN; SMITH; TERRY; TITUS; TRAVIS; TRINITY; UPSHUR; VAN ZANDT; WALKER; WALLER; WASHINGTON; WEBB; WHARTON; WILLIAMSON; WILSON; WOOD; YOAKUM. |
| WISCONSIN | BARRON; BURNETT; CHIPPEWA; DOUGLAS; DUNN; FOREST; ONEIDA; POLK; PRICE; RUSK; SAINT CROIX; SAWYER; TAYLOR; VILAS; WASHBURN. |
| WYOMING | BIG HORN; CAMPBELL; CONVERSE; CROOK; GOSHEN; HOT SPRINGS; JOHNSON; NIOBRARA; PLATTE; SHERIDAN; WASHAKIE; WESTON. |

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


**©American International Group, Inc.
All Rights Reserved.**

**ENDORSEMENT #007**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

# EXTORTION AND RANSOMWARE EVENT EXCLUSION

This endorsement modifies insurance provided by this **Policy**:

Notwithstanding any other provision of this **Policy** to the contrary:

**I.** The following is added to Subsection 1. of the PERILS EXCLUDED Subsection of the COVERED CAUSES OF LOSS Section:

- Loss, cost, damage, expense or payment, directly or indirectly, arising out of, or attributable to:

  **1.** **Extortion**; or

  **2.** A **Ransomware Event** or any remediation of any **Ransomware Event**;

  including any loss, cost, damage or expense to repair, replace or restore any **Computer System** or data of any kind or description, including loss of functionality, reduction in functionality or loss of use of any **Computer System** or data.

**II.** The following is added to the POLICY DEFINITIONS Section of the **Policy**:

**1.** **Computer System** means any computer, hardware, software, communications system, electronic device (including, but not limited to, smart phone, laptop, tablet, wearable device), server, cloud or microcontroller including any similar system or any configuration of the aforementioned and including any associated input, output, data storage device, networking equipment or back up facility.

**2.** **Extortion** means the demand or request for:

**a.** Anything of value of any kind or description, including anything of monetary value or that can be converted into a tangible or intangible asset, or

**b.** Any act, forbearance or promise to do something or refrain from doing something,

in connection with: (i) any loss or damage to property (ii) loss, damage or release of data of any kind or description or (iii) any interruption of operations, including any interruption of the operations of any **Computer System** of any kind or description; through any means or method, including a **Ransomware Event**, or any fear of or threat to cause such loss, damage, release or interruption.

**3.** **Ransomware Event** means use of unauthorized or malicious software code to encrypt data or interrupt the operations of any **Computer System** of any kind or description for the purpose of **Extortion.**

For avoidance of doubt, no coverage extension, additional coverage, global extension, exception to any exclusion or other coverage grant shall afford any coverage that would otherwise be excluded through this exclusion.

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


**©American International Group, Inc.
All Rights Reserved.**

**ENDORSEMENT #008**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## (1) DIGITAL ASSETS AND (2) OPERATIONS WITH RESPECT TO DIGITAL ASSETS EXCLUSIONARY ENDORSEMENT

This endorsement modifies insurance provided by this **Policy**:

Notwithstanding any other provision of this **Policy** to the contrary, the following provisions apply:

**I.** The following is added to Subsection 1. of the PERILS EXCLUDED Subsection of the COVERED CAUSES OF LOSS Section:

- Loss, cost, damage, expense or loss of use arising out of or caused directly or indirectly by the mining, acquiring, processing, transmitting, converting, exchanging, transacting, moving, holding, creating, destroying, deleting and/or other similar operations with respect to **Digital Assets** (hereinafter, collectively **Operations**) regardless of the methodology or equipment used to accomplish such **Operations.**

**II.** The following is added to the PROPERTY EXCLUDED Subsection of the INSURED PROPERTY Section:

- **Digital Asset(s)**

**III.** The following is added to the POLICY DEFINITIONS Section of the **Policy**:

- **Digital Asset(s)** means cryptocurrency, virtual currency, crypto asset(s), smart contract(s), non-fungible token(s), other token(s) or any other similar term that is a digital representation of value designed to work as a medium of exchange, unit of account, or store of value that uses cryptography to secure financial transactions, control the creation of additional units, and/or verify the transfer of assets. **Digital Asset(s)** also means any counterfeit or fictitious digital representation of value designed to work as a medium of exchange, unit of account, or store of value.

To the extent that there is any other term, grant of coverage or exception to an exclusion that could include or be construed to cover **Digital Assets** or **Operations**, such term, grant of coverage or exception to an exclusion shall not be construed to provide any coverage for **Digital Assets** or **Operations.**

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


**©American International Group, Inc.
All Rights Reserved.**

**ENDORSEMENT #009**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

# NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION WITH RADIOACTIVE CONTAMINATION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided by the **Policy**:

**SCHEDULE**

Radioactive Contamination Sublimit: $NOT COVERED per **Occurrence**

---

I. Subsections a., b. and d. of the PERILS EXCLUDED Section are deleted in their entirety and replaced with the following:

[Except as otherwise provided under the Additional Coverages and Additional Time Element Coverages, including Radioactive Contamination Additional Coverage below (and in such event, only to the extent provided therein) and notwithstanding any other provision of this **Policy** to the contrary, the Company does not insure for loss or damage caused directly or indirectly by any of the following perils. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:]

- Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or is contributed to or aggravated by a **Covered Cause of Loss**. However, if fire not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire, but not including any loss or damage due to nuclear reaction, nuclear radiation or radioactive contamination.

- i War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

  (1) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces; or

  (2) By military, naval or air forces; or

  (3) By an agent of any such government, power, authority or force;

  ii. Insurrection, rebellion, revolution, civil war, usurped power, seizure, destruction or any action taken by governmental authority in hindering, combating or defending against any action described in this exclusion;

  Including any consequence of Subparagraphs i. or ii. above of this exclusion.

- Any device employing atomic fission, fusion or radioactive force, or any device that disperses radioactive material or a directed-energy or electromagnetic weapon.


©American International Group, Inc.
All Rights Reserved.

- Unlawful possession, use, release, discharge, detonation, explosion, dispersal or disposal of any chemical, **Biological**, radioactive or similar agents or matter.

  As used herein, **Biological** means agents or matter including all microorganisms, fungus, mold, spores, bacteria, viruses, rickettsia, prions, nucleic acids, toxins, toxin-producing agents, and poisons produced by biological organisms.

- Any fraudulent or dishonest act or acts committed alone or in collusion with others: by any proprietor, partner, director, trustee, officer or employee of the Insured, or by any party to whom the property may have been entrusted (other than a carrier for hire).

  However, a willful act of destruction to Insured Property by an employee of the Insured, not otherwise excluded, and without the knowledge of any of the Insured's proprietors, partners, directors, trustees or officers is covered.

These exclusions apply whether in time of peace or war, regardless of who commits the act, and whether or not the event was accidental.

For avoidance of doubt, even if coverage is affirmatively provided for **Terrorism** under this **Policy** or required by law, the Company will not pay for any loss, cost, damage or expense, arising out of or occurring concurrently or in any sequence with the perils or events above regardless of any exception contained therein.

II. The following Additional Coverage is added to the **Policy**:

- RADIOACTIVE CONTAMINATION: Subject to the Radioactive Contamination sublimit of liability shown in the above Schedule, this **Policy** is extended to cover direct physical loss or damage to Insured Property caused by **Accidental** radioactive contamination, including resultant radiation damage, all as not otherwise excluded, that is discovered within twenty-four (24) hours of its **Occurrence,** provided that such radioactive contamination, including resultant radiation damage, arises out of radioactive material at the **Insured Location** and such material is used as part of the Insured's business activities. This Additional Coverage includes the cost to clean-up radioactive contamination, including resultant radiation damage, from Insured Property at the **Insured Location**, resulting from such loss or damage, but does not include testing or monitoring for radioactive contamination, including resultant radiation damage. There will be no coverage unless the loss, damage or cost is reported to the Company within one hundred eighty (180) days after the **Occurrence.**

  As used herein, **Accidental** means that the event is not intentional, regardless of whether such event is committed by an individual or group of individuals or whether any such individual(s) would be deemed to be an Insured under this **Policy**.

  The Company does not cover radioactive contamination, including resultant radiation damage, arising out of:

  **1.** A nuclear reactor at the **Insured Location**,

  **2.** Any new or used nuclear fuel intended for or used in such nuclear reactor, or

  **3.** Radioactive material originating outside **Insured Location**, whether or not the loss or damage is sustained at the **Insured Location.**

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #010**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## CONFISCATION, EXPROPRIATION AND NATIONALIZATION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided by this **Policy**:

The following Exclusion is added to Subsection B.1. of the PERILS EXCLUDED Section:

- Loss or damage due to confiscation, expropriation, nationalization, seizure, appropriation, commandeering, requisition for use or title, or willful destruction of or damage to property, by any de jure or de facto: government, sovereign power, civil authority or military authority, including any action taken under any quarantine or customs regulations.

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #011**

**This endorsement, effective 12:01 AM**, 11/01/2023
**Forms a part of Policy No.:** 062502712
**Issued to:** CUMBERLAND PROPERTY MANAGEMENT, LLC
**By:** LEXINGTON INSURANCE COMPANY

## CANCELLATION NOTICE PERIOD AMENDATORY ENDORSEMENT
**(90 DAYS)**

This endorsement modifies insurance provided by the **Policy**:

The CANCELLATION Subsection of the CONDITIONS Section is deleted in its entirety and replaced with the following;

CANCELLATION:

1. This **Policy** can be canceled by the First Named Insured by providing the Company with:

   a. An advance written request for cancellation stating when the cancellation shall be effective; and

   b. The original **Policy** or a lost policyholder release signed by the First Named Insured or its legal representative.

2. This **Policy** may be canceled by the Company by giving written notice to the First Named Insured stating when, not less than:

   a. Ninety (90) days thereafter, for cancellation for any reason, other than non-payment of premium, or

   b. Ten (10) days for non-payment of premium,

   such cancellation shall be effective. If notice is mailed, proof of mailing will be sufficient proof of notice. Payment or tender of any unearned premium due to the First Named Insured shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made in due course.

3. If the Company cancels, any refund due will be pro-rata. If the First Named Insured cancels, any earned premium due will be calculated in accordance with the customary short-rate table and procedure, subject to the Minimum Earned Premium shown in the Policy Declarations.

All other terms and conditions of the **Policy** remain the same.

Authorized Representative


©American International Group, Inc.
All Rights Reserved.

# EXHIBIT B

POLICY NUMBER: EAF657478-23

# COMMON POLICY DECLARATIONS

| | |
|---|---|
| **AXIS SURPLUS INSURANCE COMPANY**<br>**233 SOUTH WACKER DRIVE, SUITE 3510**<br>**CHICAGO, IL 60606** | **RSG SPECIALTY, LLC**<br>**R-T SPECIALTY DIV**<br>**ONE PREMIER PLAZA**<br>**5605 GLENRIDGE DR, STE 400**<br>**ATLANTA, GA 30342** |

NAMED INSURED: Cumberland Property Management, LLC
MAILING ADDRESS: 4686 Mcdermott Road, Suite 201
Plano, TX 75024
POLICY PERIOD: FROM November 01, 2023 TO November 01, 2024 AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.

| | |
|---|---|
| BUSINESS DESCRIPTION | Office Shopping Center |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| | | **PREMIUM** |
|---|---|---|
| BOILER AND MACHINERY COVERAGE PART | $ | |
| CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART | $ | |
| COMMERCIAL AUTOMOBILE COVERAGE PART | $ | |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ | |
| COMMERCIAL INLAND MARINE COVERAGE PART | $ | |
| COMMERCIAL PROPERTY COVERAGE PART | $ | 560,427 |
| CRIME AND FIDELITY COVERAGE PART | $ | |
| EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART | $ | |
| FARM COVERAGE PART | $ | |
| LIQUOR LIABILITY COVERAGE PART | $ | |
| POLLUTION LIABILITY COVERAGE PART | $ | |
| PROFESSIONAL LIABILITY COVERAGE PART | $ | |
| INSPECTION FEE | $ | |
| INSURED PURCHASED TRIA TERRORISM COVERAGE ☒ NO ☐ YES | $ | |
| **TOTAL:** | $ | 560,427 |

Premium shown is payable: $ 560,427 at inception.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

| FORMS APPLICABLE TO ALL COVERAGE PARTS (SHOW NUMBERS): | | |
|---|---|---|
| 01 | AXIS Surplus Common Policy Declarations - ES 018 1020 | |
| 02 | Notice to Policyholder - ES 115 0106 | |
| 03 | Policyholder Notice Texas - AXIS 105 (03-16) | |
| 04 | Texas Notice – AXIS TX 901 (04-20) | |
| 05 | AXIS Quota Share Follow Form - AXIS QS 1008 | |
| 06 | Scheduled Limit of Liability Endorsement - Endorsement A - ES 138 0106 | |
| 07 | Designated Adjuster Endorsement – Endorsement B - AXIS 1012470 0619 | |
| 08 | Equipment Breakdown Exclusion Endorsement - Endorsement C - AXIS 1012745 1220 | |
| 09 | Exclusion of Loss or Damage due to Virus or Bacteria - Endorsement D - AXIS 1012682 0520 | |
| 10 | Terrorism Exclusion Endorsement - Endorsement E - AXIS TERROR EXCLUSION 01 06 | |
| 11 | Service of Suit Texas - AXIS 106 (02-20) | |
| 12 | Signature Page - AXIS 102 ASIC (04-15) | |


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**NOTICE TO POLICYHOLDER**

This policy is composed of various forms explaining the insurance coverage provided. It may also include one or more endorsements. Endorsements are documents that change the policy. Endorsements may provide additional coverage to the policy. Endorsements can also restrict or remove coverage provided in the policy. THE POLICY SHOULD BE READ CAREFULLY TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.

As the context may require, the words “you”, “your”, “Insured”, and “the Insured” refer to the Named Insured shown on the Declarations Page. The words “we”, “us”, “our”, “Company”, “the Company”, and “this Company” refer to the Company providing this insurance.

**POLICYHOLDER NOTICE**

**TEXAS**

**This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85 percent tax on gross premium.**

# TEXAS NOTICE

## Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company. If you don't, you may lose your right to appeal.

**AXIS Insurance**

To get information or file a complaint with your insurance company:

**Call: Consumer Complaints Manager at 1-866-259-5435**

**Toll-free: 1-866-259-5435**

Email: ShdMbx-ConsumerComplaints@axiscapital.com

Mail: 10000 Avalon Way, Suite 200, Alpharetta, GA 30009

**The Texas Department of Insurance**

To get help with an insurance question or file a complaint with the state:

Call with a question: 1-800-252-3439

File a complaint: www.tdi.texas.gov

Email: ConsumerProtection@tdi.texas.gov

Mail: Consumer Protection, MC:CO-CP, Texas Department of Insurance, P.O. Box 12030, Austin, TX 78711-2030

## AXIS QUOTA SHARE FOLLOW FORM

Attached to and forming part of Policy Number: EAF657478-23

A. Insuring Agreement

Subject to the limitations, terms, and conditions contained in this policy or any endorsement attached hereto, the Company agrees to indemnify the Insured for direct physical loss or damage to covered property at covered locations, occurring during the Policy Period, and caused by covered perils, all as defined or described in the Lead Policy.

Except as regards the premium, the amount and participation AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this policy is subject to the same limitations, rights, terms, and conditions contained in the Lead Policy.

The Company's share of the Lead Policy limits and sub-limits (including aggregate limits), if any, shall be restricted by the Company's participation on the program as described in the Participation section of this policy and any other applicable provision in this policy or any endorsement to this policy.

B. Lead Policy:

Name of Insurer: Lexington Insurance Company
Policy Number: 062502712
Policy Term: 11/01/2023 - 11/01/2024 (At 12:01 A.M. Standard Time at the Insured Location.)

C. Participation:

The Company shall not be liable for more than 25.0% being $1,250,000 pro rata part of the $5,000,000 excess of applicable deductible(s), subject to the following sub-limits which are part of and not in addition to this limit:

1. 25.0%, being $No Coverage part of $No Coverage any one occurrence and in the annual aggregate for all losses caused by or resulting from earthquake,
2. 25.0%, being $No Coverage part of $No Coverage any one occurrence and in the annual aggregate for all losses caused by or resulting from flood, except
3. 25.0%, being $No Coverage part of $No Coverage any one occurrence and in the annual aggregate Flood in all Zones beginning with the Letter A or V.

D. Premium

This policy is issued for and in consideration of premium indicated in the Common Policy Declarations. For the purpose of premium computation, this policy is issued based on Total Insured Values of $459,857,961.

E. Minimum Earned Premium

The following minimum earned premium conditions shall apply, unless the Lead Policy contains more favorable minimum earned premium conditions for the Company:

In the event of:

1. cancellation of this policy by the Insured or

2. failure of the Insured to make timely payment of premium

the product of 35% of the original policy premium shall become earned; any conditions of the policy to the contrary notwithstanding.

F. Conditions of Coverage

1. By acceptance of this policy, the Insured agrees to pay the premium shown in the Common Policy Declarations and to comply with all the provisions of the policy.

2. If during the Policy Period the provisions of the Lead Policy are changed in any manner, as a condition precedent to coverage under this policy, the Insured shall give written notice to the Company of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change. No amendment to the Lead Policy during the Policy Period shall be effective in broadening or extending the coverage afforded by this policy or extending or increasing the limits of liability afforded by this policy unless the Company so agrees in writing. The Company may, in its sole discretion, condition its agreement to follow any changes to the Lead Policy on the Insured paying any additional premium required by the Company for such change.

3. This policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this policy. This policy can be changed only by endorsements issued by the Company and made a part of this policy.

4. Notice to any agent or knowledge possessed by any agent or by any other person other than the Company will not:

   a. create a waiver, or change any part of this policy; or

   b. prevent the Company from asserting any rights under the provisions of this policy.

G. Exclusions

1. Fungi Exclusion

   This policy does not cover:

   a. Fungi, wet or dry rot, or Bacteria

   b. Loss or damage caused directly or indirectly by Mold or Other Fungi, wet or dry rot, or Bacteria.

   c. The costs associated with the enforcement of any ordinance or law which requires the Insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of Mold or Other Fungi, wet or dry rot, or Bacteria.

   d. Any costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

   This Mold or Other Fungi, wet or dry rot, or Bacteria exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

2. Electronic Exclusion

This policy does not insure against loss or damage to, or any cost, claim or expense directly or indirectly arising out of or relating to, any of the following, regardless of any other cause or event contributing concurrently or in any other sequence to the loss, damage, claim or expense:

a. Data, Electronic Data, Programs, or Electronic Computer Programs,

b. failure of, interruption of, loss of use of, loss of access to, or reduction or alteration in the accuracy, functionality, availability, or operation of Data, Electronic Data, Programs, or Electronic Computer Programs,

c. any instruction, including but not limited to any Computer Virus, introduced into, or caused to act upon Computer Operations,

d. errors in configuring Computer Operations,

e. failure of, interruption of, loss of use of, loss of access to, or reduction or alteration in the accuracy, functionality, availability, or operation of Computer Operations.

Notwithstanding anything in the above to the contrary, and subject to the other terms and conditions of this policy not in conflict herewith, this policy insures against direct physical loss or damage caused by perils or causes of loss Insured under this policy to Insured computer hardware and Electronic Data Processing Media.

3. Pollution Exclusion

This policy does not cover any of the following:

a. Loss or damage caused by, or resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of Pollutants or Contaminants , however caused

b. The expense or cost to extract or remove Pollutants or Contaminants from debris;

c. The expense or cost to extract or remove Pollutants or Contaminants from land or water;

d. The expense or cost to extract or remove, restore or replace contaminated or polluted land or water;

e. The costs associated with the enforcement of any ordinance or law which requires the Insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of Pollutants or Contaminants;

f. Any cost to transport any property or debris to a site for storage or decontamination required because the property is infected by Pollutants or Contaminants, whether or not such removal, transport or decontamination is required by law, regulation or any authority governing such matters; or

g. Any cost to store or otherwise dispose of any property because Pollutants or Contaminants infect the property, or

h. Any expense for the investigation or defense of any loss, damage or any cost, loss of use expense, fine or penalty or for any expense or claim or suit related to any of the above.

4. Materials Exclusion

This policy does not cover loss or damage caused directly or indirectly by any of the following:

a. Removal of asbestos, dioxin, and polychlorinated biphenyl's from any goods, products, structures or debris;

b. Demolition, increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating such asbestos, dioxin, and polychlorinated biphenyl's;

c. Any governmental direction or request declaring that such asbestos, dioxin, and polychlorinated biphenyl's present in or part of or utilized in any undamaged portion of the Insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified; or

d. Any expense for the investigation or defense of any loss, damage or any cost, loss of use expense, fine or penalty or for any expense or claim or suit related to any of the above.

5. Fines or Penalties

This policy will not pay any costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

6. Nuclear Exclusion

This policy does not cover loss or damage arising directly or indirectly from nuclear detonation, reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage Insured against by this policy, however such nuclear detonation, reaction, nuclear radiation or radioactive contamination may have been caused. This exclusion replaces any other nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination exclusions found elsewhere in this policy. This exclusion applies to all coverage under this policy notwithstanding any coverage extension or any other endorsement.

7. Chemical and Biological Exclusion

This policy does not cover loss or damage arising directly or indirectly from the dispersal, application or release of, or exposure to, chemical or biological materials or agents that are harmful to property or human health, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by, any physical loss or damage Insured against by this

policy, however such dispersal, application, release or exposure may have been caused. This exclusion applies to all coverage under policy notwithstanding any coverage extension or any other endorsement.

8. Limited Coverage For Mold or Other Fungi, Wet Rot, Dry Rot And Bacteria

   a. This policy is extended to cover loss or damage to covered property directly caused by or resulting from Mold or Other Fungi, wet or dry rot, or Bacteria if such Mold or Other Fungi, wet or dry rot, or Bacteria is directly caused by or results from Insured direct physical loss or damage.

   b. As applied to this limited coverage for loss or damage by Mold or Other Fungi, wet or dry rot, and Bacteria, "loss or damage" means:

      i. Direct physical loss or damages to Covered Property by Mold or Other Fungi, wet or dry rot or Bacteria, including the cost of removal of the Mold or Other Fungi, wet or dry rot or Bacteria;

      ii. The cost to tear out and replace any part of the building or other property as needed to gain access to the Mold or Other Fungi, wet or dry rot or Bacteria; and

      iii. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is reason to believe that Mold or Other Fungi, wet or dry rot or Bacteria are present.

   c. The sub-limit for this extension of coverage is an annual aggregate and applies regardless of the number or type of coverages that may apply, the number of locations to which this extension of coverage applies, or regardless of the number or type of Mold or Other Fungi, wet or dry rot, or Bacteria that caused the loss or damage. With respect to a particular occurrence of loss which results in Mold or Other Fungi, wet or dry rot or Bacteria, we will not pay more than $10,000 even if the Mold or Other Fungi, wet or dry rot or Bacteria continues to be present or active, or recurs, in a later Policy Period.

H. Titles of Paragraphs

The several titles of the various paragraphs of this policy (and of endorsements, if any, now or hereafter attached to it) are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

I. Cancellation

The following cancellation conditions shall apply unless the Lead Policy contains more favorable conditions to the Company:

The Company may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation:

   a. at least 10 days before the effective date of cancellation if we cancel for nonpayment of premium or

   b. 30 days before effective date of cancellation if the Company cancels for any other reason.

If the policy is cancelled, the Company will send the first Named Insured any premium refund due. If the Company cancels, the refund will be pro rata, subject, however, to any minimum earned premium conditions of this policy. If the Insured cancels, the premium refund, at the discretion of the Company, may be less than pro-rata and subject to any minimum earned premium conditions of this policy.

The Company will mail or deliver cancellation notice to the first Named Insured's last mailing address known to the Company.

Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

J. Definitions

1. Company means the insurance company listed on the Common Policy Declarations.

2. Lead Policy means the specific policy identified as the "Lead Policy" under the paragraph B. of this policy.

3. Insured means the first Named Insured designated on the Common Policy Declarations.

4. Policy Period means the policy period designated on the Common Policy Declarations

5. Mold or Other Fungi means:

   a. any type or form of mold or mildew;

   b. any other type or form of fungus; or

   c. any mycotoxin, spore, scent or byproduct that is produced or released by such mold, mildew or other fungus.

6. Bacteria means:

   a. any type or form of bacterium; or

   b. any byproduct that is produced or released by such bacterium.

7. Pollutants or Contaminants means:

   a. Any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   b. Pollutants or Contaminants include, but are not limited to those materials that can cause or threaten damage to human health or human welfare or cause or threaten damage, deterioration, loss of value, marketability or loss of use to property including Bacteria, fungi, mold, mildew, virus or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency or any other governing authority.

8. Computer Operations means Computer Systems or Electronic Data Communications

System.

9. Computer Systems means computer hardware of any kind; Electronic Computer Programs; Electronic Data Processing Media; Electronic Data; operating system; Media microchip; microprocessors (computer chips); integrated circuit or similar device; computer network and networking equipment; firmware; servers; web sites; Extranet; and all input, output, processing, storage, and off-line Media libraries.

10. Computer Virus means any corrupting, harmful or otherwise unauthorized instructions or code including, but not limited to, any maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. Computer Virus includes, but is not limited to, 'Trojan Horses', 'worms' and 'time or logic bombs'.

11. Data means information or knowledge

12. Electronic Data Communications System means any communication system, including Computer Systems and the Internet, which provides the Insured with access to other Computer Systems, microchips, integrated circuits or similar devices in non-computer equipment, or which provides any party access to the Insured's Computer Systems, microchips, integrated circuits or similar devices in non-computer equipment.

13. Electronic Data Processing Media means punch cards, paper tapes, floppy disks, CD-ROM, hard drives, magnetic tapes, magnetic discs or any other tangible personal property on which Electronic Data or Electronic Computer Programs are recorded or transmitted, but not the Electronic Data or Electronic Computer Programs themselves. Money or Securities are not Electronic Data Processing Media.

14. Electronic Data means Data recorded or transmitted in a form usable in Computer Systems, microchips, integrated circuits or similar devices in non-computer equipment, and which can be stored on Electronic Data Processing Media for use by Electronic Computer Programs.

15. Extranet means an internal computer network that has been selectively opened to suppliers, customers, or other third parties via the Internet or otherwise.

16. Internet means the worldwide publicly accessible network of computers, which is commonly referred to as "The Internet" or "World Wide Web", or any other similar publicly accessible network hereafter to be developed.

17. Media means any item of tangible personal property on which Data or Programs can be recorded, but not the Data or Programs themselves. Money or Securities are not Media.

18. Money means currency, coins, bank notes and bullion; and travelers checks, register checks and Money orders held for sale to the public.

19. Securities means all negotiable and nonnegotiable instruments or contracts representing either Money or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include Money.

| Named Insured | | Endorsement Number |
|---|---|---|
| Cumberland Property Management, LLC | | A |
| **Policy Number** | **Policy Period** | **Effective Date of Endorsement** |
| EAF657478-23 | 11/01/2023 to 11/01/2024 | 11/01/2023 |
| **Issued By** | | **Endorsement Issue Date** |
| AXIS Surplus Insurance Company | | 11/01/2023 |

**This endorsement changes the policy. Please read it carefully.**

## SCHEDULED LIMIT OF LIABILITY ENDORSEMENT

In the event of loss hereunder, liability of the Company shall be limited to the least of the following.

A. The actual adjusted amount of loss, less applicable deductible(s) or self-insured retention(s).

B. 115% of the individually stated value for each scheduled item of property, time element, or other coverages shown on the latest **Application or Statement of Values on file with Company**, less applicable deductible(s) or self insured retention(s). If Actual Cash Value applies, then the maximum amount payable is 100%.

C. The Limit of Liability, Amount of Insurance or sublimit is shown or endorsed onto the Policy. If a sublimit is shown on the policy, the lesser limit shall apply.

D. The maximum amount payable under the Coinsurance Clause.

AXIS PROPERTY INSURANCE

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| B | 12:01 a.m. on 11/01/2023 | EAF657478-23 | Included |

**DESIGNATED ADJUSTER ENDORSEMENT**

It is agreed as follows:

Upon notification of a loss, Ryan Vesta, Crawford and Company will be assigned the responsibility to investigate and properly document the loss and will coordinate in a timely manner the claims adjustment process. Such adjuster will act on our behalf and will determine loss settlement in accordance with our direction and approval.

However, the Company reserves the right to hire its own adjuster at its discretion.

All other provisions of the policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

AXIS PROPERTY INSURANCE

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| C | 12:01 a.m. on 11/01/2023 | EAF657478-23 | Included |

**EQUIPMENT BREAKDOWN EXCLUSION ENDORSEMENT**

It is agreed that the following exclusion is added to the Policy:

Equipment Breakdown

This policy does not cover loss or damage to covered property resulting from any of the following:

a. mechanical breakdown, including rupture or bursting caused by centrifugal force;

b. artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

c. explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

d. explosion to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

e. loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

All other provisions remain unchanged.

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| D | 12:01 a.m. on 11/01/2023 | EAF657478-23 | Included |

**EXCLUSION OF LOSS OR DAMAGE DUE TO VIRUS OR BACTERIA**

It is agreed that the following exclusion shall be added to the policy:

**Virus or Bacteria Exclusion**

We will not pay for loss or damage to covered property caused by, arising out of or resulting from, contributed to or made worse by, actual, alleged or suspected presence of any virus, bacterium or microorganism that induces or is capable of inducing physical distress, illness or disease. Nor will we pay:

1. The expense or cost to extract or remove such a virus, bacterium or microorganism from covered property;

2. The costs associated with the enforcement of any ordinance or law which requires you or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of such a virus, bacterium or microorganism;

3. The expense or costs associated with the enforcement of or compliance with of any ordinance or law which requires the total or partial, temporary or permanent, interruption, closure or cessation of business;

4. Any cost to transport any property or debris to a site for storage or decontamination required because the property is infected by such a virus, bacterium or microorganism, whether or not such removal, transport or decontamination is required by law, regulation or any authority governing such matters; or

5. Any cost to store or otherwise dispose of any property because of the presence of such a virus, bacterium or microorganism in or on covered property.

This exclusion applies to all coverage under all forms and endorsements that comprise this coverage part or policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

With respect to loss or damage subject to this exclusion, the terms of this exclusion shall supersede any exclusion pertaining to pollutants.

As used in this endorsement:

The term “we” means the company providing this insurance.

The term “covered property” shall have the same meaning as set forth in the policy and shall have the same meaning as the term “insured property” (wherever such term is used in policy).

The terms of this exclusion, or the inapplicability of this exclusion to any particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this coverage part or policy.

All other provisions of the Policy remain unchanged.

Includes copyrighted material of Insurance Service Office Inc., with its permission.

| Named Insured | | Endorsement Number |
|---|---|---|
| Cumberland Property Management, LLC | | E |
| **Policy Number** | **Policy Period** | **Effective Date of Endorsement** |
| EAF657478-23 | 11/01/2023 to 11/01/2024 | 11/01/2023 |
| **Issued By** | | **Endorsement Issue Date** |
| AXIS Surplus Insurance Company | | 11/01/2023 |

**This endorsement changes the policy. Please read it carefully.**

## TERRORISM EXCLUSION ENDORSEMENT

A. The following exclusion is added:

Any other provision of this policy notwithstanding, this insurance does not cover loss, damage, injury, expense, cost or legal obligation directly or indirectly resulting from or arising out of or in any way related to any:

1. "Terrorism Act"; or

2. Actions taken by or on behalf of any government or any branch or division thereof (including, without limitation, the uniformed armed forces, militia, police, state security and anti-terrorism agencies) in responding to, preventing, combating, defending or retaliating against any "Terrorism Act."

This exclusion applies regardless of any other cause or event that in any way contributes concurrently or in any sequence to the loss, damage, injury, expense, cost or legal obligation.

This exclusion applies whether or not the "Terrorism Act" was committed in concert with or on behalf of any organization or government.

B. As used in this endorsement:

"Terrorism Act" means any act, preparation in respect of action or the threat of action that:

1. Involves violence or is dangerous to human life or tangible or intangible property (including electronic, communications, information or mechanical systems or infrastructure), and

2. Reasonably appears to be intended, in whole or in part, to:

a. Intimidate or coerce a civilian population or any segment of a civilian population; or
b. Disrupt any segment of the economy of one or more nations; or
c. Overthrow or influence the policy or conduct of a government; or
d. Respond to any governmental action or policy.

"Terrorism Act" shall also include any incident determined to be such by an official, department or agency that has been specifically authorized by federal statute to make such a determination.

"Terrorism Act" includes the intentional dispersal or application of pathogenic, or poisonous biological or chemical materials and shall also include any incident determined to be such by an official, department or agency that has been specifically authorized by federal statute to make such a determination.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this policy.

# SERVICE OF SUIT

# TEXAS

The Company hereby designates the Superintendent, Commissioner or Director of Insurance, or his/her designee, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or by any beneficiary under this Policy against the Company arising out of this Policy, provided that all lawful process received by said Superintendent, Commissioner or Director of Insurance, or his/her designee, is sent by certified or registered mail to the Company at:

**AXIS U.S. Insurance**

**Attn: Claims Administrator**

**10000 Avalon Blvd.**

**Suite 200**

**Alpharetta, GA 30009**

AXIS

# SIGNATURE PAGE

IN WITNESS WHEREOF, the Insurer has caused this policy to be issued by affixing hereto the facsimile signatures of its President and Secretary.

Secretary | President

Andrew Weissert, Secretary | Carlton Maner, President

# EXHIBIT C

StarStone

Part of the Core Specialty Group

# StarStone Specialty Insurance Company

**Company Address:**

Harborside 5
185 Hudson Street, Suite 2600
Jersey City, NJ 07311
(201) 743-7700
www.corespecialty.com

**To Report a Claim:**

Contact the Company at (201) 743-7700 or
send an email to: claims@corespecialty.com

**To File a Complaint**

Contact your Insurance Agent, or
Contact the Company at (201) 743-7700 or
Contact your State Director of Insurance

# SURPLUS LINES POLICYHOLDER NOTIFICATION

## STATE OF TEXAS

THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND DELIVERED AS SURPLUS LINE COVERAGE UNDER THE TEXAS INSURANCE STATUTES. THE TEXAS DEPARTMENT OF INSURANCE DOES NOT AUDIT THE FINANCES OR REVIEW THE SOLVENCY OF THE SURPLUS LINES INSURER PROVIDING THIS COVERAGE, AND THE INSURER IS NOT A MEMBER OF THE PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION CREATED UNDER CHAPTER 462, INSURANCE CODE. CHAPTER 225, INSURANCE CODE, REQUIRES PAYMENT OF A 4.85% PERCENT TAX ON GROSS PREMIUM.

StarStone

Part of the Core Specialty Group

# Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**Starstone Specialty Insurance Company**

To get information or file a complaint with your insurance company or HMO:

**Call: US Corporate Counsel at 1-855-275-6041**
Email: starstonecomplaints@startsone.com
Mail: Harborside 5, 185 Hudson Street
Jersey City, NJ 07311

**The Texas Department of Insurance**

To get help with an insurance question or file a complaint with the state:

Call with a question: 1-800-252-3439
File a complaint: www.tdi.texas.gov
Email: ConsumerProtection@tdi.texas.gov
Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

# STARSTONE SPECIALTY INSURANCE CO.

## CO-INSURING FORM GENERAL PROPERTY DECLARATIONS

This Declaration Page is attached to and forms part of the Policy as defined herein.

**Policy Number: U87778230CSP** **Renewal Of: New**

**POLICY PERIOD:**
Effective Date: 11/1/2023 Expiration Date: 11/1/2024
(12:01 A.M. Standard Time at the address of the Named Insured as stated herein)

| | |
|---|---|
| **Named Insured and Mailing Address:** | Cumberland Property Management<br>4686 McDermott Road, Suite 201<br>Plano, TX 75024 |
| **Producer Named and Address:** | Keith Shearer<br>RT Specialty, LLC - Atlanta, GA<br>5565 Glenridge Con #550<br>Atlanta, GA 30342 |
| **Description of Operations:** | **Retail** |

### Property Insurance

In return for the payment of the premium, and subject to all the terms of this policy, we agree to provide you with the insurance as stated in this policy.

**PREMIUM and FEES:**
This policy consists of the following coverage for which premium is indicated. This premium may be subject to adjustment:

| | |
|---|---|
| Commercial Property Coverage: | $535,017.00 |
| TRIA: | Rejected |
| Inspection Fee: | N/A |
| TOTAL: | $535,017.00 |

**Minimum Earned Premium:** 35%

**Forms and Endorsements:** See attached Schedule of Forms and Endorsements, CSI-CPN-202-0720

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

| | |
|---|---|
| **Lead Insurance Company:** | |
| **Name of Insurer:** | Lexington Insurance Company |
| **Policy Number:** | 062502712 |
| **Limit of Liability:** | $2,500,000 (50%) part of $5,000,000 |
| **Total Insured Values:** | $459,857,961 per schedule on file with the Company |
| **Perils Insured:** | All Risks of direct physical loss or damage excluding Flood, Earthquake, and Equipment Breakdown as defined in Lead Policy |
| **Property Covered:** | Real and Personal Property<br>Business Interruption – Gross Earnings/Extra Expense<br>And as more fully defined in the policy form as defined in Lead Policy |
| **StarStone Specialty Insurance Company Proportionate Share:** | **25%** |
| **Total Limit of Liability applicable to this policy:** | $1,250,000 (25.00%) part of $5,000,000 per occurrence, except as shown in Addendum A |
| **Deductible:** | As defined in Lead Policy |

**THESE DECLARATIONS, ALL INFORMATION AND MATERIALS MADE AVAILABLE BY OR ON BEHALF OF THE INSUREDS DURING THE UNDERWRITING PROCESS FOR THIS POLICY OR OTHERWISE INCLUDED WITHIN THE DEFINITION OF APPLICATION IN THE FOLLOWED POLICY, AND THIS POLICY FORM INCLUDING ATTACHED ENDORSEMENTS CONSTITUTE THE INSURANCE POLICY. ("Policy")**

12/15/2023
Date of Issuance

Joseph E (Jeff) Consolino
President, Joseph E Consolino

Authorized Representative, Robert Kuzloski

StarStone

Part of the Core Specialty Group

## FORMS AND ENDORSEMENTS SCHEDULE

The following Parts all attach to and form a part of this policy.

| FORM NUMBER | FORM NAME |
|---|---|
| CSI-CPN-201-0720 | Cover Page |
| CSI-CSN-843-0122 | Surplus Lines Policyholder Notification_Texas |
| CSI-CSN-812-0720 | Texas Policyholder Notification - Complaints |
| CSI-CPD-103-0622 | Co-Insuring Form Policy Declarations |
| CSI-CPN-202-0720 | Forms and Endorsement Schedule |
| CSI-CPN-203-0720 | Policy Holder Notification – Fraud Notice |
| CSI-CPN-204-0720 | Policy Holder Notification – OFAC |
| CSI-CPN-205-0622 | Notice of Claims Reporting |
| CSI-CPN-206-0720 | Notice of Privacy Policies and Practices |
| CSI-CPF-600-0622 | Starstone Co-Insuring Form |
| CSI-CPE-003-0622 | Asbestos Coverage Endorsement |
| CSI-CPE-004-0622 | Mold, Mildew, and Fungi Exclusion Endorsement |
| CSI-CPE-005-0622 | Pollution Endorsement (Sublimited) |
| CSI-CPE-006-0622 | Minimum Earned and Wind Minimum Earned Premium Endorsement |
| CSI-CPE-007-0622 | Equipment Breakdown Exclusion Endorsement |
| CSI-CPE-010-0622 | Terrorism Exclusion Endorsement |
| CSI-CPE-032-0622 | Exclusion of Loss Due to Virus and Other Microorganisms Endorsement |
| CSI-CPE-033-0622 | Nuclear, Biological, Chemical, and Radiological Exclusion Endorsement |
| CSI-CPE-034-0622 | War or Warlike Action Exclusion Endorsement |
| CSI-CPE-035-0622 | Cyber, Electronic Data and Systems Exclusion Endorsement |
| CSI-CPE-037-0622 | Service of Suit Endorsement |
| CSI-CPE-038-0622 | Joint Loss Agreement Endorsement |
| CSI-CPE-048-0622 | Several Liability |
| CSI-CPE-054-0622 | Pre-Existing Damage Exclusion Endorsement |
| CSI-CPE-028-0622 | Designated Loss Adjuster Endorsement |
| CSI-CPE-039-0622 | TRIA Rejection Endorsement |

StarStone

Part of the Core Specialty Group

# POLICYHOLDER NOTIFICATION
## FRAUD NOTICE

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |

StarStone
Part of the Core Specialty Group

| | |
|---|---|
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance<br>policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL<br>PENALTIES. |
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any<br>person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty<br>of insurance fraud. |
| **Oklahoma** | WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Oregon** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in Prison. The aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |

StarStone

Part of the Core Specialty Group

| | |
|---|---|
| | **Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and<br>may be subject to fines and confinement in prison. |
| **Tennessee** | All Commercial Insurance, Except As Provided for Workers' Compensation It is a crime to<br>knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>Workers' Compensation: It is a crime to knowingly provide false, incomplete or misleading<br>information to any party to a workers' compensation transaction for the purpose of committing<br>fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | Workers' Compensation: Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state<br>prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance<br>company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance<br>company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit<br>or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison. |

StarStone

Part of the Core Specialty Group

## POLICY HOLDER NOTIFICATION

## U.S. Treasury Department's Office of Foreign Assets Control ("OFAC")

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO REPLACE ANY PROVISIONS OF YOUR POLICY. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED.**

**THIS NOTICE PROVIDES INFORMATION CONCERNING POSSIBLE IMPACT ON YOUR INSURANCE COVERAGE DUE TO DIRECTIVES ISSUED BY OFAC.**

**PLEASE READ THIS NOTICE CAREFULLY**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

As "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treas.gov/ofac

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

StarStone

Part of the Core Specialty Group

# NOTICE OF CLAIMS REPORTING PROCEDURES

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

All claims should be reported per the below:

Email: ***newpropertyclaims@corespecialty.com***

Or

Phone: (201) 743-7700

Please have the following information available:

1. Insured Name
2. Policy Number
3. Date of Loss
4. Location of Loss
5. Detailed description of the loss event

**Any questions, please do not hesitate to contact Jerry Kissner, Head of Property Claims at 331-223-2962 (Gerald.kissner@corespecialty.com) or Dan Anstedt, AVP Technical Claims at 331-228-0116 (Daniel.anstedt@corespecialty.com)**

All other terms and conditions of this Policy remain unchanged.

StarStone

Part of the Core Specialty Group

# NOTICE OF OUR PRIVACY POLICIES AND PRACTICES

This Notice has been prepared to inform you that we do not disclose and we reserve no right to disclose to our affiliates or to nonaffiliated third parties, your nonpublic personal information, which we collect and maintain except with your permission or as permitted by law.

**Information we collect and maintain:** We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications, at your request or otherwise;
- Information we obtain from your transactions with us, our affiliates or others;
- Information we receive from consumer-reporting agencies.

**Information we may disclose:** We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

**How we protect information:** Except as otherwise described in this Notice, we restrict access to your nonpublic personal information to our employees who need to know to provide our products and services to you and as permitted by law. We maintain physical, electronic, and procedural safeguards that comply with applicable legal requirements to guard your nonpublic personal information. We have installed usernames, passwords and other safety features on our web applications to help ensure that the information you provide remains safe and secure.

**Changes to this Notice:** We may amend our privacy policies and practices at any time, and we will inform you of any material changes as required by law.

**YOU DO NOT NEED TO DO ANYTHING IN RESPONSE TO THIS NOTICE**

**THIS NOTICE IS MERELY TO INFORM YOU ABOUT OUR**

**PRIVACY POLICIES AND PRACTICES**

StarStone

Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

# StarStone Commercial Property Co-Insuring Form

## Addendum A

The Sublimits of Liability stated in this Policy are part of and not in addition to the Policy Limit. The Sublimits of Liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for a specific coverage, regardless of the number of Insured Locations, coverages or Covered Causes of Loss under this Policy.

The following Sublimits of Liability represent 100% of the coverage purchased by the Insured for the Program set forth below and the Company's share of each Sublimit of Liability shall be determined by applying the Participation as shown on the Declarations page "StarStone Specialty Insurance Company Proportionate Share".

The Sublimits of Liability stated in this Policy are per Occurrence unless otherwise indicated. Regardless of the number of Occurrences, any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or Covered Cause of Loss.

Named Storm:
i. $5,000,000 for all covered loss or damage arising out of Named Storm
ii. Subject to A.1.c.i. above, for all covered loss or damage arising out of Named Storm in a Tier 1 High Hazard Wind Zone (Consisting of Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands): $5,000,000
iii. Subject to A.1.c.i. above, for all covered loss or damage arising out of Named Storm in a Tier 1 High Hazard Wind Zone (Consisting of Virginia to Maine): $5,000,000
iv. Subject to A.1.c.i. above, for all covered loss or damage arising out of Named Storm in a Tier 1 High Hazard Wind Zone (Florida): $5,000,000
v. Subject to A.1.c.i. above, for all covered loss or damage arising out of Named Storm in a Tier 2 High Hazard Wind Zone: $5,000,000

vi. Other Sublimit(s) Applicable to Named Storm: Not Applicable
For the purpose of the above Sublimits of Liability, Named Storm includes, but is not limited to, loss or damage from wind, Hail, lightning, tornado, rain or water (whether driven by wind or not), Flood, or any wind driven objects or debris.

In the event covered loss or damage by Flood occurs concurrently or in any sequence with a Named Storm, the maximum amount the Company will pay per Occurrence for all such loss or damage by Flood shall be the applicable Sublimits of Liability for Flood as shown in Item 6.A.1.b. above, but in no event shall the Company pay more than the maximum applicable Named Storm Sublimit. However, if Flood is not covered, the maximum amount the Company will pay per Occurrence for all such loss or damage arising out of Named Storm shall exclude loss or damage by Flood.

d. Equipment Breakdown: NOT COVERED for all covered loss or damage from Equipment Breakdown
I. Other Sublimit(s) Applicable to Equipment Breakdown: Not Applicable
2. Sublimits Applicable to Additional Time Element Coverages - Each of these Sublimits is part of, and not in addition to the Policy Limit and any Sublimits applicable to Specified Covered Csauses of Loss shown in Item 6.A.1 above.
a. Contingent Time Element: $1,000,000 except as respects Earth Movement, Flood, and Named Storm, where the Sublimit is NOT COVERED

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

b. Extended Period of Indemnity: 180 days
c. Extra Expense: $2,500,000
d. Ingress & Egress: 30 days, subject to a maximum Sublimit of $1,000,000 and a distance limitation of 1 mile
e. Interruption by Civil or Military Authority: 30 days, subject to a maximum Sublimit of $1,000,000 and a distance limitation of 1 mile
f. Rental Value: $500,000
g. Royalties: $500,000
h. Additional Sublimits: Not Applicable

3. Sublimits Applicable to Additional Coverages - Each of these Sublimits is part of, and not in addition to the Policy Limit and any Sublimits applicable to Specified Covered Causes of Loss shown in Item 6.A.1. above.

a. Accounts Receivable: $1,000,000
b. Debris Removal: 25.00% of covered direct physical loss or damage payable for all Insured Property, subject to a maximum Sublimit of $1,000,000
c. Demolition And Increased Cost of Construction:
    Demolition Coverage A: Included
    Demolition Coverage B: $2,500,000
    Demolition Coverage C: $2,500,000
d. Electronic Data and Media: $500,000
e. Errors or Omissions: $500,000, except as respects Earth Movement, Flood, and Named Storm, where the Sublimit is NOT COVERED
f. Expediting Expenses: $1,000,000
g. Fine Arts: $100,000 per item subject to a maximum Sublimit of $100,000 per Occurrence
h. Fire Brigade Charges And Extinguishing Expenses: $500,000
i. Leasehold Interest (including Leasehold Improvements & Betterments): $100,000
j. Limited Pollution Coverage: $250,000 Annual Aggregate
k. Miscellaneous Unnamed Locations: $500,000, except as respects Earth Movement, Flood, and Named Storm, where the Sublimit is NOT COVERED
l. New Construction and Additions: $250,000, except as respects Earth Movement, Flood, and Named Storm, where the Sublimit is $250,000. In no event will the Company pay more than NOT COVERED for Soft Costs.
m. Newly Acquired Property: $1,000,000, except as respects Earth Movement, Flood, and Named Storm, where the Sublimit is $1,000,000
n. Outdoor Property: $500,000
o. Pairs or Sets: $100,000
p. Professional Fees: $100,000
q. Property Removed from Insured Locations: $250,000
r. Service Interruption: $1,000,000
s. Spoilage: $250,000
t. Transit: $50,000 per conveyance subject to a maximum Sublimit of $100,000 per Occurrence
u. Valuable Papers and Records: $100,000
v. Additional Sublimits: Not Applicable

4. Other Sublimits: Each of these Sublimits is part of, and not in addition to the Policy Limit and any Sublimits applicable to Specified Covered Causes of Loss shown in Item 6.A.1 above.

a. Contractor's Equipment:
$25,000 for physical loss or damage to contractor's equipment per item subject to a maximum Sublimit of $100,000 per Occurrence
b. Ordinary Payroll 30 days

B. Maximum Amount Payable: In the event of covered loss or damage hereunder, the liability of the Company shall be limited to the least of the following:

StarStone

Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

1. The actual adjusted amount of covered loss or damage, less applicable Deductible(s);
2. As respects each Insured Location, 115.00% percent of the total combined stated values for all categories of Insured Property and Time Element coverages shown for that Insured Location on the latest Statement of Values or other documentation, on file with the Company prior to the time of the loss or damage; or
3. The Policy Limit or applicable Sublimit(s) of Liability shown in Item 6.A. or elsewhere in this Policy.

Item 7. Qualifying Periods: In accordance with the Policy, the following Qualifying Periods apply to these Additional Coverages:

A. Ingress & Egress:48 hours
B. Interruption by Civil or Military Authority: 48 hours
C. Service Interruption: 48 hours

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

## CO-INSURING COVERAGE FORM

### 1. INSURING AGREEMENT:

Subject to the limitations, terms and conditions contained in this policy or endorsed hereto, the Company agrees to indemnify our share for direct physical loss or damage in any one occurrence hereunder up to the amount as shown in the Total Limit of Liability applicable to this policy section of the Co-Insuring Form General Property Declarations for the Coverage Provided and Perils shown in the Perils Insured section on the Co-Insuring Form General Property Declarations.

Except as regards the premium, the amount and participation AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this policy is subject to the same limitations, rights, terms, and conditions in the "Lead Insurance Policy".

The Company's share of the Lead Insurance Policy limits and sub-limits (including aggregate limits), if any, shall be restricted by the "Company's" participation on the program as described in the Participation section of this policy and any other applicable provision in this policy or any endorsement to this policy

### 2. MAINTENANCE OF LEAD INSURANCE POLICY

It is a condition of this policy that the policy of the Lead insurer shall be maintained in full effect during the currency of this policy and that the Lead insurer's policy shall carry limits which bear the same proportion to the total limits carried by all policies covering the property insured hereunder as the Lead Insurer's Proportionate Share as stated on the Co-Insuring Form General Property Declarations.

### 3. PROPORTIONATE SHARE

The Company's liability for any loss or damage covered by this policy shall be limited to its Proportionate Share of any loss or damage, as stated on the Co-Insuring Form General Property Declarations. The proportionate share shall apply to all limits of insurance, sub-limits of insurance, annual aggregate limits of insurance as well as to deductibles and self-insurance provisions as stated in the Lead Insurance policy.

### 4. NOTIFICATION OF CLAIMS

The insured, upon knowledge of any occurrence likely to give rise to claim for loss or damage as covered herein, shall give notice as soon as practicable to the person(s) or firm named for the purpose. See the Notice of Claims Reporting Procedures Form attached to this policy.

The insured will provide a signed and sworn proof of loss containing the information necessary to investigate the claim as requested and within sixty (60) days of the request or as required by law.

All claims for loss or damage under this policy must be made and the insured will submit final written proof of loss(es) within one year of policy expiration. Failure to do so shall invalidate claims for loss or damage hereunder.

StarStone
Part of the Core Specialty Group

201 E. Fifth Street, Suite 1200
Cincinnati, OH 45202
Tel: 844 722 7827
Fax: 513 599 7501
www.corespecialty.com

**5. CANCELLATION:**

a. This policy can be cancelled by the named insured by providing the Company with:
   i. An advanced written request for cancellation stating when the cancellation shall be effective, and

   ii. The original policy or a lost policyholder release signed by the named insured or its legal representative.

b. This policy may be cancelled by the Company by giving to the named insured at least ninety (90) days written notice of cancellation or in the case of non-payment of premium or material mis- statement, at least ten (10) days written notice of cancellation.

c. The cancellation will be effective even if the Company have not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

d. If this policy is cancelled, the Company will send the named insured any premium refund due.

**6. CONDITIONS OF COVERAGE**

By acceptance of this policy, the Insured agrees to pay the premium shown in the Co-Insuring Form General Policy Declarations and to comply with all the provisions of the policy.

If during the Policy Period the provisions of the Lead Insurance Policy are changed in any manner, as a condition precedent to coverage under this policy (the Insured shall have written notice to the Company of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such changed). No amendment to the Lead Insurance Policy during the Policy Period shall be effective in broadening or extending the coverage afforded by this policy or extending or increasing the limits of liability afforded by this policy unless the Insurer so agrees in writing. The Company may, in its sole discretion, condition its agreement to follow any changes to the Lead Insurance Policy or the Insured paying any additional premium required by the Company for such change.

This policy contains all the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this policy. This policy can be changed only by endorsements issued by the Company and made a part of this policy.

Notice to any agent or knowledge possessed by any agent or by any other person other than the Company will not:

a. Create a waiver, or change any part of this policy; or

b. Prevent the Company from asserting any rights under the provisions of this policy.

StarStone

Part of the Core Specialty Group

# ASBESTOS COVERAGE ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

## ASBESTOS COVERAGE ENDORSEMENT

This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the period of insurance by one of the following Listed Perils if a covered cause of loss in the policy

Fire; Explosion, Lightning, Windstorm, Hail, Direct Impact of Vehicle, Aircraft or Vessel, Riot or Civil Commotion, Vandalism or Malicious Mischief, Accidental Discharge of Fire Protective Equipment, Named Windstorm, Earthquake, and Flood.

This coverage is subject to each of the following specific limitations:

1. The building or structure containing the asbestos must be insured under this Policy for loss or damage by that Listed Peril.

2. The Listed Peril must be the immediate, sole cause of the damage of the asbestos.

3. The Insured must report to the Company the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However, this Policy does not insure any such damage first reported to the Insurers more than 12 (twelve) months after the expiration, or termination, of the period of insurance.

4. Insurance under this Policy in respect of asbestos shall not include any sum relating to:

   i) any faults in the design, manufacture or installation of the asbestos;
   ii) asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

5. The maximum amount that the Company will pay under this coverage endorsement in any 12 month period is $25,000

## ASBESTOS EXCLUSION

Except as set forth above, this Policy does not cover any loss, damage, cost, claim or expense, whether preventative, remedial or otherwise, directly or indirectly arising out of or relating to, regardless of any other
cause or event that contributes concurrently or in any sequence to the loss, damage, cost, claim or expense from asbestos.

This clause applies regardless of any other cause or event that contributes concurrently or in any sequence
to the loss, damage, cost, claim or expense.

StarStone

Part of the Core Specialty Group

# MOLD, MILDEW, AND FUNGI EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**MOLD, MILDEW, AND FUNGI EXCLUSION ENDORSEMENT**

1. Except as set forth in paragraph Clause 2 below, this Policy does not insure against any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to: mold, mildew or fungus

   This exclusion applies regardless whether there is (a) any physical loss, damage or destruction of property insured; (b) any insured peril or cause, whether or not contributing concurrently or in any sequence; (c) any loss of use, occupancy, or functionality; or (d) any action required, including but not limited to repair replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

2. Notwithstanding the foregoing, this Policy insures physical loss, damage or destruction of property insured by mold, mildew or fungus when directly caused by a Listed Peril that is a covered cause of loss under this policy occurring during the Policy Period.

**LISTED PERILS**

Fire; lightning; explosion; windstorm or hail; smoke; direct impact of vehicle, aircraft or vessel; strike, riot or civil commotion; vandalism or malicious mischief; leakage or accidental discharge of fire protection equipment; collapse; falling objects; weight of snow, ice or sleet; theft, sudden and accidental discharge leakage, backup or overflow of liquids or molten material from confinement within piping, plumbing systems, tanks, equipment or other containment located at the insured "location"; "Earthquake"; "Flood."

This coverage is subject to all the limitations in this Policy and, in addition, to each of the following specific limitations:

a. The property must otherwise be insured under this Policy for physical loss, damage or destruction by the Listed Peril.

b. The Insured must report the existence and cost of the physical loss, damage or destruction by mold, mildew or fungus to the Insurer as soon as practicable, but no later than twelve (12) months after the Listed Peril first caused physical loss, damage or destruction of insured property during the Policy period. This Policy does not insure any physical loss, damage or destruction by mold, mildew or fungus first reported to the Insurer after that twelve (12) month period.

StarStone

Part of the Core Specialty Group

# POLLUTION ENDORSEMENT (SUBLIMITED)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

## POLLUTION ENDORSEMENT (SUBLIMITED)

This Policy is extended to pay your expenses to extract "pollutants" from land or water if the release, discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

a. The date of direct physical "loss"; or

b. The end of the policy period.

The maximum amount that the Company will pay under this coverage endorsement in any 12 month period is $25,000 for pollution cleanup and removal.

## POLLUTION EXCLUSION

Except as set forth above, this policy does not insure any loss or damage, claim, cost, expense or other sum directly or indirectly arising out of the discharge, dispersal, seepage, migration, release or escape of "pollutants" . "POLLUTANTS" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

StarStone

Part of the Core Specialty Group

# MINIMUM EARNED AND WIND MINIMUM EARNED PREMIUM ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**MINIMUM EARNED AND WIND MINIMUM EARNED PREMIUM ENDORSEMENT**

The following terms and conditions will apply to this Policy:

1. If the Named Insured cancels this Policy, removes a Location or reduces the amount of coverage on a Location, a minimum premium of 35% of the original Policy premium shall become earned.

   Failure of the Named Insured to make timely payment of premium shall be considered a request by the Named Insured for the Company to cancel. In the event of such cancellation by the Company for non-payment of premium, the minimum premium shall be due and payable; provided, however, such non-payment cancellation shall be rescinded if the Named Insured remits the full premium due within 10 days of receiving it.

2. For Locations not "Exposed to Hurricane": If the Named Insured cancels this Policy, removes a Location or reduces the amount of coverage on a Location, the short rate return premium is 90% of applicable pro-rata premium subject to any Minimum Earned Premium stipulations in the Policy.

3. For Locations "Exposed to Hurricane": If the Named Insured cancels this Policy, removes a Location or reduces the amount of coverage on a Location and coverage existed any time during the period of June 1st to November 30th, the amount of premium the Company will return will be a percentage of the total premium determined using the below.

   The Unearned Premium is the Location premium times the Unearned Factor noted below:

| Days Policy In Force | Unearned Factor |
|---|---|
| 1 to 180 | 20% |
| 181 to 210 | 15% |
| 211 to 240 | 10% |
| 241 to 270 | 7.5% |
| 271 to 300 | 5.0% |
| 301 to 330 | 2.5% |
| 331 to 365 | 0.0% |

4. Subject to receipt of closing documents within 30 days of closing, this Policy allows pro-rata return premium for Locations sold, but not for loss of a management contract (unless the management contract is lost due to the sale of the property).

StarStone

Part of the Core Specialty Group

5. Subject to receipt of closing documents, this Policy allows pro-rata additional premium for Locations purchased during the policy term.

6. For Locations "Exposed to Hurricane", if added or coverage increased at an existing Location, during the term of the Policy and coverage exists at any time during the period of June 1st to November 30th, the premium will be calculated at 100% of the annual rate, less the Unearned Factor noted in No. 3. above. Otherwise, it shall be pro-rata.

7. Locations of like kind and quality shall be added at the account rate, subject to the Unearned Factor noted in No. 3 above. Locations of differing kind or quality or Locations in Dade, Broward, Palm Beach, Pinellas, and Hillsborough counties of Florida must be approved by the Company prior to attachment.

8. If a Location is "Exposed to Hurricane" the provisions of this clause replace any short rate provisions stipulated in this Policy, all subject to the Minimum Earned Premium provisions.

9. "Exposed to Hurricane" is defined to include any Location within 100 miles of the closest saltwater of the Atlantic Ocean and/or the Gulf of Mexico and/or the Hawaii Islands.

10. Coverage cannot be increased, nor additional Locations added if they are "Exposed to Hurricane" and a Named Storm is in existence, unless with the express written consent of the Company.

11. Nothing herein will act to provide coverage outside the automatic acquisition clause elsewhere in the Policy.

12. In the event of a total loss or constructive total loss to Covered Property by a Covered Cause of Loss, the premium applicable to that Covered Property shall be fully earned and no return premium will be due to the Named Insured.

All other terms, conditions and exclusions of the Policy remain unchanged.

StarStone

Part of the Core Specialty Group

# EQUIPMENT BREAKDOWN EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

## EQUIPMENT BREAKDOWN EXCLUSION ENDORSEMENT

Any other similar Exclusion within this Policy (or within any other Endorsement which forms part of this Policy) is deleted and replaced by the following:

This Policy excludes loss or damage due to:

**1.** Explosion in or of any of the following property: steam boilers, including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes connecting any of the foregoing; or gas turbines; except that this exclusion shall not apply to explosion of accumulated gases or unconsumed fuel within the firebox or the combustion chamber of any fired vessel, other than gas turbines, or within the flues or passages which conduct the gases of combustion therefrom.

**2.** Rupture, bursting, cracking, burning or bulging of any of the following property: steam boilers, including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes connecting any of the foregoing; hot water boilers or other equipment for heating water; pressure vessels, including equipment attached to and forming a part thereof; or gas turbines.

**3**. Mechanical or machinery breakdown, including rupture or bursting caused by centrifugal force.

**4**. Electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment caused by electrical currents artificially generated.

All other terms and conditions of this policy remain unchanged.

StarStone

Part of the Core Specialty Group

# TERRORISM EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**TERRORISM EXCLUSION ENDORSEMENT**

A. The following definitions are added with respect to the provisions of this endorsement:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      1) Use or threat of force or violence; or

      2) Commission or threat of a dangerous act; or

      3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

B. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage.

C. Exception Covering Certain Fire Losses

StarStone
Part of the Core Specialty Group

If an incident of "terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

D. Application of Other Exclusions

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

StarStone

Part of the Core Specialty Group

# EXCLUSION OF LOSS DUE TO VIRUS AND OTHER MICROORGANISMS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**EXCLUSION OF LOSS DUE TO VIRUS AND OTHER MICROORGANISMS ENDORSEMENT**

**1.** The exclusion set forth in Paragraph 2. applies to all coverages under all forms and endorsements that comprise this Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**2.** We will not pay for loss or damage caused by or resulting from any virus or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "Fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this policy.

**3.** With respect to any loss or damage subject to the exclusion in Paragraph **2.**, such exclusion supersedes any exclusion relating to "pollutants".

**4.** The following additional definitions apply to this Endorsement:

(a) "Fungus" means any plants or organisms belonging to the major group fungi, lacking chlorophyll, and including "Mold", rust, "Mildew", smuts, mushrooms, and yeasts;

(b) "Mold" means any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce "Molds".

(c) "Mildew" means a thin whitish coating of minute fungal hyphae produced on, among other things, organic matter or living organisms.

(d) "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smog, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this Policy remain unchanged.

StarStone

Part of the Core Specialty Group

# NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL EXCLUSION ENDORSEMENT**

This Policy will not pay for any loss, damage, cost or expense, whether real or alleged, that is caused, results from, is exacerbated by or otherwise impacted by, either directly or indirectly, any of the following:

1. Nuclear Hazard - including, but not limited to, nuclear reaction, nuclear detonation, nuclear radiation, radioactive contamination and all agents, materials, products or substances, whether engineered or naturally occurring, involved therein or released thereby;

2. Biological Hazard - including, but not limited to, any biological and/or poisonous or pathogenic agent, material, product or substance, whether engineered or naturally occurring, that induces or is capable of inducing physical distress, illness, or disease;

3. Chemical Hazard - including, but not limited to, any chemical agent, material, product or substance;

4. Radioactive Hazard - including, but not limited to, any electromagnetic, optical, or ionizing radiation or energy, including all generators and emitters thereof, whether engineered or naturally occurring.

The provisions of subparagraphs 1, 2, 3, and 4 will not apply and we will pay up to a maximum of $10,000 for any and all claims for such loss or damage arising out of events occurring within the term of this policy:

Where the agent, material, product or substance at issue is utilized in the course of business by a Named Insured; and

The discharge, dispersal, seepage, migration, release, escape or application of the pathogenic or poisonous nuclear, biological, chemical, or radioactive materials is accidental and is not the result of a wilful or malicious act against any persons, organizations, or property of any nature.

Only if, and to the extent required by state law, the following exception to the exclusion applies:

If a hazard excluded herein results in fire (and provided fire is a covered cause of loss), this policy will pay for the loss, damage, cost or expense caused by that fire, subject to all applicable policy provisions including the Limit of Liability on the affected covered property. Such coverage for fire applies only to direct loss or damage by fire to covered property. This coverage does not apply to insurance provided under Time Element coverages, including but not limited to, Business Income, Rental Value or Extra Expense coverage or endorsements that apply to those coverages

StarStone

Part of the Core Specialty Group

# WAR OR WARLIKE ACTION EXCLUSIONS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**WAR OR WARLIKE ACTION EXCLUSIONS ENDORSEMENT**

This policy does not insure any loss or damage, claim, cost, expense or other sum directly or indirectly arising out of War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

1. By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

2. By military, naval, or air forces; or

3. By an agent of any such government, power, authority, or force;

Any weapon of war employing atomic fission or radioactive force, whether in time of peace or war, whether or not its discharge was accidental; or

Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such occurrence, seizure or destruction;

Including any consequence of paragraphs listed herein.

All other terms and condition of the Policy remain unchanged.

StarStone
Part of the Core Specialty Group

# CYBER, ELECTRONIC DATA AND SYSTEMS EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**CYBER, ELECTRONIC DATA AND SYSTEMS EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS
Notwithstanding any provision to the contrary within the Policy or any endorsements attached thereto, it is understood and agreed as follows:

EXCLUSION:

This Policy does not insure any loss, damage, destruction, distortion, erasure, corruption or alteration of Electronic Data from any cause whatsoever (including but not limited to Computer Virus) or any loss of access, any loss of use, reduction in functionality, cost, expense of any kind or of any nature whatsoever resulting therefrom.

Further, this Policy does not insure any loss or damage that directly or indirectly results from loss, damage, destruction, distortion, erasure, corruption or alteration of Electronic Data from any cause whatsoever (including but not limited to Computer Virus).

Such loss or damage as described herein is excluded regardless of any other cause or event contributing concurrently or in any other sequence to the loss or damage.

This exclusion applies regardless of whether the loss or damage arises out of or results from authorized, unauthorized, intentional, unintentional or accidental access in, of, or to any computer, communication system, file server, network(s), networking equipment, computer system, computer hardware, computer software, data processing equipment, computer memory, microchip, microprocessor, integrated circuit or similar device.

Electronic Data means facts, concepts and information recorded, transmitted or converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment. Electronic Data also includes programs, software and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

Computer Virus means a set of corrupting, harmful or otherwise unauthorized instructions or code including,but not limited to any set of maliciously, intentionally, unintentionally or accidentally introduced instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature located anywhere in the world. Computer Virus includes, but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

However, in the event that a peril insured by this Policy results from any of the matters described herein, this Policy, subject to all its terms, conditions and exclusions, will cover physical damage to insured

property that was directly caused by such peril insured by this Policy and occurring within the Policy Period.

StarStone

Part of the Core Specialty Group

# SERVICE OF SUIT ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**SERVICE OF SUIT ENDORSEMENT**

In the event of our failure to pay any amount claimed to be due under this Policy, we agree to submit to the jurisdiction of any court of competent jurisdiction within the United States in which a suit for those amounts may be brought. Nothing in this condition constitutes or should be understood to constitute a waiver of our right to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Service of process in such suit may be made upon:

**Robert Kuzloski**
**Legal Department**
**StarStone US Companies**
412 Mt. Kemble Avenue, Suite G-60
Morristown, New Jersey 07960
Tel: 917 704 6008
Email: Robert.Kuzloski@corespecialty.com
www.corespecialty.com

or his or her representative, and that in any suit instituted against us with respect to this Policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

To the extent required by the express provisions of any statute of any state, territory, or district of the United States, we hereby designate the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office as our true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of this Policy, and we hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this policy remain unchanged.

StarStone

Part of the Core Specialty Group

# JOINT LOSS AGREEMENT ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**JOINT LOSS AGREEMENT ENDORSEMENT**

It is agreed that:

A. If, at the time of loss, a policy insuring boiler and machinery and/or mechanical breakdown exists which may insure the same property subject to a claim under this Policy; and

B. If there is disagreement between the Company and any other insurer involved in the claim either as to:

1) Whether such loss or damage was caused by a peril insured against by this Policy or by an accident insured against by such boiler and machinery and/or mechanical breakdown Insurance policy; or

2) The extent of participation of this policy and of such boiler and machinery and/or mechanical breakdown insurance policy, then;

C. Upon the Insured receiving one half of the claims payment from the insurer issuing the boiler and machinery and/or mechanical breakdown insurance policy, this Company shall, upon written request of the Insured, pay the Insured the Company's proportional share of the remaining one-half of the amount of the loss which is in disagreement, but in no event for more than this Company would have paid if there had been no boiler and machinery and/or mechanical breakdown insurance policy in effect, subject to the following conditions:

1) The amount of the claim which is in disagreement, after making provisions for any undisputed claims payable under the said policies and after the amount of the claim is agreed upon by the Insured and the Company, is limited to the minimum amount remaining payable under either the boiler and machinery and/or mechanical breakdown insurance policy or this Policy;

2) The Insured agrees that any payment(s) made under this endorsement shall be returned if the boiler and machinery insurer does not submit to and proceed with arbitration within ninety (90) days of receipt of such payment(s) as per the APPRAISAL provision of this Policy, and the Insured agrees to cooperate, but not intervene, with such arbitration;

3) This endorsement shall not apply unless such other policy issued by the boiler and machinery insurer is similarly endorsed;

4) Acceptance by the Insured of sums paid pursuant to these provisions shall not alter, waive, surrender or in any way affect the rights of the Insured against the Company.

All other terms and conditions of this policy remain unchanged.

StarStone

Part of the Core Specialty Group

## Several Liability Endorsement

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY**

*To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. This endorsement does not change any other provision of the insurance policy and takes effect on the effective date of this insurance policy unless another effective date is shown.*

The Insurer's and/or Company's liability under this Policy for covered losses is several and not joint with other insurers party to this contract. The Insurer(s) and/or Company(s) are liable only for the proportion of liability it has underwritten. The Insurer(s) and/or Company(s) are not jointly liable for the proportion of liability underwritten by any other insurer. Nor are the Insurer(s) and/or Company(s) otherwise responsible for any liability of any other insurer that may underwrite this policy.

The Insurer's and/or Company's liability may not be increased in the event that any other insurer or other party to this contract who for any reason does not satisfy all or part of its obligations.

All other terms and conditions, insured coverage and exclusions of this Insurance Policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this Policy.

StarStone

Part of the Core Specialty Group

# PRE-EXISTING DAMAGE EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement.

## PRE-EXISTING DAMAGE EXCLUSION ENDORSEMENT

There is no coverage under this Policy for loss or damage caused directly or indirectly by the following exclusion. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area:

Loss or damage arising out of pre-existing damage as outlined below:

a. A Building or any part of a Building that is in danger of falling down or caving in,

b. Any part of a Building that has separated from another part of the Building, or

c. A Building or any part of a Building that is standing which shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

All other terms and conditions of this Policy remain unchanged.

StarStone

Part of the Core Specialty Group

# DESIGNATED LOSS ADJUSTER ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the
same and apply to this endorsement:

**DESIGNATED LOSS ADJUSTER ENDORSEMENT**

It is agreed that any losses submitted for consideration under this Policy will be assigned to and adjusted by:

Ryan Vesta
Crawford GTS
Direct: +1 260-437-1937
Email: ryan_vesta@us.crawco.com

This designation, however, does not authorize the above to obligate or commit the Insurer(s) to any amount, loss valuation, limits, coverage and/or settlement, all of which remain subject to the Insurer(s) approval. It is also agreed that the use of any additional claims consultants shall only be with the pre-approval of the Insurer(s).

All other Loss Conditions, Notice, and Proof of Loss requirements hereunder remain unchanged.

StarStone

Part of the Core Specialty Group

# TERRORISM RISK INSURANCE ACT REJECTION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

## TERRORISM RISK INSURANCE ACT REJECTION ENDORSEMENT

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as and extended by the Terrorism Risk Insurance Insurance Program Reauthorization Act of 2015 summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

**All other terms and conditions of the policy remain unchanged.**

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SUNSHINE EASTGATE PLAZA, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 3:25-cv-02986-O** |
| | § | |
| **LEXINGTON INSURANCE COMPANY, AXIS SURPLUS INSURANCE COMPANY, AND STARSTONE SPECIALTY INSURANCE COMPANY,** | § | |
| | § | |
| *Defendants.* | § | |

**DECLARATION OF J.S. HELD, LLC**

| | |
|---|---|
| **THE STATE OF __ILLINOIS_________** | § |
| | § |
| **COUNTY OF ____COOK___________** | § |

1. "My name is _____David Drengenberg___. I am over twenty-one (21) years of age, am of sound mind, and capable of making this Declaration.

2. I am a Records Custodian of J.S. Held, LLC ("J.S. Held"). I am an authorized representative of J.S. Held for the purposes of giving this Declaration. As a result of my position and the materials provided to J.S. Held as part of this claim, J.S. Held has personal knowledge of the facts stated herein. I am familiar with the manner in which J.S. Held's records are created and maintained by virtue of my duties and responsibilities. J.S. Held served as the engineering firm retained by Crawford Global Technical Services on behalf of Lexington Insurance Company, AXIS Surplus Insurance Company, and StarStone Specialty Insurance Company for the insurance claim reported by Sunshine Eastgate Plaza, LLC regarding the commercial buildings located at 1430 Northwest Highway, Garland, Texas and 4445 Saturn Road Garland, Texas. The reported date of loss was a September 24, 2024 storm (the "Claim").

3. Attached hereto are J.S. Held records that have been bates labeled JS HELD 0001–0077.

4. These records are the original records or exact duplicates of the original records. These records were made and kept by J.S. Held in the course of regularly conducted business activity, and it was the regular practice of a person with knowledge of that business activity to make and keep such records. Each record was made at or near the time of the acts, events,

conditions, opinions, or diagnoses set forth in the record by, or from information transmitted by, persons with knowledge of the matters set forth.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."

Executive in _____COOK______ County, __ILLINOIS_____ on September _3__, 2026.

______David Drengenberg_____________
**DECLARANT**

January 24, 2025

Ryan Vesta
National General Adjuster
Crawford Global Technical Services
Sent via email to: Ryan_Vesta@us.crawco.com

Re: **Engineering Evaluation Report**

| | |
|---|---|
| File Name: | Cumberland Property Management - Sunshine Estate Plaza, LLC |
| Address: | 1430 Northwest Highway, Garland, Texas 75041<br>4445 Saturn Road Garland, Garland, Texas 75041 |
| Claim No. | 2350728910US (AIG/Lexington)<br>ATL 213714 (AXIS)<br>4245921 (Sedgwick) |
| Crawford File No.: | 4448960 |
| Cause of Damage: | Reported as Hail and Wind |
| Date of Damage: | Reported as September 24, 2024 |
| J.S. Held No.: | 250100173 |

Dear Mr. Vesta,

At your request, J.S. Held LLC (J.S. Held) has conducted an *Engineering Evaluation* concerning the above-referenced address(es). It was our understanding that a storm event reportedly occurred at the subject property on or around September 24, 2024. This evaluation was performed to determine whether the reported storm had caused wind and/or hail damage to the exteriors and roof coverings of the subject buildings, as well as to identify the cause of the reported water intrusion.

As part of the evaluation, J.S. Held inspected accessible interior areas, exteriors, and roof coverings of the subject property. We documented and photographed representative conditions. Refer to **Appendix A – Captioned Photographs**. These photographs may have been cropped or otherwise enhanced to emphasize certain conditions of interest. All photographs have been retained in their original formats in our file and can be provided upon request.

## CONCLUSIONS

Based on the inspection performed by J.S. Held at the subject property, the evaluation of the information discussed, and the information presented in the appendices, it was our professional engineering opinion that:

1. The modified bitumen (mod-bit) roof membranes on Buildings 1 and 2 were not damaged by hailstone impacts or the effects of wind during September 24, 2024 or any other date.
2. The south facet of the steep-slope metal roofing panels at the front elevation of Building 1 exhibited circular indentations consistent with the effects of hailstone impacts that occurred prior to the last 1-2 years prior to J.S. Held's site inspection.
    a. These indentations did not diminish the water shedding ability or reduce the expected service life of the materials.
3. The exteriors of Buildings 1 and 2 did not exhibit hail and/or wind damage.

4. The reported water intrusion in Jumping World and the Laundromat was the result of failed and insufficient weather barrier and flashing at roof appurtenances and parapet walls, not created or exacerbated by storm action.
5. The reported water intrusion in Ernesto's Mexican Restaurant and in Cruz Insurance Group were likely the result of either marginal roof leaks or leakage from piping system running in the interstitial ceiling space, not created or exacerbated by storm action.

**PROPERTY DESCRIPTION**

The subject property was a commercial shopping mall facility. Refer to **Figure 1** for the location and building labels used in this report. Based on the Dallas [Central] County Appraisal District, the buildings or additions on the subject property were built in 1973, 1986, and 1998.

Building 1 (address: 4445 Saturn Road Garland, Garland, Texas 75041) was an east facing, one-story building with multiple commercial spaces. The building featured three low-sloped roofs at different elevations (sections 1A, 1B, and 1C), all covered with mod-bit membrane surfaced with a granular cap sheet. Rooftop appurtenances featured metal parapet wall coping, heat, ventilation and air conditioning (HVAC) rooftop units (RTUs), roof vents, among others. The exterior of the building was primarily clad with cementitious textured finish, painted concrete masonry units (CMU), and pebbledash finish. **(Photos 1 through 5).**

Building 2 (address: 1430 Northwest Highway, Garland, Texas 75041) was a north facing, one-story building with multiple commercial spaces. The roof was a low-sloped structure covered with mod-bit surfaced with a granular cap sheet. Rooftop appurtenances featured metal parapet wall coping, HVAC RTU, roof pipes and vents. The exterior of the building was primarily clad with cementitious finish, painted CMU and pebbledash finish. **(Photos 6 through 10).**

**[Space intentionally left in blank.**

**Report continues on next page]**




**Figure 1.** Aerial view of property. Source: Nearmap, dated October 1, 2024. Buildings and sections labels indicated.

**SITE INSPECTION**

J.S. Held conducted a site inspection on January 8, 2025. The site inspection was attended by:

- Jimmy (unknown last name, roofing contractor, Restoremasters Commercial)
- Ty (unknown last name, roofing contractor, Restoremasters Commercial)
- Tenants/business employees from several commercial spaces present during interior inspections.
- David Jimenez, P.E. (Senior Engineer, J.S. Held)

The following information was provided during the site inspection (paraphrased by J.S. Held):

- Ernesto's Mexican Restaurant located in Building 1, south end of section 1C; had minimal areas of roof leaks.
- The Laundromat, located in Building 1, northeast end of section 1C, has two roof leaks coming from roof penetrations.
- Jumping World, located in Building 1, north end of section 1A, has multiple roof leaks primarily along the north and west exterior walls. The leaks have been occurring for several years, and roof repairs solved the leaks for a period of time, but they then reappeared.

- Cruz Insurance Group, located in Building 2, east end, had a small leak in the back (south) side of the building.
- The roofing contactors indicated that the restaurants on the middle and west side of Building 2 also had roof leaks. Some of them were already repaired. The restaurants were closed and inaccessible for J.S. Held's inspection.

**DOCUMENT REVIEW**

J.S. Held reviewed the following information in conjunction as part of our evaluation:

- Google Street View Imagery.
- Google Earth.
- Nearmap Aerial Imagery.
- CONNECT Explorer™ Aerial Imagery.
- Dallas [Central] County Appraisal District Records. URL: https://www.dallascad.org/
- National Oceanic Atmospheric Administration (NOAA), Nations Centers for Environmental Information (NCEI), Storm Events Database, Dallas County, January 1, 2019 through September 30, 2024.
- National Weather Service (NWS) *Local Storm Reports*[1], Dallas-Fort Worth National Weather Station, Dallas County, October 1, 2024 through January 8, 2025.

**OBSERVATIONS**

The following pertinent observations were made:

<u>BUILDING 1</u>

*<u>Exterior</u>*

- Hail spatter marks were identified on peripheral exterior components on the building such as HVAC cabinets with west and south exposures. These spatter marks measured up to 1/2-inch across their base. Some spatter marks were partially faded and covered with built-up grime within. **(Photos 11 and 12).**
- Circular indentations without coincident spatter marks were identified in limited soft metal components such as in some light-gauge roof vent. The indentations measured up to 1-1/4 inches in outer diameter in roof vents and were located on the southwest elevation. Several metal components such as steel and aluminum downspouts, parapet wall coping and HVAC cabinets were absent circular indentations. **(Photos 13 through 18).**
- Circular indentations were observed in the steep-slope standing metal seam panels on the east side of the building. These indentations measured up to 1-1/4-inch in outer diameter on the south slope without coincident spatter marks whereas no indentations were observed in the north

---

[1] Accessed via Iowa State University, URL: https://mesonet.agron.iastate.edu/lsr/

slope. No fractures or ruptures of the material were observed nor disengaged seam laps. **(Photo 19 through 22).**

- Flattened exposed fin coils of roughly circular shape with comparable frequency and distribution were observed on representative HVAC RTUs (installation dates including before 2014, 2017 and 2021, see **AERIAL IMAGERY REVIEW** section) facing all cardinal directions. These indentations measured up to 5/8-inch across their width and were oxidized. **(Photos 23 through 32).**
- The roofing membranes exhibited general granular shedding, some linear and irregular blemishes, especially section 1A around roof appurtenances. In some cases the blemishes exhibited a ridge of granules pushed to the side. **(Photos 33 through 38).**
- The mod-bit was closely examined in two 100-square-feet test areas (TA) for circular or semi-circular blemishes, concavity, tactile softness or spots with localized granule shedding with well-defined granule size pits with dark coloration that exhibited random and frequent distribution. TA-1A and TA-1C were located in sections 1A and 1C, respectively. **(Photos 39 through 46).**
  - TA-1A exhibited one roughly circular blemish of absent granules without concavity, pushed granules or tactile softness. Several other irregular blemishes with oxidized and planar asphalt binder were observed.
  - TA-1C exhibited one roughly circular isolated blemish of absent granules without concavity, pushed granules or tactile softness that measured approximately 1-inch across. No other blemishes were observed.
- The base of the parapet walls did not exhibit circular blemishes of absent granules with a frequent distribution. **(Photo 47).**
- The base of the parapet walls on section 1A, particularly along the north and west sides, exhibited extensive granular shedding, craze cracks and failed and degraded seam patches. Some previous repair attempts were observed in the form of sealant applications. Along the west parapet wall, no water diversion mechanism was observed in between the drainage scuppers and mod-bit surfacing granules had accumulated in between the scuppers. The metal counter flashing was absent displacement, distortion or circular indentations. **(Photos 48 through 56).**
- The mod-bit was absent displaced or folded-back sections. Rooftop appurtenances did not exhibited displacement, including roof vents and parapet wall coping.
- The exterior elevations clad with cementitious finish were absent circular punctures or fractures.

*Interior*

- Ernesto's Mexican Restaurant: Isolated and localized small water stains on the ceiling tiles were observed around a sprinkler head. No other areas of water leaks were observed or reported by the restaurant's employees. **(Photo 57).**
- Laundromat: The roof framing was exposed due to the unfinished ceiling. The laundromat's employees reported two locations of water intrusion during precipitation events. Both locations were around pipe penetrations. On one instance a small water stain on the painted metal deck was observed. **(Photos 58 and 59).**
- Jumping World: Several instances of water intrusion were reported by the manager, primarily along the north and west walls and a few isolated instances on the interior. **(Photos 60 through 69).**
  - Streak marks were observed on a wall. The origin appears to be a HVAC ductwork immediately above.

- Along the west exterior wall, the paint had bubbled and delaminated, primarily below the roofing deck. Streak marks were identified on the wall surface as well as apparent efflorescence on the CMU.
- Along the north wall (adjoining with section 1B), the paint had bubbled and delaminated, primarily below the roofing deck. Streak marks were identified on the wall surface as well as apparent efflorescence on the CMU.
- The isolated instances were within 20 feet from the north wall. In these locations, no openings or gaps were observed on the metal roofing deck.

BUILDING 2

*Exterior*

- Hail spatter marks were identified on peripheral exterior components on the building such as HVAC cabinets with west and south exposures. These spatter marks measured up to 1/2-inch across their base. Some spatter marks were partially faded and covered with built-up grime within. **(Photos 70 through 74).**
- No circular indentations were observed on soft metal components such as aluminum downspouts, parapet wall coping, HVAC cabinets and roof vents. **(Photos 75 through 82).**
- Flattened exposed fin coils of roughly circular shape with comparable frequency and distribution were observed on representative HVAC RTUs (installation dates including before 2014, 2016, 2017 and 2020, see **AERIAL IMAGERY REVIEW** section) facing all cardinal directions. These indentations measured up to 1/2-inch across their width and were oxidized. **(Photos 83 through 88).**
- Peripheral building elements such as downspouts, gutters, wall-mounted cameras and lights were absent displacement. **(Photos 89 and 90).**
- The mod-bit was closely examined in one 100-square-feet test area (TA-2) for circular or semi-circular blemishes, concavity, tactile softness or spots with localized granule shedding with well-defined granule size pits with dark coloration that exhibited random and frequent distribution. TA-2 exhibited four roughly circular blemishes of absent granules without concavity or tactile softness. Several other linear and elongated blemishes with oxidized and planar asphalt binder were observed. **(Photos 89 through 95).**
- The base of the parapet walls did not exhibit circular blemishes of absent granules with frequent distribution. **(Photos 96 and 97).**
- Outside the test area, isolated and infrequent blemishes were observed some elongated, linear or roughly circular. The roughly circular were absent concavity and tactile softness. **(Photos 98 and 99).**
- The mod-bit was absent displaced or folded-back section. Rooftop appurtenances did not exhibited displacement, including roof vents and parapet wall coping. Dirt accumulation was observed along the south roof edge of the building. **(Photos 100 through 102).**
- The exterior elevations clad with cementitious finish were absent circular punctures or fractures.

*Interior*

- Cruz Insurance Group: Isolated and localized small water stain on the ceiling tiles was observed at the southern end of the building. No other areas of water leaks were observed or reported by the employees. **(Photo 103).**

**WEATHER DATA**

As part of our evaluation, we obtained weather data from the National Centers for Environmental Information (NCEI). The referenced weather data was included in **Appendix B – Weather Data**. Refer to the information in **Appendix C – Weather Research and Hail** for further explanation of these weather data sources. The following is a summary of that data.

HAIL

J.S. Held searched the NCEI *Storm Events Database* (SED) for hail reports in Dallas County between January 1, 2019, and September 30, 2024, the last available date. These data included 150 reports of hailfall events during the search period. Based on the geographical coordinates included in the database, the closest reports was for 0.88-inch hailstones on March 22, 2021 at a location approximately 2.1 miles from the subject property. The data also included a report for 1.50-inch hailstones on May 28, 2024 at a location approximately 3 miles from the subject property. A report for 1.25-inch hailstones on March 16, 2023 at a location approximately 3.3 miles from the subject property was included in the database. No reports for September 24, 2024, were included in the database.

J.S. Held also consulted the Local Storm Reports (LSR) database for reports of hail from the Dallas-Fort Worth National Weather Station and Dallas County between October 1, 2024, and the date before our inspection. The database contained no reports of hail within this date range in this County.

WIND

J.S. Held searched the NCEI SED for reports of thunderstorm high winds, strong winds, tornados, or funnel clouds (i.e., wind events) in Dallas County between January 1, 2019, and September 30, 2024, the latest final data available. These data included 96 reports of wind events during the search period. Based on the geographical coordinates included in the database, the closest report was for a 58 miles per hour (mph) wind gust at approximately 1.2 miles from the subject property on November 10, 2021. On March 16, 2023, one report of 46 mph was reported at an approximate distance of 1.9 miles from the subject property. No reports for September 24, 2024, were included in the database.

J.S. Held also consulted the Local Storm Reports (LSR) database for reports of wind from the Dallas-Fort Worth National Weather Station and Dallas County between October 1, 2024, and the date before our inspection. The database contained no reports of winds within this date range in this County.

The weather information is provided for reference only and may or may not represent the actual weather conditions experienced at the property on or around the reported date of loss. Our analysis and conclusions in this report are based on all the information gathered and supported by the physical evidence available at the time of our inspection.

**AERIAL IMAGERY REVIEW**

Review of aerial imagery from Nearmap showed that the roof coverings on Building 1, section 1A was apparently installed prior 2014 whereas for sections 1B and 1C circa 2016 (refer to **Figure 2**). Moreover, several HVAC units had been installed from 2014 through 2022 with some units without apparent modifications since 2014.




**Figure 2.** Aerial views of Building 2. Source: Nearmap, dated as indicated.

Similarly, the roof coverings on Building 2 were installed circa 2016 (refer to **Figure 3**). Moreover, several HVAC units had been installed from 2016 through 2020 with some units without apparent modifications since 2014.




**Figure 3.** Aerial views of Building 2. Source: Nearmap, dated as indicated.

## DISCUSSION

The characteristics of hail damage are discussed in detail within **Appendix C – Weather Research and Hail.**

Hail falls randomly, and resultant damage, if any, will necessarily have a generally consistent frequency throughout the entirety of any given roof field direction with equivalent roofing materials and exposure to the hailfall. Hail damage to roof coverings occurs when hailstone impacts diminish the weather-resisting function and/or service life of the roof covering. Hailstone impacts that do not result in one or both circumstances are considered to have been resisted by the roofing materials. As such, not all hail causes damage to roofing.

Hail impact damage to modified bitumen roofs generally consists of a random distribution of generally circular blemishes, which are characterized by concentric circular rings of fractures surrounding the point of impact, and where the impact site shows evidence of rupture of the reinforced membrane (generally identifiable by an inherent tactile softness with respect to the surrounding membrane area). Through laboratory testing and field observations, it has been generally established that the minimum hailstone size capable of damaging modified bitumen membranes is approximately 1-1/2 inches in diameter[2]. However, this size is considered conservative for the identification of damage-causing natural hailstones as the ice in naturally forming hailstones is less dense than freezer-made ice used in laboratory testing,

[2] *Hailstorm Investigation* – RICOWI, Inc & RICOWI 2016 Hail investigation Program – Herzog and Kouba.

and because naturally occurring hail does not necessarily strike roofing surfaces from a perpendicular direction to impart maximum force.

The test areas performed on the roof surfaces in Buildings 1 and 2, exhibited some blemishes, some linear, elongated or roughly circular. The latter were absent inherent tactile softness, concentric cracks, concavity, or a consistent random frequency, which indicated that the mod-bit membranes of Buildings 1 and 2 had not sustained hail damage. The base of the parapet walls which are more vulnerable to hail damage due to their supporting condition were absent punctures, tears, or bruises, corroborating that no hail damage had occurred on the subject roof coverings.

Collectively, the physical evidence (spatter/scuff marks and dents in soft metals) indicated that recent hailfall (within the last 1- 2 years) consisted of some maximum-sized hailstones between 1/2 of an inch to 5/8 of an inch in diameter that fell primarily from the west and south and did not possess the necessary impacting energy to damage the mod-bit membranes. The limited indentations on light gauge/soft metal components (namely the aluminum roof vent) did not exhibit corresponding spatter marks indicated that were caused by historical hailfall (prior to the last 1-2 years). Other metal components that are typically heavier gauge than roof vents were absent indentations.

In addition, the size of the observed indentations in HVAC fin coils were conducive to estimating historical hailstone sizes between 1/2 of an inch to 5/8 of an inch[3]. The flattened fin coils were oxidized on all the elevations and exhibited similar frequency among different HVAC units installed before 2014 through 2022. Therefore, it is J.S. Held's opinion that the maximum hailstones that have fallen at the site were between 1/2 of an inch to 5/8 of an inch.

The steep-slope standing metal seam panels on the east side of the Building 1 exhibited circular indentations consistent with the effects of hailstone impacts. These indentations occurred prior to the last 1-2 years prior to J.S. Held's site inspection due to the lack of coincident spatter marks. The indentations did not exhibit fractures or ruptures of the material nor distorted seam laps. The indentations did not diminish the water shedding ability or reduce the expected service life of the panels.

The exterior elevations of the buildings clad with cementitious finish were absent of circular punctures or fractures, unlike hail damage, including the south and west elevations where recent hail impacted the site.

<u>WIND</u>

Wind pressure increases as the height of the structure increases. Further, as wind pressures increase, components and cladding elements on the exterior of a building and other lightly-framed elements (such as roof appurtenances, gutters, downspouts, parapet coping) would be the first expected elements of a building to be more notably damaged or detached entirely from the building due to their relatively light weight and exposure. Damage to and removal of susceptible components and cladding elements would be expected to occur prior to a roof system incurring structural wind damage.

Wind can cause damage to low-sloped membrane roof systems primarily through two forces: uplift and pressurization. Uplift forces are generated as the wind accelerates when it passes over the roof edge. This acceleration creates a pressure differential and a lifting force, uplift, which is exerted upon the roof

[3] *Dents in Metal Roof Appurtenances Caused by Ice Ball Impacts* – Morrison, Scott, Haag Engineering.

surface. The uplift forces, and the damage they cause, are typically greatest near the corners and edges of the roof, and to a lesser degree in the "field" or central areas of the roof. Uplift forces vary with the shape and height of the building, overall wind exposure, size of roof openings, etc. Pressurization of the roof is created by wind forces that occur when the wind is allowed to enter the space beneath the roofing surface and exert a positive upward pressure on the roofing system that might cause fractures in the areas where the largest tensile stresses are expected or by pulling the membrane out from the fasteners along the seams. Also, damage can be seen as folded-back or displaced sections once the membrane had settled or as wind-borne debris impact which causes a localized disturbance of the membrane, removing surface granules and asphalt and in some cases potentially causing a rupture of the reinforcing mat.

Building codes and design standards recognize that the highest wind pressures on low-sloped roofs occur along the roof edges and corners where the pressures are greater than within the interior fields of the roof. Therefore, wind damage to the roof covering is expected to occur in concentrated areas within the higher wind zones of the roof, which has been substantiated by studies of storm damage. Additionally, wind forces associated with a storm are primarily directional in nature and would not be expected to produce a similar magnitude of wind exposure, or resultant damage, in all directions of a building.

The low-sloped roof coverings on Buildings 1 and 2 did not exhibit folded-back, displaced or missing roofing sections. No abrasion marks with dark colored asphalt binder were observed. These conditions rendered that the modified bitumen roof membranes did not sustain wind damage. In addition, ancillary light-framed elements such as gutters, downspouts and roof appurtenances were absent of displacement or distortion caused by wind effects.

WATER INTRUSION

No storm created openings were observed on the roof surfaces of Buildings 1 and 2. The observed areas of water intrusion in Jumping World were consistent with insufficient and failed flashing, particularly at the interface between the roof coverings and parapet walls that exhibited degraded and seam patches, unrelated to storm action. The efflorescence in the CMU walls and the previous repair attempts in the parapet walls were consistent with water intrusion that had occurred over a protracted period of time. The reported water intrusion in the Laundromat was consistent with insufficient roof flashing around the pipe penetrations. Although no direct inspection of the underside of the roof framing was possible, the stained ceiling finishes in Ernesto's Mexican Restaurant and in Cruz Insurance Group were likely the result of either marginal roof leaks or leakage from piping system running in the interstitial ceiling space.

**[End of Report]**

**CLOSING**

Thank you for the opportunity to provide professional services. The opinions and conclusions in this report have been formulated within a reasonable degree of professional certainty. Please note that J.S. Held opinions are based on the information provided and/or obtained as well as our training, knowledge and experience. To the extent that hidden conditions exist, and/or additional information is made available, J.S. Held reserves the right to revise or update any of the observations, assessments, and/or opinions as conditions change or additional information is provided for our review.

This document is to inure to the benefit of the addressee only and may not be relied upon, used by, or referenced by any third party without the written consent of J.S. Held. If clarification or additional information is required, please do not hesitate to contact us.

Respectfully,
**J.S. Held LLC**
Texas CoA No. F-19689 (Expiration date April 30, 2025)




This item has been electronically signed and sealed by David Jimenez, P.E. using a Digital Signature. Printed copies of this document are not considered signed and sealed, and the signature must be verified on any electronic copies.

David Jimenez, P.E.
Senior Engineer I
TX License No. 141886 (Expires 06/30/2025)

Attachments: Appendix A - Captioned Photographs
Appendix B - Weather Data
Appendix C - Weather Research and Hail

# APPENDIX A

## Captioned Photographs



**Photo 1:** East (front) partial elevation – Building 1, section 1A.



**Photo 2:** East (front) partial elevation – Building 1, section 1B & 1C.




**Photo 3:** North elevation – Building 1, section 1C.



**Photo 4:** West elevation – Building 1, all sections.



**Photo 5:** South elevation – Building 1, section 1A.




**Photo 6:** North (front) elevation – Building 2.



**Photo 7:** West partial elevation – Building 2.



**Photo 8:** West partial elevation – Building 2.



**Photo 9:** South elevation – Building 2.



**Photo 10:** East elevation – Building 2.




**Photo 11:** Spatter marks on HVAC cabinet facing west – Building 1.




**Photo 12:** Spatter marks on HVAC cabinet facing south – Building 1.



**Photo 13:** Downspout on the north elevation absent indentations – Building 1.



**Photo 14:** Downspout on the north elevation absent indentations – Building 1.



**Photo 15:** Downspout on the west elevation absent indentations – Building 1.



**Photo 16:** Parapet wall cap absent indentations – Building 1.



**Photo 17:** HVAC top cabinet absent indentations – Building 1.



**Photo 18:** Roof vent with circular indentations at the southwest elevation. Note no coincident spatter mark on inset photo – Building 1.



**Photo 19:** Standing seam metal roof with circular indentations without coincident spatter marks – South slope, Building 1.



**Photo 20:** Standing seam metal roof with circular indentations without coincident spatter marks – South slope, Building 1.




**Photo 21:** Close up of previous indentation. Note absence of spatter mark– South slope, Building 1.



**Photo 22:** Standing seam metal roof without circular indentations – North slope, Building 1.



**Photo 23:** Flattened fin coils. See next photo for close up – East exposure, Building 1.




**Photo 24:** Close up of previous photo. Note oxidized fin coils – East exposure, Building 1.



**Photo 25:** Flattened fin coils. See next photo for close up – North exposure, Building 1.




**Photo 26:** Close up of previous photo. Note oxidized fin coils – North exposure, Building 1.



**Photo 27:** Flattened fin coils. See next photo for close up – South exposure, Building 1.




**Photo 28:** Close up of previous photo. Note oxidized fin coils – South exposure, Building 1.



**Photo 29:** Flattened fin coils. See next photo for close up – East exposure, Building 1.




**Photo 30:** Close up of previous photo. Note oxidized fin coils – East exposure, Building 1.



**Photo 31:** Close up of previous photo. Note oxidized fin coils – West exposure, Building 1.




**Photo 32:** Close up of previous photo. Note oxidized fin coils – West exposure, Building 1.



**Photo 33:** Roof overview, looking northeast - Building 1, section 1A.



**Photo 34:** Linear blemish - Building 1, section 1A.



**Photo 35:** Granular shedding around roof appurtenance - Building 1, section 1A.



**Photo 36:** Linear blemish - Building 1, section 1A.



**Photo 37:** Roof overview, looking northeast - Building 1, section 1B.



**Photo 38:** Roof overview, looking northeast - Building 1, section 1C.



**Photo 39:** TA-1A overview.




**Photo 40:** Roughly circular blemish without tactile softness - TA-1A.




**Photo 41:** Irregular blemish. Note oxidized asphalt binder - TA-1A.




**Photo 42:** Irregular blemish. Note oxidized asphalt binder - TA-1A.




**Photo 43:** Irregular blemishes. Note oxidized asphalt binder - TA-1A.



**Photo 44:** TA-1C overview.



**Photo 45:** TA-1C absent circular blemishes.




**Photo 46:** Roughly circular blemish without tactile softness - TA-1C.



**Photo 47:** Parapet wall base absent circular blemishes – Building 1.



**Photo 48:** North parapet wall overview – Building 1, section 1A.



**Photo 49:** North parapet wall. Note granular shedding and failed seam patches– Building 1, section 1A.



**Photo 50:** North parapet wall. Note granular shedding and failed seam patches– Building 1, section 1A.



**Photo 51:** North parapet wall. Note granular shedding and failed seam patches– Building 1, section 1A.



**Photo 52:** North parapet wall. Note previous repair attempts – Building 1, section 1A.



**Photo 53:** West parapet wall overview. Note granule accumulation between scuppers (arrows) – Building 1, section 1A.



**Photo 54:** West parapet wall. Note granular shedding and failed seam patches– Building 1, section 1A.



**Photo 55:** West parapet wall. Note previous repair attempts around scupper– Building 1, section 1A.



**Photo 56:** West parapet wall. Note metal counter flashing absent displacement, distortion or indentations – Building 1, section 1A.



**Photo 57:** Stained ceiling tiles around sprinkler head – Ernesto's Mexican Restaurant.



**Photo 58:** Pipe penetration with reported water intrusion. Note small stain at the metal deck (arrow) – Laundromat.



**Photo 59:** Pipe penetration with reported water intrusion. Note small stain at the metal deck (arrow) – Laundromat.



**Photo 60:** Ductwork where streak marks on the wall emanated from (see next photo) – Jumping World.



**Photo 61:** Streak marks on the wall – Jumping World.



**Photo 62:** West exterior wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 63:** West exterior wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 64:** West exterior wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 65:** North wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 66:** North wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 67:** North wall. Note bubbled and delaminated paint and efflorescence – Jumping World.



**Photo 68:** Isolated spot of reported water intrusion. Note no opening or gaps on the metal deck – Jumping World.



**Photo 69:** Isolated spot of reported water intrusion. Note no opening or gaps on the metal deck – Jumping World.




**Photo 70:** Spatter marks on a ground transformer facing west – Building 2.



**Photo 71:** Spatter marks on a ground transformer – Building 2.



**Photo 72:** Spatter marks on HVAC cabinet facing west – Building 2.




**Photo 73:** Spatter marks on HVAC cabinet facing west – Building 2.




**Photo 74:** Spatter marks on HVAC cabinet – Building 2.



**Photo 75:** Downspout absent indentations – Building 2.



**Photo 76:** HVAC cabinets absent indentations – Building 2.




**Photo 77:** HVAC cabinets absent indentations – Building 2.



**Photo 78:** Roof vent absent indentations – Building 2.



**Photo 79:** Parapet wall coping absent indentations – Building 2.



**Photo 80:** Parapet wall coping absent indentations – Building 2.



**Photo 81:** Roof hatch absent indentations – Building 2.



**Photo 82:** Roof appurtenance absent indentations – Building 2.



**Photo 83:** Flattened fin coils. See next photo for close up – South exposure, Building 2.




**Photo 84:** Close up of previous photo. Note oxidized fin coils – South exposure, Building 2.



**Photo 85:** Flattened fin coils. See next photo for close up – East exposure, Building 2.




**Photo 86:** Close up of previous photo. Note oxidized fin coils – East exposure, Building 2.



**Photo 87:** Flattened fin coils. See next photo for close up – North exposure, Building 2.




**Photo 88:** Close up of previous photo. Note oxidized fin coils – North exposure, Building 2.



**Photo 89:** Peripheral elements absent displacement – Building 2.



**Photo 90:** Peripheral elements absent displacement – Building 2.



**Photo 91:** Overview of TA-2.




**Photo 92:** Roughly circular blemish without tactile softness - TA-2.




**Photo 93:** Roughly circular blemish without tactile softness - TA-2.



**Photo 94:** Linear blemish - TA-2.




**Photo 95:** Elongated blemish - TA-2.



**Photo 96:** Parapet wall base absent circular blemishes – Building 2.



**Photo 97:** Parapet wall base absent circular blemishes – Building 2.




**Photo 98:** Roughly circular blemish absent concavity and tactile softness – Building 2.




**Photo 99:** Linear blemish – Building 2.



**Photo 100:** Roofing membrane absent displaced or folded-back section. Note parapet coping and other roof appurtenance absent displacement – Building 2.



**Photo 101:** Roofing membrane absent displaced or folded-back section. Note parapet coping and other roof appurtenance absent displacement – Building 2.



**Photo 102:** Roofing membrane absent displaced or folded-back section. Note dirt accumulation along south roof edge – Building 2.




**Photo 103:** Stained ceiling tiles– Cruz Insurance Group.

JS | HELD

# APPENDIX B

Weather Data

## Storm Events Database

### Search Results for Dallas County, Texas

**Event Types:** Hail

150 events were reported between 01/01/2019 and 09/30/2024 (2100 days)

**Summary Info:**

| | |
|---|---|
| Number of County/Zone areas affected: | 1 |
| Number of Days with Event: | 50 |
| Number of Days with Event and Death: | 0 |
| Number of Days with Event and Death or Injury: | 0 |
| Number of Days with Event and Property Damage: | 6 |
| Number of Days with Event and Crop Damage: | 0 |
| Number of Event Types reported: | 1 |

**Column Definitions:**
'Mag': Magnitude, 'Dth': Deaths, 'Inj': Injuries, 'PrD': Property Damage, 'CrD': Crop Damage

*Click on **Location** below to display details.*
*Available Event Types have changed over time. Please refer to the Database Details for more information.*

Select: All Hail Sort By: Date/Time (Oldest)

| Location | County/Zone | St. | Date | Time | T.Z. | Type | Mag | Dth | Inj | PrD | CrD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals:** | | | | | | | | 0 | 0 | 2.964M | 0.00K |
| COPPELL | DALLAS CO. | TX | 03/09/2019 | 05:15 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| DALLAS | DALLAS CO. | TX | 03/09/2019 | 07:30 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 03/09/2019 | 07:32 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 03/24/2019 | 21:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 03/25/2019 | 00:05 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 04/13/2019 | 08:08 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| TRINITY MILLS | DALLAS CO. | TX | 04/13/2019 | 08:23 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| UNION BOWER | DALLAS CO. | TX | 04/13/2019 | 09:45 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/18/2019 | 13:01 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| BALCH SPGS | DALLAS CO. | TX | 05/18/2019 | 14:00 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 06/01/2019 | 17:23 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 06/01/2019 | 17:25 | CST-6 | Hail | 1.50 in. | 0 | 0 | 1.00K | 0.00K |
| BALCH SPGS | DALLAS CO. | TX | 06/01/2019 | 17:56 | CST-6 | Hail | 1.75 in. | 0 | 0 | 10.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 06/09/2019 | 13:06 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 06/09/2019 | 13:41 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| REINHARDT | DALLAS CO. | TX | 06/29/2019 | 17:05 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE | DALLAS CO. | TX | 10/10/2019 | 20:01 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 10/20/2019 | 19:54 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 10/20/2019 | 20:00 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 10/20/2019 | 20:04 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 03/28/2020 | 07:48 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 04/19/2020 | 09:17 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| SOWERS | DALLAS CO. | TX | 04/19/2020 | 09:42 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 04/28/2020 | 04:28 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROSE HILL | DALLAS CO. | TX | 07/05/2020 | 15:23 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ALPHA | DALLAS CO. | TX | 08/16/2020 | 17:57 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ADDISON | DALLAS CO. | TX | 08/16/2020 | 17:58 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| ADDISON | DALLAS CO. | TX | 08/16/2020 | 18:03 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 08/16/2020 | 18:37 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| ALPHA | DALLAS CO. | TX | 01/24/2021 | 14:35 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 01/24/2021 | 14:45 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 03/17/2021 | 04:05 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 03/22/2021 | 20:36 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| NEW HOPE | DALLAS CO. | TX | 03/22/2021 | 21:03 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| PLEASANT VLY | DALLAS CO. | TX | 03/22/2021 | 21:10 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| LAWSON | DALLAS CO. | TX | 03/24/2021 | 16:57 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DE SOTO CARROLL ARPT | DALLAS CO. | TX | 04/09/2021 | 18:21 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| LANCASTER | DALLAS CO. | TX | 04/09/2021 | 18:23 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 04/09/2021 | 18:48 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 04/09/2021 | 18:55 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 04/09/2021 | 19:09 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 04/09/2021 | 19:09 | CST-6 | Hail | 2.00 in. | 0 | 0 | 150.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 04/09/2021 | 19:13 | CST-6 | Hail | 2.00 in. | 0 | 0 | 150.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/09/2021 | 19:15 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 04/09/2021 | 19:16 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/09/2021 | 19:17 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 04/09/2021 | 19:21 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| REINHARDT | DALLAS CO. | TX | 04/09/2021 | 19:22 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/09/2021 | 19:24 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 04/13/2021 | 02:39 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE | DALLAS CO. | TX | 04/23/2021 | 12:46 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 04/23/2021 | 13:40 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| SACHSE | DALLAS CO. | TX | 04/23/2021 | 13:40 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| SAYENE | DALLAS CO. | TX | 05/03/2021 | 20:03 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/10/2021 | 18:18 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| LAWSON | DALLAS CO. | TX | 05/10/2021 | 21:48 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE | DALLAS CO. | TX | 11/10/2021 | 21:57 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| IRVING | DALLAS CO. | TX | 11/10/2021 | 22:03 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 03/14/2022 | 16:24 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 03/14/2022 | 16:50 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 03/14/2022 | 18:09 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| ALPHA | DALLAS CO. | TX | 03/17/2022 | 18:33 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| ADDISON | DALLAS CO. | TX | 03/17/2022 | 18:33 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 04/04/2022 | 21:05 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DALLAS | DALLAS CO. | TX | 04/04/2022 | 21:48 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| PEELER | DALLAS CO. | TX | 04/13/2022 | 06:56 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 09/03/2022 | 16:41 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 09/04/2022 | 14:04 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| PLEASANT VLY | DALLAS CO. | TX | 09/04/2022 | 14:15 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 12/13/2022 | 09:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 03/01/2023 | 08:02 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 03/01/2023 | 08:10 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| LAKEVIEW | DALLAS CO. | TX | 03/01/2023 | 08:13 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DESOTO | DALLAS CO. | TX | 03/01/2023 | 08:14 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| WHEATLAND AREA | DALLAS CO. | TX | 03/01/2023 | 08:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 03/16/2023 | 15:59 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| SOWERS | DALLAS CO. | TX | 03/16/2023 | 16:02 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| ROSE HILL | DALLAS CO. | TX | 03/16/2023 | 16:27 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| ADDISON | DALLAS CO. | TX | 04/02/2023 | 15:12 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 04/20/2023 | 13:08 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/20/2023 | 13:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/20/2023 | 13:25 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| LIGGETT | DALLAS CO. | TX | 04/20/2023 | 20:56 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CARROLLTON | DALLAS CO. | TX | 04/20/2023 | 21:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| SOWERS | DALLAS CO. | TX | 05/15/2023 | 13:57 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| WHEATLAND AREA | DALLAS CO. | TX | 06/03/2023 | 18:07 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 06/08/2023 | 17:13 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| UNIVERSITY PARK | DALLAS CO. | TX | 06/11/2023 | 18:56 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| UNIVERSITY PARK | DALLAS CO. | TX | 06/11/2023 | 19:05 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 06/12/2023 | 10:02 | CST-6 | Hail | 2.00 in. | 0 | 0 | 100.00K | 0.00K |
| BALCH SPGS | DALLAS CO. | TX | 06/12/2023 | 10:05 | CST-6 | Hail | 2.00 in. | 0 | 0 | 100.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 06/12/2023 | 21:35 | CST-6 | Hail | 2.75 in. | 0 | 0 | 250.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 06/12/2023 | 21:36 | CST-6 | Hail | 4.00 in. | 0 | 0 | 1.000M | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 06/12/2023 | 21:39 | CST-6 | Hail | 2.50 in. | 0 | 0 | 200.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 06/12/2023 | 21:47 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 06/12/2023 | 21:47 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 06/12/2023 | 22:02 | CST-6 | Hail | 2.00 in. | 0 | 0 | 100.00K | 0.00K |
| ELAM | DALLAS CO. | TX | 06/12/2023 | 22:05 | CST-6 | Hail | 2.00 in. | 0 | 0 | 200.00K | 0.00K |
| SHADY GROVE | DALLAS CO. | TX | 06/13/2023 | 12:50 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| SHADY GROVE | DALLAS CO. | TX | 06/13/2023 | 12:57 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| HENSLEY FLD ARPT | DALLAS CO. | TX | 06/13/2023 | 13:00 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| EAGLE FORD | DALLAS CO. | TX | 06/13/2023 | 13:02 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DALLAS | DALLAS CO. | TX | 06/13/2023 | 13:09 | CST-6 | Hail | 1.75 in. | 0 | 0 | 5.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 06/13/2023 | 13:22 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 06/13/2023 | 13:24 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 06/13/2023 | 13:25 | CST-6 | Hail | 1.75 in. | 0 | 0 | 7.00K | 0.00K |
| TRINITY MILLS | DALLAS CO. | TX | 09/19/2023 | 17:22 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/24/2023 | 17:35 | CST-6 | Hail | 1.50 in. | 0 | 0 | 3.00K | 0.00K |
| ALPHA | DALLAS CO. | TX | 09/24/2023 | 17:36 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| MEADERS | DALLAS CO. | TX | 09/24/2023 | 17:37 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/24/2023 | 17:43 | CST-6 | Hail | 2.00 in. | 0 | 0 | 50.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 09/24/2023 | 17:44 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/24/2023 | 17:48 | CST-6 | Hail | 1.75 in. | 0 | 0 | 15.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 09/24/2023 | 17:48 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/24/2023 | 17:48 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 09/24/2023 | 17:50 | CST-6 | Hail | 2.25 in. | 0 | 0 | 150.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 09/24/2023 | 17:52 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 09/24/2023 | 17:53 | CST-6 | Hail | 1.75 in. | 0 | 0 | 15.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/24/2023 | 17:55 | CST-6 | Hail | 2.25 in. | 0 | 0 | 100.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 09/24/2023 | 17:56 | CST-6 | Hail | 2.00 in. | 0 | 0 | 50.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 09/24/2023 | 19:45 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| SOWERS | DALLAS CO. | TX | 10/04/2023 | 20:55 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 04/08/2024 | 19:00 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| SUNNYVALE | DALLAS CO. | TX | 04/08/2024 | 19:00 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/08/2024 | 19:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 04/08/2024 | 19:20 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE ARPT | DALLAS CO. | TX | 05/22/2024 | 17:50 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE ARPT | DALLAS CO. | TX | 05/22/2024 | 17:53 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE ARPT | DALLAS CO. | TX | 05/22/2024 | 18:08 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| LAKEVIEW | DALLAS CO. | TX | 05/24/2024 | 17:46 | CST-6 | Hail | 0.88 in. | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 05/27/2024 | 15:19 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| ARCADIA PARK | DALLAS CO. | TX | 05/27/2024 | 15:23 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| EAGLE FORD | DALLAS CO. | TX | 05/27/2024 | 15:23 | CST-6 | Hail | 1.75 in. | 0 | 0 | 100.00K | 0.00K |
| EAGLE FORD | DALLAS CO. | TX | 05/27/2024 | 15:30 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 05/27/2024 | 15:37 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| OAK CLIFF | DALLAS CO. | TX | 05/27/2024 | 15:38 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:42 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:44 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:45 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:46 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| COCKRELL HILL | DALLAS CO. | TX | 05/27/2024 | 15:47 | CST-6 | Hail | 1.75 in. | 0 | 0 | 100.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:54 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/27/2024 | 15:56 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| OAK CLIFF | DALLAS CO. | TX | 05/27/2024 | 16:02 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| HUTCHINS | DALLAS CO. | TX | 05/27/2024 | 16:39 | CST-6 | Hail | 2.00 in. | 0 | 0 | 100.00K | 0.00K |
| DUNCANVILLE | DALLAS CO. | TX | 05/27/2024 | 18:43 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 05/27/2024 | 18:44 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 05/27/2024 | 18:50 | CST-6 | Hail | 1.75 in. | 0 | 0 | 8.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 05/28/2024 | 05:17 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| ROSE HILL | DALLAS CO. | TX | 05/28/2024 | 05:23 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| **Totals:** | | | | | | | | 0 | 0 | 2.964M | 0.00K |

# Storm Events Database

### Search Results for Dallas County, Texas

**Event Types:** **Funnel Cloud, High Wind, Hurricane (Typhoon), Strong Wind, Thunderstorm Wind, Tornado, Tropical Depression, Tropical Storm**

**Dallas county contains the following zones:**
**Dallas**

101 events were reported between 01/01/2019 and 09/30/2024 (2100 days)

**Summary Info:**

| | |
|---|---|
| Number of County/Zone areas affected: | 2 |
| Number of Days with Event: | 40 |
| Number of Days with Event and Death: | 1 |
| Number of Days with Event and Death or Injury: | 1 |
| Number of Days with Event and Property Damage: | 24 |
| Number of Days with Event and Crop Damage: | 0 |
| Number of Event Types reported: | 4 |

**Column Definitions:**
'Mag': Magnitude, 'Dth': Deaths, 'Inj': Injuries, 'PrD': Property Damage, 'CrD': Crop Damage

**Wind Magnitude Definitions:**
Measured Gust:'MG', Estimated Gust:'EG', Measured Sustained:'MS', Estimated Sustained:'ES'

*Click on **Location** below to display details.*
*Available Event Types have changed over time. Please refer to the Database Details for more information.*

Select: All Tornadoes | All Wind Speeds | Sort By: Date/Time (Oldest)

| Location | County/Zone | St. | Date | Time | T.Z. | Type | Mag | Dth | Inj | PrD | CrD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals:** | | | | | | | | 1 | 6 | 1.976B | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 02/07/2019 | 04:32 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 03/09/2019 | 07:38 | CST-6 | Tornado | EF0 | 0 | 0 | 10.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 03/09/2019 | 07:43 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE | DALLAS CO. | TX | 03/13/2019 | 04:00 | CST-6 | Thunderstorm Wind | 70 kts. MG | 0 | 0 | 0.00K | 0.00K |
| CARROLLTON | DALLAS CO. | TX | 03/13/2019 | 04:00 | CST-6 | Thunderstorm Wind | 65 kts. MG | 0 | 0 | 50.00K | 0.00K |
| (ADS)ADDISON ARPT DA | DALLAS CO. | TX | 03/13/2019 | 04:15 | CST-6 | Thunderstorm Wind | 62 kts. MG | 0 | 0 | 0.00K | 0.00K |
| DALLAS | DALLAS CO. | TX | 03/13/2019 | 04:25 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 50.00K | 0.00K |
| ROWLETT | DALLAS CO. | TX | 03/13/2019 | 04:30 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 10.00K | 0.00K |
| (ADS)ADDISON ARPT DA | DALLAS CO. | TX | 05/18/2019 | 12:14 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| TRINITY MILLS | DALLAS CO. | TX | 05/18/2019 | 12:50 | CST-6 | Thunderstorm Wind | 45 kts. EG | 0 | 0 | 0.50K | 0.00K |
| LAWSON | DALLAS CO. | TX | 06/01/2019 | 17:30 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 5.00K | 0.00K |
| BOBWYN | DALLAS CO. | TX | 06/01/2019 | 17:35 | CST-6 | Thunderstorm Wind | 70 kts. MG | 0 | 0 | 100.00K | 0.00K |
| CARROLLTON | DALLAS CO. | TX | 06/09/2019 | 12:20 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 5.00K | 0.00K |
| RENNER | DALLAS CO. | TX | 06/09/2019 | 12:34 | CST-6 | Thunderstorm Wind | 55 kts. MG | 0 | 0 | 2.00K | 0.00K |
| (ADS)ADDISON ARPT DA | DALLAS CO. | TX | 06/09/2019 | 12:43 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 1.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 06/09/2019 | 12:45 | CST-6 | Thunderstorm Wind | 62 kts. MG | 0 | 0 | 25.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 06/09/2019 | 12:58 | CST-6 | Thunderstorm Wind | 52 kts. EG | 0 | 0 | 1.00K | 0.00K |
| ALPHA | DALLAS CO. | TX | 06/09/2019 | 13:01 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 06/09/2019 | 13:01 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 5.00K | 0.00K |
| SHADY GROVE | DALLAS CO. | TX | 06/09/2019 | 13:03 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 06/09/2019 | 13:04 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 1.50K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 06/09/2019 | 13:06 | CST-6 | Thunderstorm Wind | 59 kts. MG | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 06/09/2019 | 13:15 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 10.00K | 0.00K |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DALLAS | DALLAS CO. | TX | 06/09/2019 | 13:18 | CST-6 | Thunderstorm Wind | 60 kts. EG | 1 | 6 | 10.000M | 0.00K |
| CARROLLTON | DALLAS CO. | TX | 06/09/2019 | 13:20 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 20.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 06/09/2019 | 13:21 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 5.00K | 0.00K |
| LIGGETT | DALLAS CO. | TX | 06/16/2019 | 14:35 | CST-6 | Thunderstorm Wind | 70 kts. EG | 0 | 0 | 60.00K | 0.00K |
| FARMERS BRANCH | DALLAS CO. | TX | 06/16/2019 | 14:43 | CST-6 | Thunderstorm Wind | 78 kts. EG | 0 | 0 | 20.00K | 0.00K |
| FARMERS BRANCH | DALLAS CO. | TX | 06/16/2019 | 14:45 | CST-6 | Tornado | EF0 | 0 | 0 | 20.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 06/23/2019 | 20:29 | CST-6 | Thunderstorm Wind | 53 kts. MG | 0 | 0 | 5.00K | 0.00K |
| LIGGETT | DALLAS CO. | TX | 07/10/2019 | 17:25 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 10.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 10/20/2019 | 19:58 | CST-6 | Tornado | EF3 | 0 | 0 | 1.550B | 0.00K |
| GARLAND | DALLAS CO. | TX | 10/20/2019 | 20:24 | CST-6 | Tornado | EF2 | 0 | 0 | 400.000M | 0.00K |
| ROWLETT | DALLAS CO. | TX | 10/20/2019 | 20:36 | CST-6 | Tornado | EF1 | 0 | 0 | 10.000M | 0.00K |
| LANCASTER | DALLAS CO. | TX | 10/20/2019 | 20:44 | CST-6 | Thunderstorm Wind | 60 kts. MG | 0 | 0 | 25.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 10/20/2019 | 23:55 | CST-6 | Thunderstorm Wind | 52 kts. EG | 0 | 0 | 0.00K | 0.00K |
| GRAND PRAIRIE | DALLAS CO. | TX | 10/21/2019 | 00:24 | CST-6 | Thunderstorm Wind | 56 kts. MG | 0 | 0 | 0.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 01/10/2020 | 18:42 | CST-6 | Tornado | EF0 | 0 | 0 | 15.00K | 0.00K |
| MESQUITE | DALLAS CO. | TX | 04/12/2020 | 16:16 | CST-6 | Thunderstorm Wind | 43 kts. EG | 0 | 0 | 25.00K | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 04/28/2020 | 22:12 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 04/28/2020 | 22:45 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| BOBWYN | DALLAS CO. | TX | 04/28/2020 | 22:54 | CST-6 | Thunderstorm Wind | 56 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 06/19/2020 | 19:30 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| REINHARDT | DALLAS CO. | TX | 07/12/2020 | 02:30 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| RENNER | DALLAS CO. | TX | 08/16/2020 | 17:36 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 08/16/2020 | 18:25 | CST-6 | Thunderstorm Wind | 53 kts. MG | 0 | 0 | 0.00K | 0.00K |
| FLORENCE HILL | DALLAS CO. | TX | 03/17/2021 | 03:56 | CST-6 | Thunderstorm Wind | 57 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 03/17/2021 | 04:06 | CST-6 | Thunderstorm Wind | 53 kts. MG | 0 | 0 | 0.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 05/16/2021 | 13:00 | CST-6 | Tornado | EF0 | 0 | 0 | 2.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 05/16/2021 | 13:10 | CST-6 | Tornado | EF1 | 0 | 0 | 50.00K | 0.00K |
| LANCASTER | DALLAS CO. | TX | 07/12/2021 | 12:20 | CST-6 | Thunderstorm Wind | 56 kts. EG | 0 | 0 | 30.00K | 0.00K |
| DESOTO | DALLAS CO. | TX | 07/12/2021 | 12:20 | CST-6 | Thunderstorm Wind | 52 kts. EG | 0 | 0 | 7.00K | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 10/10/2021 | 20:29 | CST-6 | Thunderstorm Wind | 61 kts. MG | 0 | 0 | 5.00K | 0.00K |
| DALLAS (ZONE) | DALLAS (ZONE) | TX | 10/28/2021 | 11:41 | CST-6 | High Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| ROSE HILL | DALLAS CO. | TX | 11/10/2021 | 21:45 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| DALLAS (ZONE) | DALLAS (ZONE) | TX | 01/15/2022 | 11:53 | CST-6 | High Wind | 50 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 03/21/2022 | 17:20 | CST-6 | Thunderstorm Wind | 56 kts. EG | 0 | 0 | 4.00K | 0.00K |
| CARROLLTON | DALLAS CO. | TX | 03/21/2022 | 17:30 | CST-6 | Thunderstorm Wind | 60 kts. EG | 0 | 0 | 25.00K | 0.00K |
| DALLAS (ZONE) | DALLAS (ZONE) | TX | 03/29/2022 | 17:45 | CST-6 | Strong Wind | 39 kts. EG | 0 | 0 | 50.00K | 0.00K |
| FARMERS BRANCH | DALLAS CO. | TX | 06/02/2022 | 03:30 | CST-6 | Thunderstorm Wind | 65 kts. EG | 0 | 0 | 75.00K | 0.00K |
| CARROLLTON | DALLAS CO. | TX | 06/02/2022 | 03:30 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 100.00K | 0.00K |
| DE SOTO CARROLL ARPT | DALLAS CO. | TX | 07/14/2022 | 10:40 | CST-6 | Thunderstorm Wind | 39 kts. EG | 0 | 0 | 1.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 09/04/2022 | 14:12 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| BOUCHARD | DALLAS CO. | TX | 09/04/2022 | 14:14 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 10.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 09/04/2022 | 14:18 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| OAK CLIFF | DALLAS CO. | TX | 09/04/2022 | 14:21 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 0.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 09/04/2022 | 14:27 | CST-6 | Thunderstorm Wind | 56 kts. MG | 0 | 0 | 0.00K | 0.00K |
| EAGLE FORD | DALLAS CO. | TX | 09/25/2022 | 16:30 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 0.00K | 0.00K |
| PEELER | DALLAS CO. | TX | 09/25/2022 | 16:30 | CST-6 | Thunderstorm Wind | 55 kts. EG | 0 | 0 | 50.00K | 0.00K |
| ADDISON | DALLAS CO. | TX | 11/04/2022 | 13:24 | CST-6 | Thunderstorm Wind | 53 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 12/13/2022 | 09:32 | CST-6 | Thunderstorm Wind | 54 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 03/02/2023 | 18:34 | CST-6 | Thunderstorm Wind | 55 kts. MG | 0 | 0 | 0.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 03/02/2023 | 18:34 | CST-6 | Thunderstorm Wind | 66 kts. MG | 0 | 0 | 0.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 03/02/2023 | 18:45 | CST-6 | Thunderstorm Wind | 59 kts. EG | 0 | 0 | 0.00K | 0.00K |
| ELAM | DALLAS CO. | TX | 03/02/2023 | 18:45 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 8.00K | 0.00K |
| BALCH SPGS | DALLAS CO. | TX | 03/02/2023 | 19:05 | CST-6 | Thunderstorm Wind | 65 kts. EG | 0 | 0 | 75.00K | 0.00K |
| LIGGETT | DALLAS CO. | TX | 03/16/2023 | 15:47 | CST-6 | Tornado | EF1 | 0 | 0 | 0.00K | 0.00K |
| SOWERS | DALLAS CO. | TX | 03/16/2023 | 15:52 | CST-6 | Tornado | EF1 | 0 | 0 | 0.00K | 0.00K |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ROSE HILL | DALLAS CO. | TX | 03/16/2023 | 16:30 | CST-6 | Thunderstorm Wind | 40 kts. EG | 0 | 0 | 5.00K | 0.00K |
| GARLAND | DALLAS CO. | TX | 03/16/2023 | 16:30 | CST-6 | Thunderstorm Wind | 40 kts. EG | 0 | 0 | 2.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 06/07/2023 | 18:25 | CST-6 | Thunderstorm Wind | 52 kts. EG | 0 | 0 | 0.00K | 0.00K |
| (DFW)DALLAS-FT WORTH | DALLAS CO. | TX | 04/09/2024 | 01:29 | CST-6 | Thunderstorm Wind | 53 kts. MG | 0 | 0 | 0.00K | 0.00K |
| DALLAS (ZONE) | DALLAS (ZONE) | TX | 05/26/2024 | 04:20 | CST-6 | High Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| DALLAS (ZONE) | DALLAS (ZONE) | TX | 05/26/2024 | 04:48 | CST-6 | High Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| COPPELL | DALLAS CO. | TX | 05/28/2024 | 04:50 | CST-6 | Thunderstorm Wind | 62 kts. MG | 0 | 0 | 350.00K | 0.00K |
| FARMERS BRANCH | DALLAS CO. | TX | 05/28/2024 | 04:56 | CST-6 | Thunderstorm Wind | 70 kts. EG | 0 | 0 | 200.00K | 0.00K |
| RENNER | DALLAS CO. | TX | 05/28/2024 | 05:00 | CST-6 | Thunderstorm Wind | 78 kts. EG | 0 | 0 | 2.000M | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/28/2024 | 05:03 | CST-6 | Thunderstorm Wind | 63 kts. MG | 0 | 0 | 10.00K | 0.00K |
| RICHARDSON | DALLAS CO. | TX | 05/28/2024 | 05:03 | CST-6 | Thunderstorm Wind | 83 kts. EG | 0 | 0 | 2.000M | 0.00K |
| (RBD)REDBIRD ARPT DA | DALLAS CO. | TX | 05/28/2024 | 05:07 | CST-6 | Thunderstorm Wind | 52 kts. MG | 0 | 0 | 5.00K | 0.00K |
| (DAL)LOVE FLD DALLAS | DALLAS CO. | TX | 05/28/2024 | 05:08 | CST-6 | Thunderstorm Wind | 65 kts. MG | 0 | 0 | 10.00K | 0.00K |
| NEW HOPE | DALLAS CO. | TX | 05/28/2024 | 05:15 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 20.00K | 0.00K |
| (ADS)ADDISON ARPT DA | DALLAS CO. | TX | 05/28/2024 | 05:15 | CST-6 | Thunderstorm Wind | 70 kts. EG | 0 | 0 | 15.00K | 0.00K |
| PLEASANT VLY | DALLAS CO. | TX | 05/28/2024 | 05:18 | CST-6 | Thunderstorm Wind | 63 kts. MG | 0 | 0 | 250.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 05/28/2024 | 05:20 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 20.00K | 0.00K |
| CEDAR HILL | DALLAS CO. | TX | 05/28/2024 | 05:24 | CST-6 | Thunderstorm Wind | 56 kts. EG | 0 | 0 | 0.00K | 0.00K |
| SUNNYVALE | DALLAS CO. | TX | 05/28/2024 | 05:35 | CST-6 | Thunderstorm Wind | 54 kts. MG | 0 | 0 | 2.00K | 0.00K |
| LANCASTER ARPT | DALLAS CO. | TX | 05/28/2024 | 05:35 | CST-6 | Thunderstorm Wind | 50 kts. MG | 0 | 0 | 2.00K | 0.00K |
| KLEBERG | DALLAS CO. | TX | 05/28/2024 | 05:37 | CST-6 | Thunderstorm Wind | 61 kts. EG | 0 | 0 | 10.00K | 0.00K |
| GRIBBLE | DALLAS CO. | TX | 06/01/2024 | 12:00 | CST-6 | Thunderstorm Wind | 52 kts. EG | 0 | 0 | 8.00K | 0.00K |
| HIGHLAND PARK | DALLAS CO. | TX | 08/03/2024 | 03:23 | CST-6 | Thunderstorm Wind | 50 kts. EG | 0 | 0 | 0.00K | 0.00K |
| **Totals:** | | | | | | | | 1 | 6 | 1.976B | 0.00K |

JS|HELD

# APPENDIX C

## Weather Research and Hail

## NATIONAL WEATHER SERVICE – STORM EVENTS DATABASE AND LOCAL STORM REPORTS

The National Centers for Environmental Information (NCEI) collects information from the National Weather Service (NWS) and publishes descriptions of weather events in their Storm Events Database. This database is available online at http://www.ncdc.noaa.gov/stormevents, and it is searchable over a specified date range. The NCEI Storm Event descriptions are an edited combination of official weather observations at the NWS recording sites; eyewitness reports by individuals, storm spotters, or emergency management officials; media and social media reports; and occasionally the reports of observation teams dispatched by the NWS. However, these reports are not a substitute for site-specific observations. The current NWS "severe" criteria for entry of hailstones in the database is 1.0-inch diameter or larger, although values as low as 0.75-inch diameter hailstone can be included.

The NCEI database is usually several months behind the current date and will not contain information on the most recent storms. Daily weather-related observations by NWS Local Forecast Offices are compiled in another database called the Local Storm Reports (LSR) database. The LSR database is searchable online for a specified date range and displays the results on a mapping interface. The LSR data can include additional reports that were edited away during the NWS review process that generates the SED; however, it generally includes the same information.

## SPATTER MARKS AND DIRECTIONALITY OF HAIL

Spatter marks result when hailstones strike surfaces covered with grime, micro-organisms, oxidation, algae, etc. Inspection of horizontal and vertical surfaces at a property can provide insight to the approximate size, hardness, frequency, and direction of a hail event from the spatter marks left behind. Spatter marks are temporary and tend to fade within several years of their creation generally between 12 and 24 months. Although the visibility and longevity of spatter marks can vary based on the material and amount of oxides and organic materials scuffed away, harder hailstones typically remove more surface contaminants and tend to produce less splay, creating well-defined edges of a spatter mark. Spatter marks from softer hailstones typically create more splay and poorly defined edges, resulting from hailstones breaking apart upon impact. The orientation of the splay provides directionality of the hail fall, and the width of the base of the splay provides approximate hail size.

## COLLATERAL INDICATORS OF HAIL IMPACT ENERGY

When examining a property for the effects of hail, one must consider all aspects of the impact energies from hail at the site. Inspection of metal appurtenances can provide insight to the size, frequency and hardness of hailstones that have fallen. Dents in light-gauge metals impacted by hail are a permanent record of all hailstones that have struck exposed surfaces over the years. However, dents with coincidental spatter marks can provide details to the size and frequency of recent hail.

Metal surfaces can be used to evaluate the relative size of hailstones. Harder or larger hailstones produce deeper dents in metal than smaller or softer hailstones. Thin-gauge metal roof appurtenances and building trim can be easily dented by smaller diameter hailstones than would be needed to compromise some roofing materials. For example, a 1/2-inch diameter hailstone can dent a thin-gauge aluminum flue cap or fascia but lacks the energy necessary to rupture most roofing types.

Research papers by others outline the effects of hail on metal appurtenances. Understanding the relationship of the size of dents in the different types of metals at a site aids in understanding of the potential of the impact energy to the shingles from hail. Two papers that correlate impact energy with severity of dents in metal appurtenances are:

- J.D. Koontz, "*Hail: Sizing It Up!*"
- Scott Morrison, Haag Engineering, "*Dents in Metal Appurtenances Caused by Ice Ball Impacts".*

## HAIL DAMAGE – DISCUSSION AND DEFINITION

Hail damage to roof coverings occurs when hailstone impacts diminish the weather-resisting function and/or service life of the roof covering. Hailstone impacts that do not result in one or both circumstances are considered to have been resisted by the roofing materials. As such, not all hail causes damage to roofing.

Hailstones can damage building materials if they possess the necessary impact parameters. The three important characteristics of damaging hail are size, density, and hardness of the hailstone. The hailstone size and density are principal influences on the mass and velocity of a stone and, therefore, the energy the hailstone imparts on the roof surface.

In addition to size, the angle of impact also plays an important role in the energy transfer of a hailstone. Direct impacts (impacts perpendicular to a roof surface) generally transfer more energy to the roofing than do glancing impacts from hailstones. Thus, surfaces facing the direction of incident hail fall usually sustain more damage than those facing away from the impacting hail. Directional variations in impact damage to roofing usually are greater on steep roofs than flat roofs, because slopes facing away from the storm direction usually receive glancing impacts. On low-sloped roofs (approximately flat roofs), directional variations in damage are most pronounced on vertical surfaces that face the different directions, such as parapets and curbs, rather than the low-sloped roofing itself.




**MODIFIED BITUMEN**

Impact tests and field observations have shown that for modified bitumen membranes, hailstones typically must be frozen solid and about 1.5 inches in diameter before damage is likely. Hail damage to a modified bitumen roof is characterized by a fractured reinforcing mat (i.e. a bruise) at the impact point and often a discernible indentation in the substrate material. Occasionally, in special circumstances (e.g., newer membranes), granules can be scuffed from the asphalt surface without bruising, but this type of scuffing still requires a large, frozen-solid hailstone comparable to those that cause bruises.

HAIL-CAUSED GRANULE SCOURING AND NATURAL GRANULE LOSS

Granule scouring caused by hail refers to granules that have been removed by hail such that unprotected coating asphalt is exposed. The area where granules have been scoured is not accompanied by an indentation or rupture in the membrane.

It should be noted that granule loss on a modified bitumen membrane occurs from the moment it is manufactured: in shipping, handling, during installation, in wear and tear on the roof, and throughout the natural weathering process as the membrane continues to age. In general, at the time of manufacturing, more granules are placed on the membrane than are needed to cover the membrane's coating asphalt. The granule excess exists atop and between those granules that are embedded in the coating asphalt, and as long as the surface remains well-covered with granules, there is no reduction in roofing performance or expected service life. Granule loss due to weathering also can manifest as a widespread condition, or in small localized areas (sometimes in circular shapes).

In general, granule adhesion to membrane is sufficient to resist a damaging degree of granule removal by hailstone impacts of insufficient size and impact energy to also rupture the base mats. However, in cases where the granule adhesion to the asphalt is atypical low, such from a deficient bonding during original manufacture, there is a potential that hailstone impacts lacking the energy to rupture the base mat may still cause a degree of concentrated granule loss blemishes.

# EXHIBIT E

| | |
|---|---|
| **From:** | Kimberly Aaron |
| **To:** | Anthony Pastor; Service Email; "mike@themislegalgroup.com" |
| **Cc:** | Bruce Wilkin; Gisela Aguilar; Tim Drake |
| **Subject:** | 3:25-cv-02986-O; Sunshine Eastgate Plaza, LLC v. Lexington Insurance Company, AXIS Surplus Insurance Company, and Starstone Specialty Insurance Company |
| **Date:** | Tuesday, April 28, 2026 3:41:00 PM |
| **Attachments:** | image001.png<br>2026-04-28 - AXIS StarStone"s Initial Disclosures - 2986-O.pdf<br>2026-04-28 - AXIS"s ROGs to Plaintiff - 02986-O.pdf<br>2026-04-28 - AXIS"s and Starstone"s RFPs to Plaintiff - 02986-O.pdf |

Please see attached Defendants AXIS and Starstone's Initial Disclosures in the above-referenced matter.

Also attached are Defendants AXIS and Starstone's Interrogatories and Requests for Production to Plaintiff.

Thank you,

**Kimberly Aaron**
**Paralegal**
**Shackelford, McKinley & Norton, LLP**
717 Texas Ave. | 27th Floor | Houston, TX 77002
832-415-1621 *direct* | 832-565-9030 *fax*
kaaron@shackelford.law | www.shackelford.law

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SUNSHINE EASTGATE PLAZA, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-02986-O |
| | § | |
| LEXINGTON INSURANCE COMPANY, AXIS SURPLUS INSURANCE COMPANY, AND STARSTONE SPECIALTY INSURANCE COMPANY, | § § § § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS AXIS AND STARSTONE'S FIRST**
**REQUEST FOR PRODUCTION TO PLAINTIFF**

Pursuant to the Federal Rules of Civil Procedure, Defendants AXIS Surplus Insurance Company ("AXIS") and StarStone Specialty Insurance Company ("StarStone") serve the following Requests for Production on Plaintiff Sunshine Eastgate Plaza, LLC ("Plaintiff"). AXIS and StarStone further request that Plaintiff produce the documents, electronically stored information, and other tangible things requested herein at the offices of Shackelford, McKinley & Norton, LLP, 717 Texas Ave., 27th Floor, Houston, Texas, 77002, either electronically or in the manner in which they are kept in the usual course of business, and to serve written answers and responses to these requests within thirty (30) days of the service hereof. Plaintiff is under a duty to reasonably supplement these answers in accordance with the Federal Rules of Civil Procedure.

Respectfully submitted,

SHACKELFORD, MCKINLEY & NORTON, LLP

By: */s/ Gisela A. Aguilar*
**Bruce R. Wilkin**
Texas Bar No. 24053549
bwilkin@shackelford.law
**Gisela A. Aguilar**
Texas Bar No. 24132153
gaguilar@shackelford.law
717 Texas Avenue, 27th Floor
Houston, Texas 77002
Phone: (832) 415-1801
Fax: (832) 565-9030

**Timothy E. Drake**
State Bar No. 00789789
tdrake@shackelford.law
9201 N. Central Expressway, Fourth Floor
Dallas, Texas 75231
Phone: (214) 780-1383
Fax: (214) 780-1401

**ATTORNEYS FOR DEFENDANTS AXIS SURPLUS INSURANCE COMPANY AND STARSTONE SPECIALTY INSURANCE COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that in compliance with the Federal Rules of Civil Procedure, a copy of the foregoing instrument was served on the following counsel on April 28, 2026:

Antony Pastor
National Insurance Advocates, LLP
6619 S. Dixie Hwy #363
Miami, FL 331413
Telephone: (833) 701-4110
anthony@nia.law
service@nia.law

K. Michael Sturgill
THEMIS LEGAL GROUP, PLLC
556 Silicon Dr, Suite 101,
Southlake, TX 76092
Telephone: (214) 494-8044
mike@themislegalgroup.com

*/s/ Gisela A. Aguilar*
Gisela A. Aguilar

# I. DEFINITIONS

For purposes of this discovery, the terms used shall have the following meanings, unless the context clearly indicates otherwise:

**"All"** shall mean **"any"** and vice versa.

**"And"** and **"or"** shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The use of the word "including" shall be construed to include "without limitation."

**"AXIS"** shall mean and refers to AXIS Surplus Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Claim"** shall mean and refer to that insurance claim made by Plaintiff for damage or loss at the Subject Property (date of loss on or about September 24, 2024) under Lexington Insurance Policy No. 062502712, AXIS Surplus Insurance Company Policy No. EAF657478-23, and StarStone Specialty Insurance Company Policy No. U87778230CSP, to which AXIS assigned claim number ATL 213714 and StarStone assigned claim number 4245921.

**"Communication"** includes but is not limited to any telephone conversation, meeting, discussion, letter, facsimile, email, text message, or other writing or means in which information was received or transmitted to you.

**"Defendants"** shall mean and refer to AXIS Surplus Insurance Company, StarStone Specialty Insurance Company, and Lexington Insurance Company.

**"Document"** and **"Documents"** shall mean all written, reported, recorded, printed or typed or graphic matter, however produced or reproduced, now or at any time in Plaintiff's possession, custody or control. The terms shall include, but not be limited to, all letters, correspondence, telegrams, telexes, cables, telephone records, logs and notations, intra and interoffice communications, microfilm, diaries, calendar entries, summaries, messages, audio tapes, videotapes, digital recordings, computer discs or tapes, computer programs and software, photographs, film, invoices, files, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, work assignments, reports, memoranda, notes, notebooks, speeches, drafts, data sheets, data compilations, press releases, public statements and/or announcements, public and governmental filings, opinions, worksheets, statistics, contracts, agreements, intra-corporate drafts of the foregoing items and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the original.

**"Identify," "Identifies"** and **"Identification"** means:

a. natural person, means to state his or her full name if known, his or her present or last known address and telephone numbers, and if known, his or her present or last known business address, position and business affiliation.

b. corporation or business entity, means to state the name of such business, the address of its principal place of business and its telephone number.

c. Document as defined above, means to state the identifying nomenclature and the type of document or documents, including, without limitation, its date, if any; the person or office who sent it; the persons or office to whom it was sent; its present location or custodian; the form of the document; and a description of its contents. If any such document was, but no longer is, in your possession, please state what disposition was made of it. In lieu of identifying a document responsive to a interrogatory, you may attach a legible copy of the document to the answer, and to make reference to the specific document so attached in the appropriate answer.

d. contract right or obligation mean to quote the applicable contract language, state the source of the language, whether from the contract or other agreement, and the provision number in the contract.

**"Knowledge"** includes both firsthand and secondary knowledge.

**"Lawsuit"** shall mean and refers to the action styled *Sunshine Eastgate Plaza, LLC v. Lexington Insurance Company, AXIS Surplus Insurance Company, and Starstone Specialty Insurance Company*, Civil Action No. 3:25-cv-02986-O in the United States District Court for the Northern District of Texas, Dallas Division.

**"Lexington"** shall mean and refers to Lexington Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Person"** shall mean the plural as well as the singular and includes any natural person, firm, corporation, association, partnership, trust, joint venture, or other legal entity, whether public or private.

**"Plaintiff," "You,"** or **"Yours"** shall mean and refers to Plaintiff Sunshine Eastgate Plaza, LLC and its agents, owners, shareholders, members, employees, subordinates, representatives, consultants, public adjusters, contractors, officers, directors, partners, attorneys, predecessors, successors, affiliates, assigns, and all other natural persons or businesses or legal entities acting or purporting to act on behalf of or under the direction or control of them, unless otherwise indicated.

**"Policy"** shall mean and refers to the insurance policy bearing Policy No. 062502712 issued by Lexington Insurance Company Policy, insurance policy bearing Policy No. EAF657478-23 issued by AXIS Surplus Insurance Company, and the insurance policy bearing Policy No. U87778230CSP issued by StarStone Specialty Insurance Company, all with effective dates of November 1, 2023 through November 1, 2024.

**"Property Management Company"** means any individual, or entity, retained by Plaintiff to act as property manager of the Subject Properties and/or maintain, manage, inspect or supervise the Subject Properties and any such individual and/or entity's past, present, and future agents, owners, principals, shareholders, members, employees, subordinates, representatives, consultants, contractors, officers, directors, partners, attorneys, predecessors, successors, affiliates, assigns, and all other natural persons or businesses or legal entities acting or purporting to act on behalf of or under the direction or control of them, unless otherwise indicated.

**"Relating to," "referring to," "reflecting," "regarding"** or **"evidencing"** shall mean and shall include stating, describing, recording, noting, mentioning, concerning, reflecting, referring to, relating to, relevant to, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, showing, tending to show, discussing, evaluating, studying, analyzing, constituting, comprising, embodying, containing, evidencing, pertaining to, respecting, supporting, tending to support, under-cutting, tending to undercut, contradicting, or tending to contradict.

**"StarStone"** shall mean and refers to StarStone Specialty Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Statement"** means (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital of a statement made by the person and contemporaneously recorded.

**"Subject Property"** shall mean and refer to the property owned by Plaintiff and generally located at 1430 - 1454 Northwest Highway, Garland, Texas 75041.

**"Supplied"** includes sold by, purchased from, or otherwise furnished by the party to which the interrogatory refers.

**"Things"** shall mean and refer to any tangible items not otherwise included in the definition of document above.

## II. INSTRUCTIONS

All responsive information and documents are to be divulged which are not privileged and are in the possession, custody or control of Plaintiff, its attorneys, investigators, agents, employees, officers, directors, representatives, or anyone acting on Plaintiff's behalf.

Where an individual production request calls for an answer which involves more than one part, each part of the answer shall be clearly set out so that it is understandable.

These production requests are continuing in nature and require supplemental answers in the event you or your attorney(s) discover additional responsive information.

Where knowledge or information in your possession, custody or control is requested, such request includes knowledge or information possessed by your present or former (at the time they were acting on your behalf) attorneys, agents, subordinates, employees, directors, officers, representatives and consultants, and anyone else from whom Plaintiff have a superior right to compel the information.

The singular form of a word shall be interpreted as a plural and the plural form of a word shall be interpreted as a singular whenever appropriate in order to bring within the scope of these interrogatories any information that might otherwise be considered beyond their scope.

In the event that any document requested has been lost or destroyed, please identify that document by author(s), addressee(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, all persons who had custody of each document, date of loss or destruction, and the name and title of the person responsible for the loss or destruction.

If you object or refuse to answer in whole or in part any production request propounded below, or if you object or refuse to identify or provide any document requested below on the grounds that it requests information that falls within the scope of any discovery privilege or exemption, please provide the following information as to each such objection:

a. Information or materials to the request has been withheld,
b. The request to which the information or materials relates, and
c. The privilege or privileges asserted.

If you believe the production request may request production of some information which is protected by applicable privilege or exemption, you are requested to answer with any responsive information that is not subject to a claim of privilege.

## III. REQUESTS FOR PRODUCTION TO PLAINTIFF

**REQUEST FOR PRODUCTION NO. 1:**

Produce all Documents, Statements, and Communications related to the Claim.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**

Produce all Documents relating to written communications Plaintiff, or anyone acting on Plaintiff's behalf, had with Defendants, or anyone acting on Defendants' behalf (including, but not limited to, Ryan Vesta of Crawford Global Technical Services and David Jimenez, P.E. of J.S. Held, LLC).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:**

Produce all Documents, including engineering reports, estimates, photos, and invoices, which support the damages or losses sought in this Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**

Produce all Documents related to the condition, maintenance, repairs and/or replacements of the Subject Property's roofing system, exterior, and/or interiors from January 1, 2019 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:**

Produce all Documents and Communications You rely on to calculate the scope and costs of repairs sought in Your live pleading.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:**

Produce all inspection reports, surveys, property condition documents, repair recommendations, or appraisal reports for the Subject Property, with all attachments, which have been prepared for or provided to Plaintiff or anyone acting on Plaintiff's behalf since January 1, 2019.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 7:</u>**

Produce all photographs or videos of the Subject Property's roofing system, exteriors, and/or interiors taken by anyone, from January 1, 2019 to the present.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 8:</u>**

Produce all Communications, including all attachments thereto, between Plaintiff and any Property Management Company, public adjuster, engineer, or contractor that relate to the Subject Property's roofing system, exteriors, and/or interiors relating to the alleged September 24, 2024 weather event.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 9:</u>**

Produce all Communications, including all attachments thereto, between Plaintiff or anyone acting on Plaintiff's behalf and any tenants of the Subject Property, relating to the Claim, the Policy and/or the condition of the Subject Property between January 1, 2019 and the present.

**RESPONSE**:

**<u>REQUEST FOR PRODUCTION NO. 10:</u>**

Produce all Communications, including all attachments thereto, between Plaintiff and

- RSG Specialty, LLC f/k/a RT Specialty, LLC,
- Restore Masters (including, but not limited, to Raleigh Wren),
- Jay Hathcox,
- City of Garland building officials, and/or
- Dallas County building officials

relating to the Claim, the Policy and/or the Subject Property between January 1, 2019 and the present.

**RESPONSE**:

**<u>REQUEST FOR PRODUCTION NO. 11:</u>**

Produce all contracts, agreements, estimates, bids, proposals, quotes, invoices, payments, schedules or damage descriptions from January 1, 2019 to the present between Plaintiff or anyone acting on Plaintiff's behalf and any roofers, engineers, consultants, appraisers, and contractors (including, but not limited, to Restore Masters), relating the Subject Property, the Claim, and/or the Lawsuit.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 12:</u>**

Produce all Documents and Communications, including all attachments thereto, relating to Plaintiff's efforts to repair or mitigate damages or losses You claim were caused by the alleged September 24, 2024 weather event.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 13:</u>**

Produce all written agreements and contracts with any Property Management Company, public adjuster, engineer, insurance agent, insurance broker, and/or contractor relating to the Subject Property from January 1, 2019 to the present.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 14:</u>**

Produce all budgets, ledger sheets, accounting records and/or financial statements from January 1, 2019 to the present that record or relate to the amount of money Plaintiff spent and/or expects to spend to maintain, repair, or improve the Subject Property's roofing system, exterior, gutters, and/or interiors.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 15:</u>**

Produce all Notices of Loss/Notices of Claim relating to any other claim for damage or loss to the Subject Property or similar documents submitted to any insurer for the Subject Property, from January 1, 2019 to the present.

**RESPONSE:**

**<u>REQUEST FOR PRODUCTION NO. 16:</u>**

Produce all Documents reviewed by or provided to any consulting experts which were reviewed by any testifying expert witness or fact witness regarding the Policy, the Subject Property, or the Claim.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**

Produce all Documents submitted by Plaintiff, or anyone acting on Plaintiff's behalf to any insurer for any loss arising at the Subject Property from January 1, 2019 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**

Produce all Documents regarding the need to inspect, repair or replace any or all of the Subject Property's roofing system, exteriors, and interiors at the Subject Property, whether actually done or not, from January 1, 2019 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**

Produce all tenant complaints, complaint or maintenance logs, notices, maintenance or repair requests, leak logs, work orders, repair requests, and any similar documents or Communications that relate to the Subject Property's roofing system, exterior, and/or interiors, from January 1, 2019 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**

Produce all Documents relating to any prior insurance claim(s) made for the Subject Property between January 1, 2019 and the present, including but not limited to claims for storm-related damages.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 21:**

Produce all Documents that reflect the condition, testing, inspection, or repairs of any claimed damage at the Subject Property, including any protocols, test criteria, inspection reports, core samples, test results, photographs, Communications, estimates, invoices, reports, evaluations, payments, permits, logs, between January 1, 2019 and the present.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 22:**

Produce all Documents, including ledgers and proof of payment, that reference and/or demonstrate the amount of money You spent to repair any portion of the Subject Property You claim was damaged by the alleged September 24, 2024 weather event and/or to mitigate any loss or damage that forms the basis for the Claim.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 23:**

Produce all Documents used to answer any of AXIS's Interrogatories to Plaintiff or referenced in any of Your responses to AXIS's Interrogatories.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 24:**

Produce all Communications, including all attachments thereto, between Plaintiff and tenants of the Subject Property, relating to the Claim, the Policy and/or the condition of the Subject Property between January 1, 2019 and the present.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 25:**

Produce all Documents relating to the valuations performed in connection with loans, financing, loan applications, purchase, acquisitions, purchase due diligence, and/or potential sale or leasing of the Subject Property by Plaintiff.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 26:**

Produce all Communications, including all attachments thereto, between Plaintiff and their insurance agent(s) relating to the procurement of the Policy, prior commercial property policies insuring the Subject Property, the Subject Property, and/or the Claim and prior claims, from January 1, 2021 to the present.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 27:**

Produce Your accounting records for the four (4) years before the alleged September 24, 2024 storm loss event through the present, including, but not limited to:

a) all general ledgers;
b) monthly profit and loss statements;
c) balance sheets;
d) income statements;
e) rent rolls;
f) financial statements; and
g) records related to future capital maintenance and future capital improvements.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 28:**

Produce copies of the relevant portions of all tax returns and accounting reports that refer to, mention, or discuss the monies paid to repair, rebuild, replace, and/or maintain the Subject Property from January 1, 2020 to the present.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 29:**

Produce executed copies of all lease agreements that were in force at the time of the alleged September 24, 2024 weather event.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 30:**

Produce all Documents related to any emergency or temporary repairs performed, including payments for such repairs, as a result of the alleged September 24, 2024 weather event.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 31:**

Produce all Documents reflecting when the Subject Property's roofing system was installed, inspected, updated, repaired or replaced, the contractor, roofer, or other Person (or entity) who performed such work, and the amount paid for the work.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 32:**

Produce all Documents You claim support Your allegation that Defendant delayed or somehow mishandled the adjustment of the Claim.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 33:**

Produce copies of all Documents, Communications, and Statements obtained by Plaintiff pursuant to any discovery request, Open Records Request, Subpoena Duces Tecum, or any other request for information or documentation relating to the Claim and/or this Lawsuit.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 34:**

Produce a privilege log identifying each document that You withheld from production under any claim of privilege or other immunity, and which states the nature of the privilege or immunity being asserted.

**RESPONSE**:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SUNSHINE EASTGATE PLAZA, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-02986-O |
| | § | |
| LEXINGTON INSURANCE COMPANY, | § | |
| AXIS SURPLUS INSURANCE COMPANY, | § | |
| AND STARSTONE SPECIALTY | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT AXIS SURPLUS INSURANCE COMPANY'S FIRST**
**SET OF INTERROGATORIES TO PLAINTIFF**

Pursuant to the Federal Rules of Civil Procedure, Defendant AXIS Surplus Insurance Company ("AXIS") serves the following Interrogatories on Plaintiff Sunshine Eastgate Plaza, LLC ("Plaintiff") to be answered under oath, in writing, and separately. The answers must be signed by the person making them and shall be returned to the offices of Shackelford, McKinley & Norton, LLP, 717 Texas St., 27th Floor, Houston, Texas, 77002 within thirty (30) days of the service hereof. Plaintiff is under a duty to reasonably supplement these answers in accordance with the Federal Rules of Civil Procedure.

Respectfully submitted,

SHACKELFORD, MCKINLEY & NORTON, LLP

By: */s/ Gisela A. Aguilar*

**Bruce R. Wilkin**
Texas Bar No. 24053549
bwilkin@shackelford.law
**Gisela A. Aguilar**
Texas Bar No. 24132153
gaguilar@shackelford.law
717 Texas Avenue, 27th Floor
Houston, Texas 77002
Phone: (832) 415-1801
Fax: (832) 565-9030

**Timothy E. Drake**
State Bar No. 00789789
tdrake@shackelford.law
9201 N. Central Expressway, Fourth Floor
Dallas, Texas 75231
Phone: (214) 780-1383
Fax: (214) 780-1401

**ATTORNEYS FOR DEFENDANTS AXIS SURPLUS INSURANCE COMPANY AND STARSTONE SPECIALTY INSURANCE COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that in compliance with the Federal Rules of Civil Procedure, a copy of the foregoing instrument was served on the following counsel on April 28, 2026:

Antony Pastor
National Insurance Advocates, LLP
6619 S. Dixie Hwy #363
Miami, FL 331413
Telephone: (833) 701-4110
anthony@nia.law
service@nia.law

K. Michael Sturgill
THEMIS LEGAL GROUP, PLLC
556 Silicon Dr, Suite 101,
Southlake, TX 76092
Telephone: (214) 494-8044
mike@themislegalgroup.com

*/s/ Gisela A. Aguilar*
Gisela A. Aguilar

# I. DEFINITIONS

For purposes of this discovery, the terms used shall have the following meanings, unless the context clearly indicates otherwise:

**"All"** shall mean **"any"** and vice versa.

**"And"** and **"or"** shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive. The use of the word "including" shall be construed to include "without limitation."

**"AXIS"** shall mean and refers to AXIS Surplus Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Claim"** shall mean and refer to that insurance claim made by Plaintiff for damage or loss at the Subject Property (date of loss on or about September 24, 2024) under Lexington Insurance Policy No. 062502712, AXIS Surplus Insurance Company Policy No. EAF657478-23, and StarStone Specialty Insurance Company Policy No. U87778230CSP, to which AXIS assigned claim number ATL 213714 and StarStone assigned claim number 4245921.

**"Communication"** includes but is not limited to any telephone conversation, meeting, discussion, letter, facsimile, email, text message, or other writing or means in which information was received or transmitted to you.

**"Defendants"** shall mean and refer to AXIS Surplus Insurance Company, StarStone Specialty Insurance Company, and Lexington Insurance Company.

**"Document"** and **"Documents"** shall mean all written, reported, recorded, printed or typed or graphic matter, however produced or reproduced, now or at any time in Plaintiff's possession, custody or control. The terms shall include, but not be limited to, all letters, correspondence, telegrams, telexes, cables, telephone records, logs and notations, intra and interoffice communications, microfilm, diaries, calendar entries, summaries, messages, audio tapes, videotapes, digital recordings, computer discs or tapes, computer programs and software, photographs, film, invoices, files, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, work assignments, reports, memoranda, notes, notebooks, speeches, drafts, data sheets, data compilations, press releases, public statements and/or announcements, public and governmental filings, opinions, worksheets, statistics, contracts, agreements, intra-corporate drafts of the foregoing items and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the original.

**"Identify," "Identifies"** and **"Identification"** means:

a. natural person, means to state his or her full name if known, his or her present or last known address and telephone numbers, and if known, his or her present or last known business address, position and business affiliation.

b. corporation or business entity, means to state the name of such business, the address of its principal place of business and its telephone number.

c. Document as defined above, means to state the identifying nomenclature and the type of document or documents, including, without limitation, its date, if any; the person or office who sent it; the persons or office to whom it was sent; its present location or custodian; the form of the document; and a description of its contents. If any such document was, but no longer is, in your possession, please state what disposition was made of it. In lieu of identifying a document responsive to a interrogatory, you may attach a legible copy of the document to the answer, and to make reference to the specific document so attached in the appropriate answer.

d. contract right or obligation mean to quote the applicable contract language, state the source of the language, whether from the contract or other agreement, and the provision number in the contract.

**"Knowledge"** includes both firsthand and secondary knowledge.

**"Lawsuit"** shall mean and refers to the action styled *Sunshine Eastgate Plaza, LLC v. Lexington Insurance Company, AXIS Surplus Insurance Company, and Starstone Specialty Insurance Company*, Civil Action No. 3:25-cv-02986-O in the United States District Court for the Northern District of Texas, Dallas Division.

**"Lexington"** shall mean and refers to Lexington Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Person"** shall mean the plural as well as the singular and includes any natural person, firm, corporation, association, partnership, trust, joint venture, or other legal entity, whether public or private.

**"Plaintiff," "You,"** or **"Yours"** shall mean and refers to Plaintiff Sunshine Eastgate Plaza, LLC and its agents, owners, shareholders, members, employees, subordinates, representatives, consultants, public adjusters, contractors, officers, directors, partners, attorneys, predecessors, successors, affiliates, assigns, and all other natural persons or businesses or legal entities acting or purporting to act on behalf of or under the direction or control of them, unless otherwise indicated.

**"Policy"** shall mean and refers to the insurance policy bearing Policy No. 062502712 issued by Lexington Insurance Company Policy, insurance policy bearing Policy No. EAF657478-23 issued by AXIS Surplus Insurance Company, and the insurance policy bearing Policy No. U87778230CSP issued by StarStone Specialty Insurance Company, all with effective dates of November 1, 2023 through November 1, 2024.

**"Property Management Company"** means any individual, or entity, retained by Plaintiff to act as property manager of the Subject Properties and/or maintain, manage, inspect or supervise the Subject Properties and any such individual and/or entity's past, present, and future agents, owners, principals, shareholders, members, employees, subordinates, representatives, consultants, contractors, officers, directors, partners, attorneys, predecessors, successors, affiliates, assigns, and all other natural persons or businesses or legal entities acting or purporting to act on behalf of or under the direction or control of them, unless otherwise indicated.

**"Relating to," "referring to," "reflecting," "regarding"** or **"evidencing"** shall mean and shall include stating, describing, recording, noting, mentioning, concerning, reflecting, referring to, relating to, relevant to, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, showing, tending to show, discussing, evaluating, studying, analyzing, constituting, comprising, embodying, containing, evidencing, pertaining to, respecting, supporting, tending to support, under-cutting, tending to undercut, contradicting, or tending to contradict.

**"StarStone"** shall mean and refers to StarStone Specialty Insurance Company, its past, present, and future officers, directors, members, agents, insurers, servants, representatives, employees, independent contractors, claim adjusters, field adjusters, third-party administrators, parents, subsidiaries, affiliated companies, partners, predecessors, attorneys, successors-in-interest, and any other person or entity acting, or purporting to act, on its behalf or under its control.

**"Statement"** means (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical or other type of recording, or any transcription thereof which is a substantially verbatim recital of a statement made by the person and contemporaneously recorded.

**"Subject Property"** shall mean and refer to the property owned by Plaintiff and generally located at 1430 - 1454 Northwest Highway, Garland, Texas 75041.

**"Supplied"** includes sold by, purchased from, or otherwise furnished by the party to which the interrogatory refers.

**"Things"** shall mean and refer to any tangible items not otherwise included in the definition of document above.

## II. INSTRUCTIONS

All responsive information and documents are to be divulged which are not privileged and are in the possession, custody or control of Plaintiff, its attorneys, investigators, agents, employees, officers, directors, representatives, or anyone acting on Plaintiff's behalf.

Where an individual interrogatory calls for an answer which involves more than one part, each part of the answer shall be clearly set out so that it is understandable.

These interrogatories are continuing in nature and require supplemental answers in the event you or your attorney(s) discover additional responsive information.

Where knowledge or information in your possession, custody or control is requested, such request includes knowledge or information possessed by your present or former (at the time they were acting on your behalf) attorneys, agents, subordinates, employees, directors, officers, representatives and consultants, and anyone else from whom Plaintiff have a superior right to compel the information.

The singular form of a word shall be interpreted as a plural and the plural form of a word shall be interpreted as a singular whenever appropriate in order to bring within the scope of these interrogatories any information that might otherwise be considered beyond their scope.

In the event that any document requested has been lost or destroyed, please identify that document by author(s), addressee(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, all persons who had custody of each document, date of loss or destruction, and the name and title of the person responsible for the loss or destruction.

If you object or refuse to answer in whole or in part any interrogatory propounded below, or if you object or refuse to identify or provide any document requested below on the grounds that it requests information that falls within the scope of any discovery privilege or exemption, please provide the following information as to each such objection:

i. The place, date (or approximate date), and manner of recording or otherwise preparing the document or thing;

ii. The name and title of sender, and the name and title of each recipient of the document or thing;

iii. The summary of the contents of the document or thing;

iv. The identity of each person or persons (other than those providing stenographic or clerical assistance) participating in the preparation of the document or thing;

v. The identity of each person to whom the contents of the document or thing have been communicated by copy, exhibition, reading, or substantial summarization, the

date(s) of said communication, and the employer and title of each person identified at the time of said communication; and

vi. A statement of the basis on which a privilege or exemption is claimed.

If you believe an interrogatory may request production of some information which is protected by applicable privilege or exemption, you are requested to answer with any responsive information that is not subject to a claim of privilege or other reason for non-production.

When asked “what facts support your contention” or to describe the “factual basis” or “factual detail” in an interrogatory, the request seeks evidentiary facts and not ultimate facts.

## III. INTERROGATORIES TO PLAINTIFF

**INTERROGATORY NO. 1:**

Identify all persons, excluding your counsel, who provided substantive information in response to these interrogatories.

**ANSWER:**

**INTERROGATORY NO. 2:**

Identify the dollar amount of Your claim for damages, including the amount for each of the following, where applicable: any compensatory damages, consequential damages, statutory damages, penalties, interest, attorney's fees, or costs, the basis for said damages, and the differentiation between damage to the buildings/structures and each suite number or address, and any other alleged damages or losses claimed.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify all Property Management Companies who were retained by You to act as property manager of the Subject Property and/or maintain, manage, inspect, supervise, or maintenance of, the Subject Property from January 1, 2019 to present, including but not limited to, when the property management company was hired, where its principal place of business is located, and who at the property management company would have the most information about the condition of the Subject Property. Please include in your response the person's name, current address, phone number and years serving as part of the property management team.

**ANSWER:**

**INTERROGATORY NO. 4:**

Have You made any repairs for damage that You claim was caused by the September 24, 2024 weather event?

**ANSWER:**

**INTERROGATORY NO. 5:**

Identify all repairs completed for the damage You claim was caused by the alleged September 24, 2024 weather event, including identifying the specific repairs and all invoices and proof of

payment reflecting amounts paid for any completed repairs. “Completed repairs” refers to repairs You contend were required or needed to remedy damage to the Subject Property occurring on or about September 24, 2024 and have been completed. Please include in your response the month, day, and year any repairs began and were completed, the amount paid for the repairs and a description of any completed repairs.

**ANSWER:**

**INTERROGATORY NO. 6:**

Identify all outstanding repairs for the damage You claim was caused by the alleged September 24, 2024 weather event, and any contracts, proposals, bids, quotes, or estimates reflecting amounts for the outstanding repairs. “Outstanding repairs” refers to repairs You contend are required or needed to remedy damage to the Subject Property You contend occurred on or about September 24, 2024 but have yet to be performed. Please include in your response a description of the outstanding repairs.

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify all persons who inspected or evaluated the roofs, exterior and/or interior of the Subject Property in connection with the Claim, including, but not limited to when the inspection occurred, who conducted the inspection, what was the scope of the inspection (i.e., photography, videos, testing, sampling etc.), and each device that was used to inspect and evaluate.

**ANSWER:**

**INTERROGATORY NO. 8:**

Describe all efforts made to mitigate the loss or damage at the Subject Property related to the Claim and identify the date(s) on which such efforts were made, who performed the work and the amount Plaintiff paid for such work.

**ANSWER:**

**INTERROGATORY NO. 9:**

Identify all Person(s) hired or retained by or on behalf of Plaintiff and/or any Property Management Company to repair, rebuild, replace, maintain, evaluate, or inspect the condition of the Subject Property’s roofing system, exterior, and interiors, in any capacity from January 1, 2019 to the present.

**ANSWER:**

**INTERROGATORY NO. 10:**

Identify the Person(s) with the most knowledge about the condition, maintenance, and repairs of the Subject Property from January 1, 2019 to the present.

**ANSWER:**

**INTERROGATORY NO. 11:**

Please explain the installation, maintenance, and repair history of the Subject Property's roofing system, including, but not limited to, when the roofing components were installed, when any repair work was done, what contractor(s) performed the work, and the amount paid to each contractor for such work.

**ANSWER:**

**INTERROGATORY NO. 12:**

Identify all other claims made by Plaintiff to any property insurer for property damage, including, but not limited to, damage to the roof, exterior, and interiors, at the Subject Property, from January 1, 2019 to the present.

Please include in your response the claim number, insurer, policy number, policy period, date of loss, amount you claimed, amount paid to you, and contact information for any insurance company, adjuster, or public adjuster who handled such claim.

**ANSWER:**

**INTERROGATORY NO. 13:**

Identify each and every tenant or occupant who has submitted a complaint regarding the condition of the Subject Property since or following the alleged September 24, 2024 weather event. Please include in your response the individual's name, address, suite number, and phone number.

**ANSWER:**

**INTERROGATORY NO. 14:**

Identify all members of Sunshine Eastgate Plaza, LLC. For any member that is a natural person, identify his/her name, address, citizenship, and state in which he/she is domiciled. For any member that is a partnership or limited liability company, identify each partner's or member's name, address, and citizenship. For any corporate member, identify the corporation's name, principal place of business, and state of incorporation.

**ANSWER:**

# EXHIBIT F

NAIC Company Code
26620

# AXIS Surplus Ins Co
## Company Overview for 2025
## Property/Casualty

Commenced Business Date: December 8, 1983
State of Domicile: IL

10000 AVALON BOULEVARD, SUITE 200
ALPHARETTA, GA 30009

Company Code = 26620
Group Code = 3416
Group Name = AXIS Capital Grp
FEIN: 63-0941128

WWW.AXISCAPITAL.COM
678-746-9400

## Assets, Liabilities and Capital & Surplus




| Key Financials | |
|---|---|
| Assets | $1,519,878,995 |
| Liabilities | $1,162,229,149 |
| Capital and Surplus | $357,649,845 |

Assets = Liabilities + Capital & Surplus

- Assets
- Liabilities
- Capital and Surplus

## Top Direct Premiums by Line of Business




| Line of Business | |
|---|---|
| Other liability - occurrence | $1,055,007,288 |
| Fire | $445,673,152 |
| Allied lines | $398,975,008 |
| Other liability - claims-made | $277,279,583 |
| Earthquake | $46,668,813 |

## Three-Year Net Income




| FAS_YEAR | |
|---|---|
| 2025 | $65,745,943 |
| 2024 | $48,719,900 |
| 2023 | $14,014,532 |

## Complaint Count




| Complaint Year | Complaint Count |
|---|---|
| 2025 | 0 |
| 2024 | 0 |
| 2023 | 0 |

Recipient agrees not to market, sell, reprint, reproduce or distribute without the express written permission in advance from the NAIC.
For copyright and reprint information, please visit https://www.naic.org.

Report reflects data reported from the state insurance department to the NAIC as of September 8, 2026

Copyright © 1991 - 2026 National Association of Insurance Commissioners. All rights reserved.

# EXHIBIT G

# EXAMINATION REPORT

# OF

# STARSTONE SPECIALTY INSURANCE COMPANY

# AS OF

# DECEMBER 31, 2022

TRINIDAD NAVARRO
COMMISSIONER

STATE OF DELAWARE
DEPARTMENT OF INSURANCE

# REPORT ON EXAMINATION

# OF

# STARSTONE SPECIALTY INSURANCE COMPANY

# AS OF

# DECEMBER 31, 2022

The above-captioned report was completed by examiners of the Delaware Department of Insurance.

Consideration has been duly given to the comments, conclusions and recommendations of the examiners regarding the status of the company as reflected in the report.

This report is hereby accepted, adopted and filed as an official record of this Department.

Trinidad Navarro
Insurance Commissioner

Dated this 3 day of June, 2024

TABLE OF CONTENTS


SCOPE OF EXAMINATION ........ 1

SUMMARY OF SIGNIFICANT FINDINGS ........ 3

COMPANY HISTORY ........ 3

CAPITALIZATION ........ 5

DIVIDENDS ........ 6

MANAGEMENT AND CONTROL ........ 6

DIRECTORS ........ 6

OFFICERS ........ 7

CORPORATE RECORDS ........ 7

INSURANCE HOLDING COMPANY SYSTEM ........ 8

AGREEMENTS WITH AFFILIATES ........ 9

TERRITORY AND PLAN OF OPERATION ........ 10

TERRITORY ........ 10

PLAN OF OPERATION ........ 10

REINSURANCE ........ 11

FINANCIAL STATEMENTS ........ 15

STATEMENT OF ASSETS ........ 16

STATEMENT OF LIABILITIES, SURPLUS AND OTHER FUNDS ........ 17

STATEMENT OF INCOME ........ 18

RECONCILIATION OF CAPITAL AND SURPLUS ........ 19

ANALYSIS OF CHANGES IN FINANCIAL STATEMENTS RESULTING FROM THE EXAMINATION ........ 20

COMMENTS ON FINANCIAL STATEMENT ITEMS ........ 20

SUBSEQUENT EVENTS ........ 20

SUMMARY OF RECOMMENDATIONS ........ 21

May 23, 2024

Honorable Trinidad Navarro
Commissioner of Insurance
Delaware Department of Insurance
1351 West North Street
Suite 101 Dover, Delaware 19904

Dear Commissioner:

In compliance with instructions and pursuant to statutory provisions contained in Examination Certification No. 23.014, dated June 16, 2023, an examination has been made of the affairs, financial condition and management of

**STARSTONE SPECIALTY INSURANCE COMPANY**

hereinafter referred to as the Company or SSIC. The Company was incorporated under the laws of the State of Delaware as a stock company with its registered office located at 1209 Orange Street, Wilmington, Delaware 19801. The administrative office of the Company is located at 210 E. Fifth Street, Suite 1200, Cincinnati, Ohio 45202.

**SCOPE OF EXAMINATION**

The Delaware Department of Insurance (Department) performed a risk-focused financial examination of the Company. The last examination was conducted as of December 31, 2018, by the Department as part of a multi-state coordinated examination. This examination covered the period of January 1, 2019 through December 31, 2022 and was performed as part of a multi-state coordinated examination of the Core Specialty Insurance Holdings Inc. (Core Specialty) and its

regulated insurance entities, wherein Delaware is the lead state. The companies in Core Specialty included in the examination are as follows:

| Company Name | NAIC Number | State of Domicile |
|---|---|---|
| StarStone Specialty Insurance Company (Company) | 44776 | DE |
| StarStone National Insurance Company (SNIC) | 25496 | DE |
| Lancer Insurance Company (LIC) | 26077 | IL |
| Lancer Insurance Company of New Jersey (LICNJ) | 37680 | NJ |

The examination was conducted concurrently with that of the Company's Delaware domiciled affiliates and to the fullest extent, the efforts, resources, project material and findings were coordinated and made available to all examination participants.

We conducted our examination in accordance with the *National Association of Insurance Commissioners* (NAIC) *Financial Condition Examiners Handbook* (Handbook) and generally accepted statutory insurance examination standards consistent with the Insurance Code and Regulations of the State of Delaware. The NAIC Handbook requires that we plan and perform the examination to evaluate the financial condition, assess corporate governance, identify current and prospective risks of the Company and evaluate system controls and procedures used to mitigate those risks. An examination also includes identifying and evaluating significant risks that could cause an insurer's surplus to be materially misstated both currently and prospectively.

All accounts and activities of the Company were considered in accordance with the risk-focused examination process. This may include assessing significant estimates made by management and evaluating management's compliance with Statutory Accounting Principles. The examination does not attest to the fair presentation of the financial statements included herein. If, during the course of the examination, an adjustment is identified, the impact of such adjustment will be documented separately following the Company's financial statements.

This examination report includes significant findings of fact, pursuant to the General Corporation Laws of the State of Delaware as required by 18 *Del. C.* § 321, along with general information about the insurer and its financial condition. There may be other items identified during the examination that, due to their nature, are not included within the examination report but separately communicated to other regulators and/or the Company.

During the course of this examination, consideration was given to work performed by the Company's external accounting firm, Ernst & Young, LLP (E&Y). Certain auditor work papers of the 2022 E&Y audit of the Company have been incorporated into the work papers of the examiners and have been utilized in determining the scope, areas of emphasis in conducting the examination, and in the area of risk mitigation and substantive testing.

## SUMMARY OF SIGNIFICANT FINDINGS

There were no significant findings or material changes in financial statements as a result of this examination.

## COMPANY HISTORY

The Company was incorporated as DT Insurance Corporation on August 16, 1991, under the laws of the State of Delaware, and commenced business on November 19, 1991.

On December 22, 1998, Alea Holding US Company acquired the Company and the Company's name was changed to Rhine Re Insurance Ltd. On August 31, 2000, the Company's name was changed to Alea North America Reinsurance Company. On December 20, 2001, the Company's common stock was contributed to Alea North America Insurance Company. On November 15, 2002, the Company's name was changed to Alea North America Specialty Insurance Company.

On September 29, 2006, Praetorian Insurance Company acquired the Company and the Company's name was changed to Praetorian Specialty Insurance Company. Effective May 31, 2007, Praetorian Financial Group and its subsidiaries were sold to QBE Holdings, Inc.

On February 17, 2009, Torus US Holdings Inc. acquired the Company as a clean shell for $61.48 million, with all prior obligations remaining the responsibility of the sellers through a series of agreements. On March 2, 2009, the Company's name was changed to Torus Specialty Insurance Company.

On April 1, 2014, Kenmare Holdings Ltd., a wholly-owned subsidiary of Enstar Group Limited (Enstar), through its subsidiary North Bay Holdings Limited, and together with Trident V, L.P., Trident V Parallel Fund, L.P. and Trident V Professionals Fund, L.P., which are managed by Stone Point Capital LLC (Stone Point) (collectively Trident) purchased StarStone Insurance Holdings Limited (SIHL) for $646 million, with the approval of the Department. Concurrently, SIHL became StarStone Specialty Holdings Limited (SSHL).

After the consummation of the purchase, the ownership interests of SSHL were Enstar (58.98%), Trident (39.32%) and Dowling Capital Partners (1.70%). On September 21, 2015, the Company's name was changed to SSIC.

On June 10, 2020, Enstar announced an agreement to recapitalize SSHL and appoint a new management team and Board of Directors (Board). As part of the recapitalization, Enstar entered into a definitive agreement to sell SSHL to Core Specialty, a newly formed entity with equity backing from funds managed by SkyKnight Capital L.P. (SkyKnight), Dragoneer Investment Group (Dragoneer) and Aquiline Capital Partners LLC (Aquiline), as well as other private investors. The recapitalization was completed on November 30, 2020, upon which Core Specialty became the

ultimate controlling entity of the Company and the partnership name of SIHL was changed to the corporate name of StarStone US Holdings, Inc. (SUHI).

On April 16, 2021, Core Specialty announced an agreement to merge with Lancer Financial Group, Inc. (subsequently converted into a limited liability company and renamed Lancer Financial Group, LLC), combining the companies in a stock and cash transaction. The merger was completed on December 31, 2021. Core Specialty then acquired LIC and LICNJ (collectively Lancer).

Subsequent to the Lancer merger, the ownership of Core Specialty was as follows: Corinthian DF Holdings, LP (SkyKnight/Dragoneer) 44%, Cavello Bay Reinsurance Limited (Cavello), an affiliate of Enstar, 19.9%, Aquiline Financial Services Fund IV L.P. 8.6%, Company directors and management 14.3% and other investors 13.2%.

Capitalization

The Company's Amended and Restated Certificate of Incorporation authorizes the issuance of 1000 shares of common stock with a $7,000 par value. As of December 31, 2022, the Company had only 500 common shares issued and outstanding totaling $3,500,000. All outstanding common shares of the Company are owned by SUHI.

As of December 31, 2022, the Company reported gross paid in and contributed surplus of $814,465,335. During 2019, 2020 and 2022 the Company received capital contributions from its parent, SUHI, in the amounts of $45,000,000, $600,000,000 and $90,000,000, respectively.

Effective January 1, 2022, the Department approved the Company's request for a Quasi Reorganization pursuant to *Statutory Accounting Principles (SSAP) No. 72 – Surplus and Quasi-Reorganizations*. To facilitate this quasi reorganization, the Company reclassified 100% its year end 2021 reported unassigned funds of $190,864,156 into gross paid in and contributed surplus. The $90,000,000 contributed by SUHI to the Company in 2021 was in turn, contributed to its

wholly owned subsidiary, SNIC. The contributions and reclassification were in association with the acquisition of Hallmark's Excess & Surplus Lines operations.

Dividends

The Company's Board did not approve, authorize or pay any stockholder dividends to SUHI during the examination period.

## MANAGEMENT AND CONTROL

Directors

Pursuant to the general Corporation Laws of the State of Delaware, as implemented by the Company's Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws, all corporate powers and its business property and affairs are managed by, or under the direction of, its Board.

In accordance with the Company's Amended and Restated Bylaws, the number of Directors shall be fixed from time to time by a resolution of the Board or stockholders, but in no event be less than two. Directors shall be elected at the annual meeting of the stockholders and shall hold office for a term of one year or until their successors are elected and qualified. The members of the Board, serving as of December 31, 2022, each elected or appointed in accordance with the Company bylaws were as follows:

| Name and Location | Principal Occupation |
|---|---|
| Russell Sinco | Chief Financial Officer – Insurance Operations<br>Core Specialty Insurance Holdings, Inc. |
| Jeffrey Wanamaker | Chief Underwriting Officer<br>Core Specialty Insurance Holdings, Inc. |
| Robert Kuzloski | General Counsel, EVP and Corporate Secretary<br>Core Specialty Insurance Holdings, Inc. |

Officers

In accordance with its Amended and Restated Bylaws, officers serving the Company shall be a Chief Executive Officer, President, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Treasurer and one or more Assistant Treasurers. The officers shall hold office until their successors are chosen and qualify. Any number of offices may be held by the same person, except the offices of chief executive officer and secretary may not be held by the same person. The principal officers, as reported in the Company's 2022 Annual Statement and serving at December 31, 2022, are as follows:

| Name | Title |
| --- | --- |
| Joseph Consolino | President and Chief Executive Officer |
| Jeffrey Wanamaker | Senior Vice President |
| Russell Sinco | Chief Financial Officer and Treasurer |
| Robert Kuzloski | Secretary |
| John Reitwiesner | Vice President |
| Paul Simeone | Vice President |
| Erikalyn Lauterbach | Assistant Secretary |

The Company maintains a formal written Code of Conduct, which provides an ethical and legal framework for business practices and conduct to which all Company employees, officers and directors must adhere. Incorporated into the Code of Conduct is a Conflict-of-Interest Policy. On an annual basis, all employees are required to complete online training and acknowledge they have read and are complying with certain Company policies.

Corporate Records

The recorded minutes of the shareholder and Board were reviewed for the period under examination. The recorded minutes of the shareholder and Board adequately documented their meetings, the election of directors and officers and the approval of Company transactions and events. In addition, the review of Company files indicated that written correspondence was

submitted to the Department with regards to the changes in officers and directors during the period under examination in compliance with 18 *Del. C.* §4919.

Insurance Holding Company System

The Company is a member of an Insurance Holding Company System as defined under 18 *Del. C.* §5001 of the Delaware Insurance Code. The immediate parent of the Company as of December 31, 2022 was SUHI, which is 100% owned by Core Specialty.

As of December 31, 2022, ownership and organizational structure of the Core Specialty group is as follows:



<u>Agreements with Affiliates</u>

The Company and its affiliates are party to several intercompany agreements. The following significant intercompany agreements, not inclusive of reinsurance agreements which are covered below, were in effect as of December 31, 2022:

*Intercompany Services Agreement*

Effective November 30, 2020, SSIC entered into an Intercompany Services Agreement with Core Specialty Insurance Services (CSIS) (formerly known as StarStone US Intermediaries, Inc.), pursuant to which CSIS will provide, or arrange for the provision of, all services necessary or appropriate in connection with the management and operation of the Company. The Department approved the Intercompany Services Agreement on January 22, 2021.

*Tax Sharing Agreement*

Effective January 1, 2022, the Company, SNIC, LIC and LICNJ entered into a Tax Sharing Agreement (TSA) with CSIS, and its affiliates and subsidiaries. The TSA governs the filing of consolidated U.S. corporation income tax returns by the Consolidated Group, whereby Core Specialty will prepare and file the requisite return and assume the primary liability for payment of any federal income tax liability flowing therefrom. The TSA also governs the method for allocating the consolidated tax liability of the Core Specialty Affiliated Group among the Members, for reimbursing Core Specialty for payment of such tax liability, for compensating any Party for use of its losses or tax credits, and to provide for the allocation and payment of any refund arising from a carryback of losses or tax credits from subsequent tax years. The Tax Sharing Agreement was approved by the Department on April 1, 2022.

## TERRITORY AND PLAN OF OPERATION

Territory

The Company is licensed as a domestic surplus lines insurer in Delaware and on an exempt surplus lines basis in all fifty U.S. States, the District of Columbia, Puerto Rico and Guam.

Plan of Operation

The Company writes a wide range of casualty and specialty insurance, as well as reinsurance products, to a large client base.

The Company's 2022 direct written premiums by line of business were as follows:

| Line of Business | Premium | Percent |
|---|---|---|
| Fire | $ 358,510,479 | 45.64% |
| Other Liability - Claims Made | 147,235,214 | 18.75% |
| Other Liability - Occurrence | 103,044,926 | 13.12% |
| Medical Professional Liability - Claims Made | 90,965,015 | 11.58% |
| Earthquake | 21,025,165 | 2.68% |
| Other Commercial Auto Liability | 17,597,222 | 2.24% |
| Allied Lines | 15,337,049 | 1.95% |
| Homeowner's Multiple Peril | 10,533,329 | 1.34% |
| Products Liability | 8,601,286 | 1.10% |
| Ocean Marine | 7,503,981 | 0.96% |
| Private Flood | 4,322,733 | 0.55% |
| All Other Lines of Business Combined | 764,585 | 0.10% |
| | $ 785,440,984 | 100.00% |

The Company's 2022 direct written premiums by jurisdiction were as follows:

| Jurisdiction | Premium | Percent |
|---|---|---|
| Alabama | $ 17,339,098 | 2.21% |
| Florida | 111,769,618 | 14.23% |
| California | 116,357,133 | 14.81% |
| Georgia | 20,582,265 | 2.62% |
| Illinois | 19,220,920 | 2.45% |
| Louisiana | 38,157,028 | 4.86% |
| Massachusetts | 15,896,151 | 2.02% |
| Texas | 103,249,816 | 13.15% |
| New Jersey | 30,303,612 | 3.86% |
| New York | 62,874,235 | 8.00% |
| Pennsylvania | 22,161,141 | 2.82% |
| All Other Jurisdictions Combined | 227,529,967 | 28.97% |
| | $ 785,440,984 | 100.00% |

## REINSURANCE

For 2022, the Company reported the following distribution of net premiums written:

| | |
|---|---|
| Direct business | $ 785,440,984 |
| Reinsurance assumed (from non-affiliates) | 797,615 |
| Reinsurance assumed (from affiliates) | - |
| Total direct and assumed | $ 786,238,599 |
| | |
| Reinsurance ceded (to affiliates) | $ - |
| Reinsurance ceded (to non-affiliates) | 207,296,679 |
| Total ceded | $ 207,296,679 |
| | |
| Net premiums written | $ 578,941,920 |

The Company's unaffiliated reinsurance program is a joint program with its affiliate SNIC.

The Company had the following significant property reinsurance contracts effective during 2022:

*Traditional Property Catastrophe*

Layer 1-3, effective March 1, 2022 through March 1, 2023:
1. Layer 1 65% of $70,000,000 xs $55,000,000

Self-retention layer $25,000,000 xs $125,000,000:

2. Layer 2 $45,000,000 xs $150,000,000
3. Layer 3 $105,000,000 xs of $195,000,000

Layer 4-5, effective June 1, 2022 through June 1, 2023:

4. Layer 4 $100,000,000 xs $300,000,000
5. Layer 5 $100,000,000 xs $300,000,000

The Company has one reinsurance contract relating to an insurance linked security, a property catastrophe bond. Under the contract, the Company, and its affiliate SNIC, are ceding insurers for the purpose of managing catastrophe related risks direct and assumed written insurance coverages. The reinsurance agreement provides supplemental reinsurance coverage up to approximately 24% of $270,000,000 (fully collateralized) for catastrophe losses in excess of $300,000,000 (per occurrence and annual aggregation) occurring between June 1, 2022 and June 1, 2023.

The Company has reinsurance coverage for Workers Compensation, effective October 1, 2022, in various layers as follows:

- $3,000,000 xs $2,000,000
- $5,000,000 xs $5,000,000
- $10,000,000 xs $10,000,000
- $30,000,000 xs $20,000,000

Additionally, the Company has reinsurance coverage for Workers' Compensation on a per person basis, effective October 1, 2022, in various layers as follows:

- $3,000,000 xs $2,000,000
- $5,000,000 xs $5,000,000
- $5,000,000 xs $10,000,000

*Affiliate Ceded Reinsurance*

Effective January 1, 2013, the Company entered into a continuous Quota Share Reinsurance Agreement (Quota Share) with Starstone Insurance Bermuda Ltd. (SIBL), a member

of its holding company group and an alien reinsurer which has been established as an accredited Delaware reinsurer under the provisions of 18 *Del. C.* § 911 Credit allowed a domestic ceding insurer and 18 *Del. Admin. Code* § 1003 Credit for Reinsurance. Under the Quota Share agreement, the Company cedes 65% of its net retained premium and commission plus a 20% reimbursement of the Company's underwriting expense. Effective January 1, 2014, the Quota Share agreement was amended to increase the ceding percentage from 65% to 100% on discontinued business. Effective December 31, 2017, the Company terminated the Quota Share agreement on a run-off basis. The agreement and the amendment were approved by the Department. The Company ceded $ 1,090,000 in written premiums and $(3,288,000) in incurred loss and LAE in 2022 and $843,000 in written premiums and $(3,986,000) in incurred loss and LAE in 2021 to SIBL under the Quota Share agreement.

Effective January 1, 2013, the Company entered into a continuous aggregate excess of loss (Stop Loss) reinsurance agreement with SIBL. The Stop Loss provides protection against cumulative losses of the Company between an 80% calendar year net incurred loss ratio and a 160% calendar year net incurred loss ratio. Effective January 1, 2018, the agreement was amended to decrease the attachment point to ratio to 75%. The agreement and the amendment were approved by the Department. The Company ceded $ 0 in written premiums and $6,657,000 in incurred loss and LAE in 2022 and $0 in written premiums and $(4,811,000) in incurred loss and LAE in 2021 to SIBL under the Stop Loss agreement.

On December 15, 2016, the Company executed a Quota Share agreement with KaylaRe, Ltd (KaylaRe), a Bermuda-based Class 4 reinsurer primarily owned by Cavello, a subsidiary of Enstar and funds manager Hillhouse Capital Management, Ltd., and Stone Point. During the first quarter of 2018, Enstar entered into an agreement to purchase the remaining shares of KaylaRe.

The Quota Share agreement was effective January 1, 2016. Since the execution of the agreement surpassed nine months, the agreement had both retroactive and prospective provisions. Under the agreement, the Company cedes 35% of its net premium and acquisition costs after deduction of third-party reinsurance plus 35% of overhead expenses. Effective January 1, 2018, the Company terminated the Quota Share agreement on a run-off basis. Under the prospective portion of this agreement, the Company ceded written premiums of $903,000 and $924,000 during 2022 and 2021, respectively. The Company ceded incurred losses and LAE of $(272,000) and $(917,000) in 2022 and 2021, respectively.

*Retroactive Reinsurance*

The Quota Share endorsement effective January 1, 2014, with SIBL was bifurcated between prospective and retroactive. The retroactive portion of the Quota Share endorsement included reserves commuted with StarStone Insurance (UK) Limited in 2014. The Company ceded initial reserves of $31,552,000, paid $28,989,000 in consideration and recognized $2,563,000 of initial retroactive reinsurance gains which is classified as Special Surplus Funds. The Company recognized retroactive reinsurance gains of $503,000 in 2022 and retroactive reinsurance losses of $1,112,000 in 2021.

Under the retroactive provision of the KaylaRe 35% Quota Share agreement, the Company ceded initial reserves of $10,138,000, paid $6,889,000 in consideration and recognized $3,249,000 of initial retroactive reinsurance gains which is classified as Special Surplus Funds. The Company recognized retroactive reinsurance losses of $157,000 in 2022 and retroactive reinsurance gains of $2,012,000 in 2021.

Effective October 31, 2020, in connection with the recapitalization, the Company entered into a loss portfolio transfer reinsurance agreement with Enstar, reinsuring their net exiting

reserves with Clarendon National Insurance Company, an affiliate of Enstar. As part of the transaction, the Company paid a premium of $5,096,000 above the amount of the Company's net reserves of $147,364,000. The Company recognized a retroactive loss of $6,127,000 and $11,977,000 in 2022 and 2021, respectively.

A summary of Retroactive Reserves as of December 31, 2022 is as follows:

| Company | Ceded Amount |
|---|---|
| StarStone Bermuda Ltd. | $ 1,021,000 |
| KaylaRe Ltd. | 2,808,000 |
| Clarendon National Insurance Company | 76,082,000 |
| Total | $ 79,911,000 |

## FINANCIAL STATEMENTS

The following financial statements are based on the statutory financial statements filed by the Company with the Department and present the financial condition of the Company for the period ending December 31, 2022:

- Statement of Assets as of December 31, 2022
- Statement of Liabilities, Surplus and Other Funds as of December 31, 2022
- Statement of Income for the year ended December 31, 2022
- Reconciliation of Capital and Surplus for the Period from the Prior Examination as of December 31, 2018 to December 31, 2022

Statement of Assets
As of December 31, 2022

| | Assets | Nonadmitted Assets | Net Admitted Assets |
|---|---|---|---|
| Bonds | $ 768,253,410 | $ - | $ 768,253,410 |
| Common stocks (stocks) | 574,759,729 | 461,842 | 574,297,887 |
| Cash | 44,434,293 | - | 52,401,155 |
| Cash equivalents | 7,966,862 | - | - |
| Subtotals, Cash and Invested Assets | $ 1,395,414,294 | $ 461,842 | $ 1,394,952,452 |
| Investment income due and accrued | 6,559,793 | - | 6,559,793 |
| Uncollected premiums and agents' balances in the course of collection | 56,464,692 | 1,675,382 | 54,789,310 |
| Amounts recoverable from reinsurers | 79,761,703 | - | 79,761,703 |
| Current federal and foreign income tax recoverable and interest thereon | 46,512,303 | - | 46,512,303 |
| Net deferred tax asset | 40,600,845 | 40,600,845 | - |
| Electronic data processing equipment and software | 113,871,030 | 113,871,030 | - |
| Receivables from parent; subsidiaries and affiliates | 16,742,123 | - | 16,742,123 |
| Aggregate write-ins for other-than-invested assets | 16,259,500 | - | 16,259,500 |
| Subtotal other assets | $ 376,771,989 | $ 156,147,257 | $ 220,624,732 |
| Total Assets | $ 1,772,186,283 | $ 156,609,099 | $ 1,615,577,184 |

Statement of Liabilities, Surplus and Other Funds
As of December 31, 2022

| | | Notes |
|---|---|---|
| Losses | $ 393,555,255 | (1) |
| Reinsurance payable on paid losses and loss adjustment expenses | 5,706,054 | |
| Loss adjustment expenses | 62,043,394 | (1) |
| Commissions payable; contingent commissions and other similar charges | 572,002 | |
| Other expenses (excluding taxes; licenses and fees) | 15,252,903 | |
| Taxes, licenses and fees | 361,644 | |
| Unearned premiums (after deducting unearned premiums for ceded reinsurance of $52,513,136) | 276,851,369 | |
| Ceded reinsurance premiums payable | 86,626,954 | |
| Funds held by company under reinsurance treaties | 22,473,792 | |
| Provision for reinsurance | 3,236,000 | |
| Payable to parent; subsidiaries and affiliates | 56,011,339 | |
| Payable for securities | 6,076,468 | |
| Aggregate write-ins for liabilities | (109,346,451) | |
| Total Liabilities | $ 819,420,723 | |
| | | |
| Aggregate write-ins for special surplus funds | $ 4,009,015 | |
| Common capital stock | 3,500,000 | |
| Gross paid in and contributed surplus | 814,465,335 | |
| Unassigned funds (surplus) | (25,817,889) | |
| Surplus as regards policyholders | $ 796,156,461 | |
| Totals Liabilities, Surplus and Other Funds | $ 1,615,577,184 | |

Statement of Income
For the Year Ended December 31, 2022

| | |
|---|---|
| Premiums earned | $ 487,161,070 |
| | |
| Losses incurred | $ 236,182,051 |
| Loss adjustment expenses incurred | 47,841,193 |
| Other underwriting expenses incurred | 202,188,232 |
| Total underwriting deductions | $ 486,211,476 |
| | |
| Net underwriting gain (loss) | $ 949,594 |
| | |
| Net investment income earned | $ 12,997,816 |
| Net realized capital gains (losses) less capital gains tax of $0 | (191,761) |
| Net investment gain (loss) | $ 12,806,055 |
| | |
| Net gain (loss) from agents' or premium balances charged off (amount recovered $0 amount charged off $31,174) | $ (31,174) |
| Finance and service charges not included in premium | - |
| Aggregate write-ins for miscellaneous income | (1,734,583) |
| Total other income | $ (1,765,757) |
| | |
| Net income before dividends to policyholders; after capital gains tax and before all other federal and foreign income taxes | $ 11,989,892 |
| Dividends to policyholders | - |
| Net income; after dividends to policyholders; after capital gains tax and before all other federal and foreign income taxes | $ 11,989,892 |
| Federal and foreign income taxes incurred | (3,371,973) |
| Net income | $ 15,361,865 |

# Reconciliation of Capital and Surplus
## For the Period from the Prior Examination
## As of December 31, 2018, to December 31, 2022

| | Common Capital Stock | Aggregate Write-Ins for Surplus Funds | Paid In & Contributed Surplus | Unassigned Funds (Surplus) | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2018 | $ 3,500,000 | $ 10,245,249 | $ 270,329,491 | $ (127,111,366) | $ 156,963,374 |
| 2019 Net Income (Loss) | - | - | - | (6,208,379) | (6,208,379) |
| 2019 Other Changes [1] | - | - | - | (3,097,829) | (3,097,829) |
| 2019 Paid-in Surplus [2] | - | - | 45,000,000 | - | 45,000,000 |
| 2019 Special Surplus Funds [3] | - | (62,002) | - | 62,002 | - |
| Balance at December 31, 2019 | $ 3,500,000 | $ 10,183,247 | $ 315,329,491 | $ (136,355,572) | $ 192,657,166 |
| 2020 Net Income (Loss) | - | - | - | (1,818,423) | (1,818,423) |
| 2020 Other Changes [1] | - | - | - | 419,726 | 419,726 |
| 2020 Paid-in Surplus [4] | - | - | 600,000,000 | - | 600,000,000 |
| 2020 Special Surplus Funds [3] | - | (5,204,597) | - | 5,204,597 | - |
| Balance at December 31, 2020 | $ 3,500,000 | $ 4,978,650 | $ 915,329,491 | $ (132,549,672) | $ 791,258,469 |
| 2021 Net Income (Loss) | - | - | - | (31,175,761) | (31,175,761) |
| 2021 Other Changes [1] | - | - | - | (26,238,632) | (26,238,632) |
| 2021 Special Surplus Funds [3] | - | 900,090 | - | (900,090) | - |
| Balance at December 31, 2021 | $ 3,500,000 | $ 5,878,740 | $ 915,329,491 | $ (190,864,155) | $ 733,844,076 |
| 2022 Net Income (Loss) | - | - | - | 15,361,865 | 15,361,865 |
| 2022 Other Changes [1] | - | - | - | (43,049,480) | (43,049,480) |
| 2022 Surplus Adjustment [5] | - | - | - | 190,864,156 | 190,864,156 |
| 2022 Paid-In Surplus [6] | - | - | (100,864,156) | - | (100,864,156) |
| 2022 Special Surplus Funds [3] | - | (1,869,724) | - | 1,869,724 | - |
| Balance at December 31, 2022 | $ 3,500,000 | $ 4,009,015 | $ 814,465,335 | $ (25,817,889) | $ 796,156,461 |

[1] Changes in unassigned funds - other for each year includes: change in net unrealized capital gains/(losses); change in net deferred income tax; change in nonadmitted assets; change in provision for reinsurance and aggregate write-ins for gains and losses in surplus (i.e. change in retroactive special surplus).

[2] During 2019, the Company received a capital contribution in the amount of $45 million from its direct Parent, SUHI.

[3] Special Surplus Funds adjustments relate to increases and decreases in the retro gain primarily for the KaylaRe and SIBL retroactive reinsurance contracts.

[4] During 2020, the Company received a capital contribution in the amount of $600 million from its direct Parent, SUHI.

[5] Effective January 1, 2022, the Department approved the Company's request for a Quasi-Reorganization pusuant to *Statutory Accounting Principles (SSAP) No. 72 – Surplus and Quasi-Reorganizations*. As a result, the Company reclassified year end 2021 Unassigned Funds of $190,864,156 into Gross Paid-In and Contributed Surplus.

[6] During 2022, the Company received a capital contribution in the amount of $90 million from its direct Parent, SUHI. Additionally, the Company reclassified year end 2021 Unassigned Funds of $190,864,156 into Gross Paid-In and Contributed Surplus. Refer to footnote 5 above for details.

## ANALYSIS OF CHANGES IN FINANCIAL STATEMENTS RESULTING FROM THE EXAMINATION

There were no changes made to the Financial Statements as a result of this Examination.

## COMMENTS ON FINANCIAL STATEMENT ITEMS

Note 1:

| | |
|---|---|
| Losses | $ 393,555,255 |
| Loss Adjustment Expenses | $ 62,043,394 |

The examination liability for the aforementioned captioned items is the same, subject to comments below, as those balances were reported by the Company as of December 31, 2022. The examination analysis of LAE reserves was conducted in accordance with Generally Accepted Actuarial Principles and Statutory Accounting Principles, including NAIC *Accounting Practices and Procedures Manual, SSAP No. 55 – Unpaid Claims, Losses and Loss Adjustment Expenses*.

## SUBSEQUENT EVENTS

The following were the significant subsequent events noted within the Core Specialty Group since the period from the date of examination and the date of this report:

*Acquisitions*

On December 1, 2023, Core Specialty and its controlling persons acquired Standard Life and Accident Insurance Company (SLAICO) and the MGU/Stop-Loss business of American National Group, through the acquisition of 100% of the stock of SLAICO and certain reinsurance transactions. The Texas Department of Insurance issued a Form A approval regarding the acquisition on November 30, 2023.

*Directors and Officers*

Russell Sinco resigned his position as CFO and Treasurer of the insurance operations and his directorships including with the Company and SNIC. These positions are now held by Matthew Moore who was appointed in December 2023.

## SUMMARY OF RECOMMENDATIONS

There were no recommendations as a result of this examination.

The assistance and cooperation of examiners representing the states on the coordinated examination is acknowledged. In addition, the assistance of the consulting actuarial firm, INS Consultants, Inc., the consulting information systems specialist firm, INS Services, Inc., investment specialist Robert Selvaggio with Rutter Associates, LLC, the Company's outside audit firm, E&Y and the Company's management and staff was appreciated and is acknowledged.

Respectfully submitted,

Hails Taylor, CFE
Examiner In-Charge
State of Delaware

Anthony Cardone, CFE
Supervising Examiner
State of Delaware

I, Hails Taylor, hereby verify and attest, under penalty of perjury, that the above is a true and correct copy of the examination report and findings submitted to the Delaware Department of Insurance pursuant to Examination Authority No. 23.014

Hails Taylor, CFE

# EXHIBIT H

# MARKET CONDUCT EXAMINATION REPORT

**OF**

**LEXINGTON INSURANCE COMPANY**

**AS OF**

**September 1, 2006**

I, Matthew Denn, Insurance Commissioner of the State of Delaware, do hereby certify that the attached REPORT ON MARKET CONDUCT EXAMINATION, made as of SEPTEMBER 1, 2006 of the

**LEXINGTON INSURANCE COMPANY**

is a true and correct copy of the document filed with this Department.

ATTEST BY: ______________________________

DATE: 15 JULY 2008




*In Witness Whereof*, I have hereunto set my hand and affixed the official seal of this department at the City of Dover, this 15TH day of JULY 2008.

______________________________

*Insurance Commissioner*

**REPORT ON MARKET CONDUCT EXAMINATION**

OF THE

**LEXINGTON INSURANCE COMPANAY**

AS OF

**SEPTEMBER 1, 2006**

The above captioned Report was completed by examiners of the Delaware Insurance Department.

Consideration has duly been given to the comments, conclusions, and recommendations of the examiners regarding the status of the Company as reflected in the Report.

This Report is hereby accepted, adopted, and filed as an official record of this Department.

MATTHEW DENN
INSURANCE COMMISSIONER

DATED this 15TH day of JULY, 2008.

**TABLE OF CONTENTS**

SALUTATION ..... 1

EXECUTIVE SUMMARY ..... 2

SCOPE OF EXAMINATION ..... 2

HISTORY AND PROFILE ..... 3

METHODOLOGY ..... 3
A. COMPANY OPERATIONS/MANAGEMENT ..... 4
Standard A 08 ..... 4
Standard A 09 ..... 4
B. COMPLAINTS ..... 5
C. REVIEW OF PROCEDURES ..... 5
C.1. Procedures Reviewed but with No Recommendations ..... 6
C.2. Procedures Reviewed with a Recommendation ..... 6

CONCLUSION ..... 8

**SALUTATION**

January 17, 2008

Honorable Matthew Denn
Insurance Commissioner
State of Delaware
841 Silver Lake Boulevard
Dover, Delaware 19904

Dear Commissioner Denn:

In compliance with the instructions contained in Certificate of Examination Authority Number 05.777, and pursuant to statutory provisions including 18 Del. C. §318-322, a Market Conduct Examination has been conducted of the affairs and practices of:

**Lexington Insurance Company.**

The examination was performed as of September 1, 2006. Lexington Insurance Company, hereinafter referred to as "Company" or as "Lexington," is incorporated under the laws of the State of Delaware. This examination consists of two phases, an on-site phase and an off-site phase. The on-site phase of the examination was conducted at the following location:

100 Summer St. Boston, MA 02110.

The off-site examination phase was performed at the offices of the Delaware Department of Insurance, hereinafter referred to as the "Department" or as "DDOI" and other appropriate locations.

The report of examination thereon is respectfully submitted.

## EXECUTIVE SUMMARY

Lexington Insurance Company was incorporated on March 31, 1965 under the laws of the State of Delaware. Its main administrative office is located at 100 Summer St. Boston, MA 02110.

As a Surplus Lines writer the Company focuses on insuring risks for which admitted writers cannot provide the insurance coverage, either because of the complexity of the risk or because the coverage does not lend itself to conventional insurance contracts.

This examination is a Delaware Baseline Examination in which the processes, procedures and controls utilized by the Company in its various business areas are reviewed and evaluated. The following business areas were reviewed: Company Operations/Management, Complaint Handling, Marketing and Sales, Producer Licensing, Policyholder Service, Underwriting and Claims Handling.

One area of concern was noted during the examination. The concern in Procedure 11, Complaint Handling, is with the Company's lack of follow-up on complaints pertaining to Independent Adjustors. See section C.2 for additional information regarding this issue.

## SCOPE OF EXAMINATION

While the basic business areas that are subject to a Delaware Market Conduct Examination vary depending on the type of insurer, all baseline examinations include, Company Operations/Management, Complaint Handling, Marketing and Sales, Producer Licensing, Policyholder Service, Underwriting & Rating and Claims.

This examination is comprised of two components. The first is a review of the Company's countrywide complaint patterns. This review is not a pass/fail test, rather, it determines whether or not there is a detectable pattern to the complaints the Company receives from all sources.

The second component is an analysis of the management of the various business areas subject to a Market Conduct Examination through a review of the written procedures and operating processes of the Company. This component also includes an analysis of how the Company communicates its instructions and intentions to its operational echelons, how it measures and monitors the results of those communications, and how it reacts to and modifies its communications based on the resulting findings of the measurement and monitoring activities. The examiners also determine whether or not this process is dynamic and results in enhanced compliance activities. Because of the predictive value of this form of analysis, focus can be directed on those areas where review indicators suggest that the process used by management does not appear to be achieving the appropriate levels of statutory and regulatory compliance.

All business areas noted above are addressed, to some extent, by one or more of the Procedures reviewed, thus providing a comprehensive view of the Company and its component operations.

This examination report is a report by exception rather than a report by test. This means that only those areas where a Recommendation for corrective action is made are detailed in this report.

## HISTORY AND PROFILE

Lexington Insurance Company was incorporated on March 31, 1965 under the laws of the State of Delaware and began business on April 1, 1965. The Company commenced business by assuming substantially all of the in-force business of the First State Insurance Company, also a Delaware corporation. At the time of incorporation, the Company was 100% owned by AIG, a Delaware holding company. On December 31, 1985, AIG transferred its ownership of the Company as follows: 70% to National Union Fire Insurance Company of Pittsburgh, PA, 20% to The Insurance Company of the State of Pennsylvania, and 10% to Birmingham Fire Insurance Company of Pennsylvania (now known as AIG Casualty Company), all of whom are member companies of AIG.

The Company writes substantially all Property and Casualty lines of business with a focus on Commercial business. The Company writes all classes of business insurance, including large commercial or industrial property insurance, excess liability, medical malpractice, inland marine, environmental, and excess and umbrella coverages. In addition, the Company also offers many specialized forms of insurance such as equipment breakdown, directors and officers' liability, difference in conditions, and various types of errors and omissions coverages. As a surplus lines insurer, the Company accepts business from licensed surplus lines brokers. The Company also serves as the lead participant in an inter-company pooling arrangement that is comprised of the Company and two affiliated companies, Landmark Insurance Company and AIG Excess Liability Insurance Company, Ltd. (formerly known as Starr Excess Liability Insurance Company, Ltd.).

## METHODOLOGY

This examination is based on the Standards and Tests for a Market Conduct Examination of a Property & Casualty Insurer found in Chapter VIII of the Delaware Market Conduct Examiners' Handbook. This chapter is derived from applicable Delaware Statutes, Rules and Regulations as referenced herein and the NAIC's *Market Conduct Examiners' Handbook* (2004 edition).

The types of review used in this examination fall into three general categories: generic, sample, and electronic.

A "generic" review is conducted through an analysis of general data gathered by the examiner or provided by the examinee in response to queries by the examiner.

A "sample" review is conducted through direct review of a random sample of files using a sampling methodology described in the Delaware Market Conduct Examiners' Handbook and the NAIC's *Market Conduct Examiners' Handbook*. Samples of complaint files, underwriting files and claim files were reviewed to determine that the processes described by the Company are actually used by the Company.

An "electronic" review is conducted through the use of a computer program or routine applied to a download of computer records of the examinee. This type of review typically reviews one hundred percent (100%) of the records of a particular type.

In this examination only two Standards were directly tested. The Procedures were tested through a combination of "generic" review and direct observation of the processes used. Each Standard contains a brief description of the purpose or reason for the Standard. The Procedure review does not include this description. The examiners' "Observations" are noted following both Standards and each Procedure where a "Recommendation" for corrective action is made.

## A. COMPANY OPERATIONS/MANAGEMENT

This examination report is not designed to be a pass/fail report except for the following two Standards dealing with appropriate licensure and cooperation with the examination process.

**Standard A 08**

NAIC's *Market Conduct Examiners' Handbook - Chapter VIII, §A, Standard 8*
**The Company is licensed for the lines of business that are being written.**
18 Del. C. §318(a), §505(b), §508(b)

The review methodology for this Standard is "generic." This Standard has a direct insurance statutory requirement. This Standard determines whether or not the Company's operations are in conformance with the Company's Certificate of Authority.

*Results:* Pass

*Observations:* The Company is licensed for the lines of business being written based upon a review of premium schedules and the Company's Delaware Certificate of Authority.

*Recommendation:* None

**Standard A 09**

NAIC's *Market Conduct Examiners' Handbook - Chapter VIII, §A, Standard 9*
**The Company cooperates on a timely basis with the examiners performing the examination.**
18 Del. C. §318(a), §320(c), §508(b), §520(b)3

The review methodology for this Standard is "generic." This Standard has a direct insurance statutory requirement. This Standard determines whether the Company is cooperating with the examiners in the completion of an open and cogent review of the Company's operations. Cooperation with the examiners in the conduct of an examination is not only required by statute, it is conducive to completing the examination in a timely manner thereby minimizing cost.

*Results:* Pass

*Observations:* The Company cooperated with the examiners in the conduct of the examination. All persons involved with the examination were cooperative and provided all requested information on a timely basis.

*Recommendation:* None

## B. COMPLAINTS

The evaluation of the Standards in this business area is based on the Company's response to various information requests (IRs) and their handling of complaint files at the Company. Delaware statute 18 Del. C. §2304(17) requires the Company to "…maintain a complete record of all complaints received." This statute also requires that "this record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of these complaints and the time it took to process each complaint." Delaware's definition of a complaint is: "… any written communication primarily expressing a grievance."

*Observations*: Based upon the examiners' review it appears that the Company maintains a complete and accurate Complaint Log. This was further confirmed during the review of the Company's claim and underwriting files wherein no additional complaints were found in these files.

The Company's Complaint Log listed 175 nationwide complaints received during the examination period. Of these 175 complaints a sample of fifty (50) files were selected for review. Of the fifty (50) files reviewed, five (5) were found to have errors, all of which pertained to complaints against independent adjustors used by Lexington. Refer to the discussion below pertaining to Procedure 11 – Complaint Handling.

## C. REVIEW OF PROCEDURES

The management of well-run companies generally has some processes that are similar in structure. These processes usually take the form of written procedures. While these procedures vary in effectiveness from company to company, the absence of these procedures or the ineffective application of them is often reflected in the failure of various examination Standards. The processes usually include:

- a planning function where direction, policy, objectives and goals are formulated
- an execution or implementation of the planning function elements
- a measurement function that considers the results of the planning and execution, and
- a reaction function that utilizes the results of measurement to take corrective action or to modify the process to develop more efficient and effective management of its operations.

The absence of written procedures that provide direction for company staff in its various operational areas tends to produce an inconsistent application of the intended process. The same is generally true of the absence of a means to measure the results of the application of procedures and a means to determine that the process is performing as intended.

The reviews in this section are not pass/fail measurements. Rather, they are intended to reflect those management strengths and weaknesses that have a bearing on regulatory compliance issues.

The following list itemizes all Procedures that were reviewed, but for which no concerns or recommendations were noted. Subsequent to this listing is a detailed explanation of the aforementioned Recommendation made for Procedure 11 – Complaint Handling.

## C.1. Procedures Reviewed but with No Recommendations

Procedure 01 – Audit (Internal and External)
Procedure 02 – Assertion of Privilege
Procedure 05 – Anti-Fraud
Procedure 07 – Managing General Agent (MGA) Oversight and Control
Procedure 08 – Vendor Oversight and Control
Procedure 09 – Customer and Consumer Privacy Protection
Procedure 10 – Production of Business
Procedure 13 – Advertising, Sales and Marketing
Procedure 14 – Agent Produced Advertising
Procedure 20 – Producer Selection, Appointment and Termination
Procedure 21 – Producer Defalcation
Procedure 22 – Prevention of the Use of Persons with a Felony Conviction
Procedure 24 – Premium Billing
Procedure 26 – Policy Issuance
Procedure 28 – Requesting Claim History
Procedure 30 – Premium Determination and Quotation
Procedure 32 – Underwriting and Selection
Procedure 34 – Terminations
Procedure 35 – Underwriting File Documentation
Procedure 40 – Staff Training
Procedure 43 – Claim Handling
Procedure 44 – Internal Claim Audit
Procedure 45 – Claim File Documentation
Procedure 48 – Catastrophic Claim Handling

## C.2. Procedures Reviewed with a Recommendation

Procedure 11 – Complaint Handling

The Company's handling of the investigation of complaints concerning independent adjustors was not adequately documented. In the review of the complaints, there were five (5) exceptions noted, all related to this same issue. Although the Company resolved all of the other aspects of the complaints, these five (5) files did not contain evidence of the Company's investigation into the allegations pertaining to the Independent Adjustors. Without specific documentation it is not clear that the Company actually investigated the allegations.

The Company stated that it is standard procedure for the Legal Department to notify the Claims Department of all complaints received, including those involving independent adjusters. The Claims Department is then supposed to investigate the allegations and resolve any outstanding issues. The Company's written Complaint Handling Procedure does state that all parties cited in the complaint are to be investigated. However, there is no specific language in the Company's Procedures addressing complaints made against an Independent Adjustor, the requirements for that complaint investigation and the documentation needed for that investigation.

An Independent Adjustor does not have the same relationship with the Company as an agent or an employee. While the Company's current procedures require all parties cited in a complaint to be investigated, it is not clear that this requirement applies to Independent Adjustors.

Adjustors are generally used to evaluate the merits of a claim and to make recommendations to the company regarding the benefits that might be payable for the claim. An Independent Adjustor is an independent contractor who adjusts claims for different insurance companies on an as-needed basis. Companies whose financial resources or volume of claims may not require employing their own in-house adjustors generally use the services of an Independent Adjustor.

Since there was no evidence in the complaint files that the Company investigated the five (5) complaints received pertaining to the Independent Adjustors, then either the Company's personnel did not know to, or simply did not, follow-up on these allegations.

Given the nature of the allegations in these complaints [*i.e.,* lack of punctuality, lack of communication, rudeness, lack of knowledge of claim handling standards, excessive time delays, and lack of claim file documentation] the Company should communicate its own Claim Handling Standards and expectations to all Independent Adjustors it contracts with to ensure that all claims are handled properly.

*Recommendation*: It is recommended that the Company add specific instructions to its Complaint Handling Procedures stating that any complaints pertaining to an Independent Adjustor be handled in the same manner as any other complaint. It is recommended that these instructions also address the Company's Claim Handling Standards and Investigation Standards. Finally, it is recommended that the Company communicate its own Claim Handling Standards and expectations to all Independent Adjustors with which it contracts.

**CONCLUSION**

The examination was conducted by Brian Tinsley, Sean Connolly, Nobu Koch and Cynthia Amann and is respectfully submitted.

Brian Tinsley
Market Conduct Examiner-in-Charge
Insurance Department
State of Delaware

Cynthia M Amann
Market Conduct Supervising Examiner
Insurance Department
State of Delaware